## STATE OF CONNECTICUT *v.* DANIEL WEBB
### (14409)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.[1]

[1] This case first was argued to this court before Justices Callahan, Borden, Berdon, Norcott and Katz, on November 3, 1995. The panel was then expanded to include the entire court and the matter was reargued before the court en banc. The two additional members of the court, Chief Justice Peters and Justice Palmer, read the transcript of the previous argument prior to reargument, and the parties were invited to focus their reargument on the issue of whether the death penalty constitutes cruel and unusual punishment in violation of the Connecticut constitution.

Because various members of the court had disqualified themselves in each of the prior capital felony cases, this case constitutes the first capital felony case considered by the entire court. In this case, the parties have waived any potential disqualification of any member of the court.

Argued December 1, 1995—officially released July 30, 1996

*John R. Williams* and *Norman A. Pattis*, for the appellant (defendant).

*Timothy J. Sugrue*, executive assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Rosita M. Creamer* and *Dennis J. O'Connor*, senior assistant state's attorneys, and *Harry Weller*, assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals, following a jury trial, from the judgment of conviction of capital felony in violation of General Statutes § 53a-54b (5),[2] of murder

---

[2] General Statutes § 53a-54b provides in relevant part: "Capital felony. A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . ."

in violation of General Statutes § 53a-54a,[3] of felony murder in violation of General Statutes § 53a-54c,[4] of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B),[5] of criminal attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70[6] and 53a-49,[7] and of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217,[8] and from the imposition

---

[3] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[4] General Statutes § 53a-54c provides in relevant part: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit . . . kidnapping [or] sexual assault in the first degree . . . and, in the course of and in furtherance of such crime or of flight therefrom, he . . . causes the death of a person other than one of the participants . . . ."

[5] General Statutes § 53a-92 provides in relevant part: "Kidnapping in the first degree: Class A felony. (a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony . . . ."

[6] General Statutes § 53a-70 provides in relevant part: "Sexual assault in the first degree: Class B felony: One year not suspendable. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[7] General Statutes § 53a-49 provides in relevant part: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[8] General Statutes § 53a-217 provides in relevant part: "Criminal possession of a firearm or electronic defense weapon: Class D felony. (a) A person is guilty of criminal possession of a firearm or electronic defense weapon when he possesses a firearm or electronic defense weapon and has been convicted of a capital felony, a class A felony, except a conviction under section 53a-196a, a class B felony, except a conviction under section 53a-86, 53a-122 or 53a-196b, a class C felony, except a conviction under section

of the sentence of death by electrocution.[9]

In June, 1991, the defendant, Daniel Webb, was tried before a jury on charges of capital felony, murder, felony murder, kidnapping in the first degree, criminal attempt to commit sexual assault in the first degree, and criminal possession of a pistol or revolver. The jury returned a verdict of guilty on all counts. In July, 1991, the trial court conducted a separate sentencing hearing, pursuant to General Statutes § 53a-46a,[10] before the

53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216. For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction. . . ."

[9] The defendant appeals from the judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b). He also seeks review of the sentence of death pursuant to General Statutes § 53a-46b, which provides for mandatory review by this court of any sentence of death.

[10] General Statutes § 53a-46a provides in relevant part: "Hearing on imposition of death penalty. Aggravating and mitigating factors. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the

admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict as provided in subsection (e) that (1) the defendant committed the offense

same jury. The jury returned a special verdict finding that the state had proved two aggravating factors beyond a reasonable doubt, and that the defendant had not proved a mitigating factor by a preponderance of the evidence. After the trial court, *Corrigan, J.*, rendered its judgment of conviction in accordance with the jury's verdict, and imposed on the defendant a sentence of death by electrocution, this appeal followed. The defendant raises claims challenging particular actions of the trial court during the guilt and penalty phases of the trial, challenging the constitutionality of various aspects of the capital sentencing statutes, and challenging the constitutionality of the statute providing for mandatory proportionality review by this court of death sentences. We affirm the defendant's conviction on all counts. We also affirm the imposition of the sentence of death.

Subsequent to the defendant's conviction and sentencing, the legislature amended General Statutes § 54-100.[11] The effect of the amendment is to require that

during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony . . . or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

[11] Public Acts 1995, No. 95-16, which amended General Statutes § 54-100, provides: "Section 54-100 of the general statutes is repealed and the following is substituted in lieu thereof:

"The method of inflicting the punishment of death shall be by [electrocution] CONTINUOUS INTRAVENOUS INJECTION OF A SUBSTANCE OR SUBSTANCES IN A QUANTITY SUFFICIENT TO CAUSE DEATH, IN ACCORDANCE WITH PROCEDURES PRESCRIBED BY THE COMMISSIONER OF CORRECTION IN CONSULTATION WITH THE COMMISSIONER OF PUBLIC HEALTH AND ADDICTION SERVICES. The [warden of the Connecticut Correctional Institution, Somers, is directed] COMMISSIONER SHALL DIRECT A WARDEN OF AN APPROPRIATE CORRECTIONAL INSTITUTION to appoint a suitable person to perform the duty of executing sentences of the court requiring the infliction of the death penalty. Such person shall receive, for such duty, such compensation as is determined by the [directors of the Connecticut Correctional Institution, Somers] COMMISSIONER. When any person is sentenced TO DEATH by any court of

the defendant's death sentence be carried out by means of lethal injection rather than by electrocution. Because the defendant requests the opportunity to challenge the constitutionality of execution by lethal injection, we remand the case to the trial court for a hearing limited to that issue.

The jury reasonably could have found the following facts. On August 24, 1989, the defendant's girlfriend, Rosa Billington, allowed him to borrow her car, a brown Mercury Zephyr bearing the license plate 598-FUT. At approximately noon, the defendant drove Billington's car into the Talcott Plaza parking garage in downtown Hartford. The defendant's finger and palm prints are on a parking stub from the garage, dated August 24, 1989.

The victim worked at the Talcott Plaza building and, as an employee of Connecticut National Bank, she possessed parking privileges in the parking garage. On August 24, 1989, the victim had a lunchtime appointment with a West Hartford real estate agent. She telephoned the real estate agent for directions at 12:05 p.m. At 12:13 p.m., a security camera recorded the victim as

this state having competent jurisdiction, [to be electrocuted,] he shall, within twenty days after final sentence, be conveyed to [the Connecticut Correctional Institution, Somers,] AN APPROPRIATE CORRECTIONAL INSTITUTION and such punishment shall be inflicted only within the walls of said institution, [in Somers,] within an enclosure to be prepared for that purpose under direction of the warden of [the Connecticut Correctional Institution, Somers, and the board of directors thereof, which] SAID INSTITUTION. SUCH enclosure shall be so constructed as to exclude public view. Besides the warden or deputy warden and such number of [guards] CORRECTION OFFICERS as he thinks necessary, the following persons may be present at the execution, but no others: The sheriff of the county in which the prisoner was tried and convicted, the [board of directors, the] COMMIS-SIONER, A physician of [the Connecticut Correctional Institution, Somers, the] A CORRECTIONAL INSTITUTION, A clergyman in attendance upon the prisoner and such other adults, as the prisoner may designate, not exceeding three in number, representatives of not more than five newspapers in the county where the crime was committed, and one reporter for each of the daily newspapers published in the city of Hartford."

she entered an elevator in the Talcott Plaza building. She never arrived at her appointment.

The defendant abducted the victim at gunpoint from the parking garage, forcing her into his girlfriend's car. Driving for approximately twelve minutes, he took her to Keney Park, which is nearly four miles away from downtown Hartford. At the park, the defendant forcibly removed or forced the victim to remove her shoes, pantyhose and panties. The defendant then attempted to assault the victim sexually. The victim struggled, resulting in rips to her clothing and a scratch to the defendant's face. When she broke free of the defendant and sought to escape, he shot her twice in the back, causing her to fall to the ground. These wounds caused the victim to experience significant hemorrhaging and excruciating pain.

After she was shot, the victim began crawling away from the defendant, screaming as many as six times, "help, help, help, someone please help me, help me." At some point, she began to cough blood. As she crawled away, the defendant returned to Billington's car and drove it to the victim's location. When there, he exited the car and stood in front of her. At that point, as much as three minutes had passed since the defendant had fired the two shots that had struck the victim in the back. The defendant then shot the victim three more times, once in the chest, once in the ear and, finally, point blank in the face. When he shot her the last time, the defendant bent down and held the gun so close to the victim's face that her skin bore stippling from the hot gunpowder. The defendant then returned to the car and drove out of the park.

Three witnesses had heard the gunshots and the victim's screams for help, and had seen the brown car

leaving the park.[12] One of the witnesses, Anthony Bibbins, followed a Mercury Zephyr with the license plate 598-FUT, until it was parked, and during that time he saw the defendant change his shirt. When Bibbins saw a police cruiser speeding toward Keney Park, he returned to the park. Bibbins then led the police to the neighborhood where he had seen the defendant park Billington's car. They found the car parked on the street where Billington lived. Approximately three minutes before the police arrived, Theresa Thomas had observed the defendant, whom she knew, park the car and ride away on a bicycle. Officer Mark Lumpkin, who also knew the defendant, saw him riding a bicycle in the area at approximately the same time.

The police officers who arrived at Keney Park found the victim lying on the ground in a pool of blood. She had been bleeding from her mouth and face, and her clothing was soaked with blood. Her feet and hands were soiled with dirt, and dirt and debris were lodged under her fingernails. Her clothing was torn and her panties, pantyhose and one shoe were found approximately 100 feet from her body. Seven .38 caliber bullet casings were found, six of which were designed for specially enhanced bullets with more power than ordinary .38 caliber ammunition. At least two of the bullets later removed from the victim's body possessed hollow points, which are designed to expand upon contact and cause greater damage to their target than ordinary bullets.

The defendant voluntarily went to Hartford police headquarters in the late afternoon of the day of the murder. There he was arrested and charged with the murder of the victim. After his arrest, the defendant

[12] One of the witnesses, Willie Woodard, saw the defendant stand in front of the victim and shoot her. Woodard positively identified the defendant as the person who had fired the shots.

resisted when police officers attempted to test his hands for gunpowder residue, and the officers were forced to subdue him physically and pry open his hands. Both of the defendant's hands tested positive for lead, one of the three principal elements in gunpowder. Similarly, the outside driver's door handle of Billington's car tested positive for lead, and the inside driver's door handle showed traces of all three principal gunpowder elements, lead, barium and antimony. Fibers removed from the victim's clothing were microscopically similar to fibers taken from the carpet of Billington's car. Hair found inside the car was microscopically indistinguishable from the victim's hair. The victim's fingerprints were discovered on the exterior of the windshield on the passenger side of Billington's car.

On appeal, the defendant raises more than thirty claims that, he asserts, require us to reverse his conviction and the imposition of the death penalty.[13] We address the defendant's claims in six main parts. First, we consider the defendant's facial challenge, under the state constitution, to the constitutionality of the death penalty statutes. Second, we consider the defendant's claims of error during the guilt phase of his trial. Third, we consider the defendant's challenge to the constitutionality of the statutory bifurcated trial procedure for determining guilt and penalty in capital felony cases. Fourth, we consider the defendant's claims of error during the penalty phase of his trial. Fifth, we consider the defendant's claim that this case should be remanded to the trial court in order to allow him to challenge the constitutionality of execution by lethal injection. Sixth, we consider the defendant's challenges to the constitutionality of the mandatory proportionality review statute, and we review the defendant's sentence of death

---

[13] The defendant does not challenge the sufficiency of the state's evidence on any of the six crimes for which he was convicted.

to determine whether it is excessive or disproportionate to the penalty imposed in similar cases.

# I

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTES

The defendant first claims that the death penalty statutes facially violate the right to due process guaranteed by article first, §§ 8 and 9, of the Connecticut constitution,[14] and the prohibition against cruel and unusual punishment of the eighth amendment to the United States constitution.[15] We disagree.

## A

### State Constitutional Claim

The defendant challenges the facial validity of the death penalty statutes under article first, §§ 8 and 9, of the state constitution. Although this court previously has concluded that Connecticut's death penalty statutes do not violate the due process clauses of article first, §§ 8 and 9, the defendant urges us to reexamine those conclusions in conjunction with an analysis of a constitutional provision not at issue in our prior decisions,

---

[14] The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[15] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The eighth amendment is made applicable to the states through the fourteenth amendment. *Robinson* v. *California*, 370 U.S. 660, 666, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

The defendant also challenges the constitutionality of the death penalty statutes as applied to him. We consider those claims, as necessary, in subsequent parts of this opinion.

namely, the social compact clause of article first, § 1.[16] The defendant claims that, as a result of this analysis, we should conclude that article first, §§ 8 and 9, together with article first, § 1, prohibit the imposition of the death penalty. We reject the defendant's claim and reaffirm our prior constitutional holdings.

1

In *State* v. *Ross*, 230 Conn. 183, 245–52, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), we rejected a claim that the state constitution categorically forbids the imposition of the death penalty because death constitutes cruel and unusual punishment. We first concluded that the due process clauses of the state constitution impliedly prohibit punishment that is cruel and unusual. Id., 245–47. We then considered the claim, based on the state constitution, that the death penalty constitutes cruel and unusual punishment because it does not comport with contemporary standards of decency and civilization. Id., 248. In our analysis of this claim, we considered the six factors that we have previously declared to be relevant to this court's interpretation of the provisions of our state constitution: (1) the text of the constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms. Id., 249; see *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).

On the basis of this analysis, this court rejected the defendant's claim in *Ross*. "The first five factors do not

---

[16] The constitution of Connecticut, article first, § 1, provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

support the defendant's argument. In article first, § 8, and article first, § 19, our state constitution makes repeated textual references to capital offenses and thus expressly sustains the constitutional validity of such a penalty in appropriate circumstances. Connecticut case law has recognized the facial constitutionality of the death penalty under the eighth and fourteenth amendments to the federal constitution. See, e.g., *State* v. *Davis*, 158 Conn. 341, 358, 260 A.2d 587 (1969), vacated and remanded on other grounds, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972). Federal constitutional law does not forbid such a statute outright. *Gregg* v. *Georgia*, [428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)]. Courts in the overwhelming majority of our sister states have rejected facial challenges to the death penalty under their state constitutions.[17] Finally, Connecticut's history has included a death penalty statute since 1650, when it was incorporated into Ludlow's Code;[18] see 3 N. Osborn, History of Connecticut (1925)

---

[17] "See, e.g., *Gilreath* v. *State*, 247 Ga. 814, 279 S.E.2d 650 (1981), cert. denied, 456 U.S. 984, 102 S. Ct. 2258, 72 L. Ed. 2d 862 (1982); *State* v. *Ramseur*, 106 N.J. 123, 524 A.2d 188 (1987); *Commonwealth* v. *Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S. Ct. 2444, 77 L. Ed. 2d 1327 (1983); *State* v. *Campbell*, 103 Wash. 2d 1, 691 P.2d 929 (1984), cert. denied, 471 U.S. 1094, 105 S. Ct. 2169, 85 L. Ed. 2d 526 (1985).

"Thirty-seven states have passed death penalty statutes since 1972. See R. Pascucci, E. Strauss & G. Watchman, 'Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency,' 69 Cornell L. Rev. 1129, 1217 (1984). In the only two states in which the death penalty was held to have been facially unconstitutional as cruel and unusual punishment; *People* v. *Anderson*, 6 Cal. 3d 364, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972), and *District Attorney* v. *Watson*, 381 Mass. 648, 411 N.E.2d 1274 (1980); amendments to the state constitution promptly rejected these decisions. J. Acker & E. Walsh, 'Challenging the Death Penalty under State Constitutions,' 42 Vand. L. Rev. 1299, 1331 (1989)." *State* v. *Ross*, supra, 230 Conn. 250 n.30.

[18] "Capital punishment existed even prior to the adoption of Ludlow's Code in 1650. The laws of 1642 made idolatry, witchcraft, blasphemy, murder, bestiality, adultery, rape, kidnapping and false witnessing punishable by death. G. Clark, A History of Connecticut (2d Ed. 1914) p. 444." *State* v. *Ross*, supra, 230 Conn. 250 n.31.

pp. 24–25; and such a penalty was considered constitutional at the time of the adoption of the constitution of 1818.[19]

"We must therefore decide whether contemporary understandings of applicable economic and sociological norms compel the conclusion that any death penalty constitutes cruel and unusual punishment. The question is not whether any one of us would vote to enact a death penalty if our role were that of a legislator. It is, rather, whether the defendant is correct in his contention that the death penalty is so inherently cruel and so lacking in moral and sociological justification that it is unconstitutional on its face because it is fundamentally offensive to evolving standards of human decency. Stated so categorically, we are unpersuaded by the defendant's contention. Judicial evaluation of evolving standards of human decency cannot proceed in a vacuum. Community standards of acceptable legislative policy choices are necessarily reflected in the text of our constitutional document, in our history and in the teachings of the jurisprudence of our sister states as well as that of the federal courts. While we should not blindly follow a beaten path, we agree with the New Jersey Supreme Court's cogent observation: 'When, in the course of a decade, thirty-seven states call for the death penalty, the probability that the legislature of each state accurately reflects its community's standards approaches certainty.' *State* v. *Ramseur*, 106 N.J. 123, 173, 524 A.2d 188 (1987)." *State* v. *Ross*, supra, 230 Conn. 249–51.

We then concluded that, although the death penalty is not cruel and unusual punishment prohibited by the

---

[19] "The constitution of 1818 declared in relevant part: '[N]o person shall be holden to answer for any crime, the punishment of which is death or imprisonment for life, unless on a presentment or indictment of a grand jury.' G. Clark, A History of Connecticut (2d Ed. 1914) p. 89." *State* v. *Ross*, supra, 230 Conn. 250 n.32.

state constitution, the imposition of the penalty must conform to constitutional constraints. We held that "the due process clauses of our state constitution incorporate the principles underlying a constitutionally permissible death penalty statute that the United States Supreme Court has articulated in [its capital jurisprudence]. These principles require, as a constitutional minimum, that a death penalty statute, on the one hand, must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably and, on the other hand, must permit the sentencing judge or jury to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular offense. Our death penalty statute, § 53a-46a, meets these minimum state constitutional law requirements." Id., 252.

One year later, in *State* v. *Breton*, 235 Conn. 206, 217–18, 663 A.2d 1026 (1995), we considered another challenge to the facial validity of the death penalty statutes. In that case, the defendant acknowledged that this court had already considered and rejected his constitutional claims in *Ross*, but nonetheless asked the court to reconsider the conclusions reached in that case. We held that, "[u]pon review of the merits of the defendant's claims, we are persuaded that our constitutional holdings in *Ross* should be affirmed. Accordingly, for the reasons stated in *Ross*, we reject the defendant's challenges to our capital sentencing scheme that he makes under both the federal and state constitutions . . . ." Id., 218. This court specifically rejected the defendant's claim that the death penalty constitutes cruel and unusual punishment impliedly prohibited by article first, §§ 8 and 9, of the state constitution because, "for the reasons enumerated in *Ross* . . . the death penalty is not per se prohibited by [those provisions] of the state constitution." Id.

This defendant, like the defendants in *Ross* and *Breton*, also challenges the constitutionality of the death penalty statutes under the due process clauses provided in article first, §§ 8 and 9, of our state constitution. We recognize, nonetheless, the legitimacy of the defendant's willingness to mount a challenge that mirrors that rejected in *Ross* and *Breton*, because this case provides us with our first opportunity to consider this issue en banc. Accordingly, we now reaffirm the conclusion reached by this court in *Ross* and *Breton*, that the imposition of the death penalty does not violate the prohibition against cruel and unusual punishment derived from the due process clauses of article first, §§ 8 and 9, of the state constitution. We also adopt the reasoning by which we had reached that conclusion. We further affirm that a sentence of death must be imposed, if at all, within the constitutional constraints articulated in those opinions and the federal precedents upon which those constraints are based.

2

The defendant also claims that the death penalty constitutes cruel and unusual punishment in violation of article first, §§ 8 and 9, but he argues that this claim can be resolved properly only if these provisions are interpreted in conjunction with a provision of the state constitution that was not raised in *Ross* or *Breton*, namely, the social compact clause of article first, § 1. Specifically, the defendant argues that the social compact clause incorporates social contract theory into the state constitution, requiring us to declare invalid those acts of the legislature that exceed the scope of the social compact. Moreover, the defendant argues, individuals enter into the social compact in order to secure their self-interest and self-preservation and, therefore, they would never consent to a compact that permitted the government to deprive them of their lives. Thus, the defendant contends that members of the social compact

retain an absolute natural right to life. From this premise, the defendant argues that we must conclude that the legislature's enactment of the death penalty statutes exceeded its authority as limited by the social compact and, as a result, that the statutes violate the due process clauses of our state constitution, when construed with the social compact clause. We are not persuaded.

"In our assessment of whether the statute passes constitutional muster, we proceed from the well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . The burden of proving unconstitutionality is especially heavy when, as at this juncture, a statute is challenged as being unconstitutional on its face." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 236.

In *Moore* v. *Ganim*, 233 Conn. 557, 581, 660 A.2d 742 (1995), we recently rejected a claim, based in part upon the social compact clause of article first, § 1, that the state constitution guarantees an unenumerated right to minimal subsistence. We explained that "[t]he social compact theory posits that all individuals are born with certain natural rights and that people, in freely consenting to be governed, enter a social compact with their government by virtue of which they relinquish certain individual liberties in exchange 'for the mutual preservation of their lives, liberties, and estates.' J. Locke, 'Two Treatises of Government,' book II (Hafner Library of Classics Ed. 1961) ¶ 123, p. 184; see also 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) pp. 12–13." *Moore* v. *Ganim*, supra, 598. Equating social compact theory with natural law, we rejected the plaintiffs' claim that these concepts give rise to such an unenumerated right to subsistence. Id., 600.

Moreover, in *State* v. *Joyner*, 225 Conn. 450, 465–72, 625 A.2d 791 (1993), we explicitly rejected the argument that natural law principles give rise to unenumerated constitutional rights. Specifically, we rejected a claim that natural law principles require, as a matter of constitutional law, that the state bear the burden of establishing the sanity of a criminal defendant. In that case, we examined the historical role of natural law in our constitutional system.

"According to Professor Philip A. Hamburger, eighteenth century Americans understood natural liberty to be the freedom of individuals in the state of nature, while they recognized certain other rights, such as habeas corpus and jury rights, as existing only under the laws of civil government. P. Hamburger, 'Natural Rights, Natural Law, and American Constitutions,' 102 Yale L.J. 907, 918–22 (1993). 'In accordance with their understanding of natural law, Americans assumed that, under civil government, individuals retained only a portion of their natural liberty. They assumed that individuals retained only such natural rights as were reserved by a constitution or, much less securely, were left unimpeded by their other civil laws.' Id., 930." *State* v. *Joyner*, supra, 225 Conn. 468–69.

" 'When saying that constitutions and other civil laws should be formulated to reflect natural law, Americans typically were not suggesting that natural law was a kind of constitutional law or a source for constitutional rights not protected by a written constitution. On the contrary, under modern natural rights analysis, constitutional law and natural law were quite distinct from one another and played very different roles.' [P. Hamburger, supra, 938]. 'Far from being a form of constitutional law, natural law typically was assumed to be the reasoning on the basis of which individuals adopted constitutions and a means by which the people could measure the adequacy of their constitutions.' Id., 940.

'Although Americans often discussed constitutional guarantees of natural rights in terms of natural law, they did not broadly incorporate natural law into their constitutions and usually did not question the positive character of these documents.' Id., 954.

"Professor Hamburger's analysis suggests that our forebears did not understand natural law to be a source of expansive, unlimited rights that the civil law was prohibited from subjecting to substantial statutory restrictions." *State* v. *Joyner*, supra, 225 Conn. 469–70. On the basis of this analysis, we refused to adopt, as a matter of constitutional law, a natural right to be free of the burden of proving one's insanity as a defense to a criminal prosecution. Id., 470.

In the present case, the defendant concedes that his argument that the social compact protects his natural right to life from government infringement requires us to accept the premise that natural law serves as an unwritten source of constitutional rights. The defendant further concedes that "the concept of natural law, and the rights that flow therefrom, can be ambiguous. . . . However, there can be nothing more basic . . . than the right to life." Thus, as the defendant acknowledges, the concepts of the social compact and of natural law as sources of unenumerated constitutional rights are intertwined. Indeed, we have treated the two as functionally the same. See *Moore* v. *Ganim*, supra, 233 Conn. 600–601. We now, therefore, reaffirm our explicit holding in *Joyner*, and the clear implication derived from *Joyner* and *Moore*, that neither the social compact clause nor its counterpart, natural law, constitutes a source of unenumerated rights under our constitutional scheme.

Although we have rejected natural law and the social compact clause as sources of unenumerated rights, we nevertheless have concluded that citizens of our state

may possess certain such unwritten constitutional rights. See, e.g., *State* v. *Ross*, supra, 230 Conn. 246 (implied prohibition against cruel and unusual punishment derived from due process clauses of article first, §§ 8 and 9); *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962) (double jeopardy prohibition derived from due process clause of article first, § 9). Unenumerated rights exist, if at all, however, only if they are grounded in or derived from the constitutional text or Connecticut's unique historical record.[20]

In the present case, we have rejected the defendant's textual argument that the social compact clause incorporates social contract theory and natural law into our constitution. The defendant does not argue that other textual provisions or the historical record supports his claim that he possesses an absolute natural right to

_____

[20] It is true that, on three occasions in the nineteenth century, this court referred to the social compact clause in discussing the issues before it. In *Jackson* v. *Bulloch*, 12 Conn. 38, 42–43 (1837), the court held that slaves were not protected by article first, § 1, because they were not members of the social compact. In *Goshen* v. *Stonington*, 4 Conn. 209, 221 (1822), the court, in dictum, indicated that certain statutes that retrospectively impaired vested rights might be contrary to the social compact. Similarly, in *Welch* v. *Wadsworth*, 30 Conn. 149, 155 (1861), the court relied on *Goshen* for the proposition that retrospective laws may violate the principles of the social compact. In none of these cases, however, did the court invalidate a statute because the statute contravened the social compact referred to in article first, § 1.

Furthermore, although in *Moore* v. *Ganim*, supra, 233 Conn. 601, we assumed, for the purposes of that opinion, "that the framers believed that individuals would continue to possess certain natural rights even if those rights were not enumerated in the written constitution," we did not mean to suggest by that assumption that either the social compact clause or the concept of natural law could serve as the source of such rights. As we stated in *Moore*, and as we now reaffirm, any such rights must be derived from our constitutional text or historical record. Id., 601; see also id., 626–27 (*Peters*, *C. J.*, concurring) ("[i]n determining what claims rise to the level of unenumerated constitutional rights and assessing the scope of such rights . . . we must take care not to extend such rights beyond the contours that the historical record supports").

life.[21] Thus, we conclude that the social compact clause of article first, § 1, does not confer a natural right to life that the legislature, operating under appropriate constitutional constraints regarding death penalty legislation, cannot take away.

Anticipating our rejection of his textual argument, the defendant urges us to interpret the constitution "within the context of the times." We agree that, as we engage over time in the interpretation of our state constitution, we must consider the changing needs and expectations of the citizens of our state. As we have previously stated, "[t]he Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes*, 209 Conn. 98, 115, 547 A.2d 10 (1988). There is no persuasive evidence, however, that those changing needs and expectations require the conclusion that the legislature cannot constitutionally enact death penalty legislation, and that such legislation would impair the contemporary effectiveness of our constitution for our citizens. Indeed, as we stated in *Ross*, the enactment of the death penalty statutes by our elected representatives provides strong evidence of the contrary proposition. *State* v. *Ross*, supra, 230 Conn. 251 (legislature's enactment of statutes permitting imposition of death penalty accurately reflects "community standards" and "evolving standards of human decency").

Thus, we conclude that the social compact clause does not incorporate into our constitution social contract theory and its corollary, natural law, or an unenumerated absolute natural right to life. Accordingly, we

---

[21] Indeed, we have previously noted that the constitutional text and historical record support the constitutionality of the death penalty statutes. *State* v. *Ross*, supra, 230 Conn. 249–50.

affirm our prior constitutional holdings that the death penalty statutes do not facially violate the due process clauses of article first, §§ 8 and 9.

### B

### Federal Constitutional Claim

The defendant also raises a federal constitutional challenge to § 53a-46a (f). Section 53a-46a (f) provides that the death penalty shall be imposed if the capital sentencer finds at least one aggravating factor and no mitigating factor. Specifically, the defendant claims that this statute violates the eighth amendment to the federal constitution because the "mechanistic" nature of the statute prevents the sentencer from arriving at an individualized sentencing determination based on a reasoned moral response to the penalty phase evidence. This claim is foreclosed by this court's decision in *State* v. *Ross*, supra, 230 Conn. 235–41, in which we previously considered and rejected an identical claim.[22]

### II

### GUILT PHASE CLAIMS

The defendant next challenges certain actions taken by the trial court during the guilt phase of his trial. The defendant's first claims concern his right to counsel. Specifically, the defendant claims that the trial court improperly: (1) failed to disqualify his attorneys because they possessed a conflict of interest; (2) failed to grant his request for new counsel; and (3) failed to canvass him adequately prior to allowing him to waive his right to counsel.

The defendant also challenges the trial court's conduct of jury voir dire, claiming that the trial court

---

[22] In part VI B 5 of this opinion, we resolve the defendant's federal constitutional claim that the capital sentencer's ability to consider "mercy" as a mitigating factor renders its penalty determination standardless and arbitrary.

improperly: (1) excused for cause venirepersons who were opposed to the death penalty; (2) permitted the use of a venire panel selected on a nonrandom, racial basis; (3) deprived him of his right to a jury drawn from a fair cross section of the community; and (4) failed to inquire adequately of certain venirepersons who may have seen him in shackles. Additionally, the defendant claims that the trial court improperly instructed venirepersons and jurors to ignore "women's intuition" during preliminary instructions concerning reasonable doubt. Finally, the defendant claims that the trial court improperly failed to recuse itself. We conclude that none of these claims requires reversal of the defendant's convictions.

## A

### Right to Counsel Claims

The defendant claims that the trial court improperly: (1) failed to appoint new counsel because his trial attorneys possessed a conflict of interest; (2) failed to appoint new counsel after a breakdown in communications occurred between the defendant and his attorneys; and (3) failed to conduct an adequate canvass of him prior to allowing him to represent himself. We disagree.

### 1

We first consider the defendant's claim that the trial court improperly failed to disqualify his trial attorneys because they possessed a conflict of interest. The defendant argues that the trial court violated his right to the effective assistance of counsel, guaranteed by the sixth amendment to the United States constitution,[23]

[23] The defendant claims a violation of both the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. He assumes, however, that our review of this claim under the state and federal constitutions is identical. "Although we have, in the context of the right to the effective assistance of counsel, stated that 'the state and federal constitutional standards for review of ineffective assistance of coun-

by failing to disqualify the public defenders representing him despite the fact that a witness for the state was employed by the public defender's office.[24]

On December 18, 1990, the state filed a motion to disqualify the public defender's office from representing the defendant because the state intended to call as a "crucial" witness William Paetzold, who had formerly been employed by the state as a criminologist. After Paetzold testified at the probable cause hearing, he had been hired as an assistant public defender and was engaged as such in geographical area number nineteen at Rockville. The state argued that Paetzold belonged to the same "firm" as the defendant's trial attorneys and, therefore, the trial attorneys should be disqualified because of this alleged conflict of interest.

A special public defender was appointed to represent the defendant solely for the purposes of the state's

sel claims are identical'; *Aillon* v. *Meachum*, 211 Conn. 352, 355–56 n.3, 559 A.2d 206 (1989); we have more often and recently insisted on a separate and independent analysis of our state criminal constitutional provisions." *Phillips* v. *Warden*, 220 Conn. 112, 131 n.15, 595 A.2d 1356 (1991). Because the defendant presents no separate and independent state constitutional analysis, we review only his claim of a sixth amendment violation.

[24] We have previously held that claims of ineffective assistance of counsel should be pursued on a petition for a new trial or on a petition for a writ of habeas corpus rather than on direct appeal. *State* v. *Leecan*, 198 Conn. 517, 541–42, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). We reasoned that a claim of incompetent counsel will generally require an evidentiary hearing because "[t]he trial transcript seldom discloses all of the considerations of strategy that may have induced counsel to follow a particular course of action." Id., 541. In the present case, however, the defendant does not claim ineffective assistance due to attorney incompetence or error. Rather, he claims, based on the undisputed facts in the record, that, as a matter of law, judicial conduct denied him his sixth amendment right to counsel. Because the defendant's claims do not require further evidentiary development, unlike the usual claims of attorney incompetence, as well as some conflict of interest claims; see, e.g., *Phillips* v. *Warden*, 220 Conn. 112, 595 A.2d 1356 (1991); but may be resolved as a matter of law upon review of the existing record, we will review them on direct appeal. See *State* v. *Rodriquez*, 200 Conn. 685, 694–97, 513 A.2d 71 (1986) (reviewing conflict of interest claim but refusing to review claim of ineffective assistance).

motion. The trial court, *Damiani, J.*, held in camera discussions and two hearings concerning the state's motion. The state withdrew the motion at the second hearing on March 1, 1991. At that time, the trial court asked the defendant whether he wished to have his trial counsel disqualified. On the advice of his specially appointed counsel, the defendant remained silent. The trial court informed the defendant that if he wanted his attorneys to be dismissed from the case "this Court will be inclined to do so." The trial court expressed its concern, however, that "for myself unilaterally to simply dismiss them from the case would be denying Mr. Webb his counsel of choice." After the defendant refused to respond to the court's inquiry, the trial court decided that the defendant's trial counsel should not be disqualified.

On May 10, 1991, during jury selection, the defendant asked the trial court, *Corrigan, J.*, to remove his counsel and appoint counsel independent of the public defender's office. Among the reasons he proffered for his request was that the state intended to call Paetzold to testify. The defendant argued that the jury would be prejudiced if it learned that a state's witness worked for the public defender's office, because the jury might conclude that Paetzold possessed "inside information." When the trial court assured the defendant that none of the attorneys in the case would elicit from Paetzold the fact that he was employed by the public defender's office, the defendant informed the court that he was satisfied with that resolution of his concerns about the possible conflict of interest raised by the state's intention to call Paetzold as a witness.[25]

---

[25] Upon the court's request that the defendant specify any other reason that he believed a conflict of interest existed, the defendant stated as follows:

"The Defendant: Well, there's no more conflicts on that issue, as to Paetzold, you know, other than—

"The Court: As to Paetzold, you're satisfied that none of the counsel in this case would be allowed to ask whether he's now presently employed

The defendant now claims that the court, *Damiani, J.,* should have disqualified his trial attorneys when the alleged conflict of interest first arose, despite his silence, and, similarly, that the trial court, *Corrigan, J.,* should have dismissed those same counsel upon his request two months later. He argues that the court's failure to replace his counsel violated his federal constitutional right to effective assistance of counsel. Specifically, the defendant contends that, because his counsel and Paetzold were all employed as public defenders, they were members of the same "firm" for the purposes of rule 1.10 (a) of the Rules of Professional Conduct,[26] which imputes the disqualification of one member of a law firm to all other lawyers in the firm. Thus, the defendant argues, because Paetzold could not both represent the defendant and testify against him, his disqualification should be imputed to the defendant's attorneys, rendering it improper for them to represent the defendant if Paetzold were going to testify.[27]

---

with the Public Defender's Office. You're satisfied with that?

"The Defendant: Ah-huh. Yes."

[26] Rule 1.10 of the Rules of Professional Conduct provides in relevant part: "Imputed Disqualification: General Rule

"(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2."

[27] The state argues that the defendant may not now challenge the failure of the trial court, *Damiani, J.,* to disqualify his counsel after the withdrawal of the state's motion to disqualify, because the defendant did not object to the court's decision at that time. Thus, the state contends, the defendant's challenge should be limited to the failure of the trial court, *Corrigan, J.,* to disqualify his counsel during voir dire pursuant to the defendant's request.

We need not decide this issue because, whether we permit the defendant to challenge the actions of both Judges Damiani and Corrigan or only the later actions of Judge Corrigan, our resolution of the defendant's claims depends upon our resolution of one question: whether, for the purposes of the imputed disqualification rule, Paetzold was a member of the same firm as the defendant's attorneys. Because we conclude that Paetzold was not a member of the same firm for the purposes of imputed disqualification, the defendant cannot prevail on either claim, and the state's argument that he did not properly preserve his challenge to the actions of the trial court, *Damiani, J.,* is rendered moot.

"Our state and federal constitutions guarantee a criminal defendant the right to assistance of counsel. U.S. Const., amend. VI; Conn. Const., art. I, § 8. As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *Glasser* v. *United States*, 315 U.S. 60, 70, 62 S. Ct. 457, 86 L. Ed. 680 (1942); *State* v. *Martin*, 201 Conn. 74, 78, 513 A.2d 116 (1986); *Festo* v. *Luckart*, 191 Conn. 622, 626–27, 469 A.2d 1181 (1983). *State* v. *Williams*, 203 Conn. 159, 166–67, 523 A.2d 1284 (1987). The trial court has broad discretionary power to determine whether an attorney should be disqualified for an alleged . . . conflict of interest. *State* v. *Jones*, 180 Conn. 443, 448, 429 A.2d 936 (1980) [aff'd, 193 Conn. 70, 475 A.2d 1087 (1984)]. . . . The ultimate issue is whether the trial court could reasonably have reached the conclusion that it did. *State* v. *Hamele*, 188 Conn. 372, 383, 449 A.2d 1020 (1982)." (Citations omitted; internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 654–55, 583 A.2d 915 (1990). In this case, whether the trial court reasonably concluded that disqualification of the defendant's counsel was not required depends on whether the attorneys possessed an *actual conflict of interest in their representation of the defendant.* To decide whether an actual conflict existed in the manner asserted by the defendant, we must determine whether the defendant's counsel and the state's witness, Paetzold, must be considered to be members of a single firm for the purposes of the imputed disqualification rule.

" '[W]henever counsel for a client reasonably foresees that he will be called as a witness to testify on a material matter, the proper action is for that attorney to withdraw from the case.' " *Enquire Printing & Publishing Co.* v. *O'Reilly*, 193 Conn. 370, 376, 477 A.2d 648 (1984). Rule 3.7 of the Rules of Professional Conduct

provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ." The comment to rule 3.7 relies on rule 1.10 of the Rules of Professional Conduct to extend that disqualification to members of the lawyer's firm, explaining that "if there is likely to be substantial conflict between the testimony of the client and that of the lawyer or a member of the lawyer's firm, the representation is improper."

The state does not challenge the defendant's contention that Paetzold possessed a conflict of interest that would have prohibited *him* from representing the defendant. Rather, the state challenges the defendant's contention that rule 1.10 imputes Paetzold's conflict to the defendant's two trial counsel because Paetzold also was employed as a public defender, thus making all three of them members of the same firm for the purposes of the disciplinary rule.

The determination of whether lawyers constitute a firm for the purposes of imputed disqualification will depend upon the circumstances of the case at hand. As the comment to rule 1.10 of the Rules of Professional Conduct explains, "[l]awyers employed in the same unit of a legal service organization constitute a firm, but not necessarily those employed in separate units. As in the case of independent practitioners, whether the lawyers should be treated as associated with each other can depend on the particular rule that is involved, and on the specific facts of the situation."

In *State* v. *Jones*, supra, 180 Conn. 452,[28] this court held that, although the chief assistant state's attorney

---

[28] In *State* v. *Powell*, 186 Conn. 547, 442 A.2d 939, cert. denied sub nom. *Moeller* v. *Connecticut*, 459 U.S. 838, 103 S. Ct. 85, 74 L. Ed. 2d 80 (1982), this court overruled the implicit conclusion of the court in *State* v. *Jones*, supra, 180 Conn. 443, that the denial of a motion to disqualify is a final judgment subject to immediate appeal. Our decision in *Powell*, however, did not prompt us to modify our substantive holding concerning the conflict

for the judicial district of New Haven was disqualified from prosecuting a former client, his disqualification would not be imputed to all prosecutors in the New Haven office. We explained that " '[c]thical problems cannot be resolved in a vacuum.' " Id., 455. "Although rigid application of the law firm disqualification rule might afford an easy solution . . . a rule this broad would result in many unnecessary withdrawals, limit mobility in the legal profession, and restrict the state in the assignment of counsel where no [harm] has in fact occurred." (Citations omitted.) Id., 456–57. Because the disqualified attorney had no contact with the other prosecutors concerning the defendant's case, we held that the trial court had not abused its discretion by denying the defendant's disqualification motion. Id., 455–57.

Similarly, in *State* v. *Cobb*, Supreme Court Docket No. 14384 (S.C. 14384), which both parties discuss in their briefs, we, in an unpublished order issued November 4, 1993, directed that the case be remanded to the trial court to determine whether a conflict of interest required the disqualification of the defendant's appellate counsel. The state moved to disqualify the public defender litigating the defendant's appeal after the defendant had filed a habeas corpus petition alleging ineffective assistance by his public defenders at trial. One of the defendant's trial attorneys was assigned to the trial services unit in Hartford and the other was a local public defender in Waterbury. On appeal, the defendant was represented by a public defender from the legal services unit in New Haven. After our remand, the trial court determined "that the Public Defender System is not a single unitary firm and that the Trial Services Unit and the Legal Services Unit are indeed separate firms as defined in the comment to Rule 1.10.

of interest issue in *Jones* and, moreover, we subsequently affirmed that holding in *State* v. *Jones*, 193 Conn. 70, 92, 475 A.2d 1087 (1984).

Therefore, no conflict exists to require the disqualification of . . . the defendant's appellate counsel."

In the present case, one of the defendant's trial attorneys, Ronald Gold, was a public defender assigned to the Hartford-New Britain judicial district at Hartford. The other public defender, Fred DeCaprio, was assigned to the trial services unit in Hartford. Paetzold was a public defender assigned to geographical area number nineteen at Rockville. As in *Cobb* and *Jones*, we conclude that the three attorneys were not members of a unitary firm for the purposes of imputed disqualification. Each worked in a distinct unit of the public defender system, and there is no suggestion in the record of a professional relationship between the defendant's trial counsel, both of whom worked in Hartford, and Paetzold, who had been recently hired to work in Rockville.

This conclusion is strongly supported by the fact that the defendant's attorneys, who were in the best position to determine whether they possessed conflicting interests in their representation of the defendant, stated on the record that no conflict required their disqualification and declined to request to withdraw from the case. "[A]ttorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath. *Holloway* v. *Arkansas*, [435 U.S. 475, 486, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978)], quoting *State* v. *Brazile*, 226 La. 254, 266, 75 So. 2d 856 (1954)." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 203 Conn. 169.

Trial counsel, moreover, had an ethical obligation to seek to withdraw from their representation of the defendant if they perceived any breach in their duty of undivided loyalty to their client or if any ethical rule would be violated by their continued representation. "If an unforeseen conflict arises after representation

has been undertaken, an attorney should withdraw from the representation of the client. [Rules of Professional Conduct, Rule 1.7, comment]; see also Rules of Professional Conduct, Rule 1.16." *Westport Bank & Trust Co.* v. *Corcoran, Mallin & Aresco*, 221 Conn. 490, 498, 605 A.2d 862 (1992). Thus, the defendant's attorneys' decisions not to seek to withdraw, as well as their representations to the court that they were not obliged to withdraw, support the conclusion that they did not possess an actual conflict of interest. See *State* v. *Williams*, supra, 203 Conn. 169–70 (trial court properly relied upon defense attorney's representations concerning defendant's knowledge of risks of waiver of conflict of interest).

Therefore, we conclude that, in the circumstances of this case, the defendant's trial counsel and Paetzold were not members of a single firm for the purposes of rule 1.10 and, therefore, that a conflict of interest should not be imputed to the defendant's trial counsel. The defendant's counsel, therefore, did not possess a conflict of interest and the trial court's failure to disqualify them did not violate the defendant's sixth amendment right to effective assistance of counsel.[29]

Moreover, even if we were to conclude that a conflict should be imputed to the defendant's counsel, the defendant has failed to show that the conflict adversely

---

[29] The state also argues that the defendant waived his right to conflict-free representation when he failed to respond to the trial court's inquiry. The state relies upon *State* v. *Groomes*, 232 Conn. 455, 475–76, 656 A.2d 646 (1995), in which we held that the defendant validly waived his right to a jury trial, despite his refusal to respond to the court's questioning, when his attorney informed the court that the defendant wished to waive his right, that he had discussed the waiver with his counsel and had been advised against it, and that he had been informed of the potential danger of refusing to respond to the court. We need not decide whether the defendant's silence in the present case disentitled him to challenge, at this juncture, the course that the trial court chose to follow, because we conclude that no actual conflict of interest burdened the defendant's attorneys.

affected the performance of his counsel. "In a case of a claimed conflict of interest . . . in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 133, 595 A.2d 1356 (1991).[30] If an actual conflict of interest burdens the defendant's counsel, the defendant need not establish actual prejudice. Id., 132–33. The defendant need only demonstrate that the counsel's performance was adversely affected by the conflict. Id., 133, 139, 144–47; see *Burger* v. *Kemp*, 483 U.S. 776, 785–88, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987).

The defendant failed in the trial court to allege any adverse effect other than the possibility of jury bias, which he agreed had been resolved by the trial court's actions. Nor does he claim any adverse effect on appeal. Moreover, a review of the record shows no adverse effect on trial counsel's performance as a result of the alleged conflict. DeCaprio conducted a thorough cross-examination of Paetzold that was consistent with the cross-examination to be expected from a skilled and loyal attorney. Paetzold's testimony solely concerned the method of collection and chain of custody of physical evidence taken from the car driven by the defendant. Paetzold did not testify concerning the results of tests conducted on the evidence or the implications of the evidence relative to the defendant's guilt. DeCaprio's

---

[30] Although *Phillips* and the United States Supreme Court cases that developed this standard all involved appeals from habeas corpus proceedings, the same standard applies to ineffective assistance of counsel claims on direct appeal. "[S]ince fundamental fairness is the central concern, 'no special standards ought to apply to ineffectiveness claims made in habeas corpus proceedings' . . . as opposed to proceedings on direct appeal." (Citation omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 134, quoting *Strickland* v. *Washington*, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

questions challenged the propriety of the collection methods that Paetzold and his colleagues had used, and DeCaprio effectively laid the necessary foundation for the argument that the collected evidence had been contaminated due to the use of improper techniques. Moreover, a comparison of the cross-examination of Paetzold at trial with his cross-examination at the probable cause hearing, when he was not a public defender, also demonstrates that DeCaprio's performance did not suffer as a result of any alleged conflict of interest.[31] We conclude that even if a conflict of interest existed, the defendant has failed to meet his burden of establishing that the performance of his trial counsel was adversely affected by the conflict.

2

We next address the defendant's claim that the trial court improperly denied his request for new counsel. Specifically, the defendant argues that the trial court's failure to remove his counsel because of a breakdown in communications violated his sixth amendment rights to counsel and to a fair trial.[32]

A request for the appointment of new counsel must be supported by a substantial reason and may not be

---

[31] In fact, during the probable cause hearing, DeCaprio did not attempt to elicit testimony tending to prove that the collected evidence became contaminated as a result of the collection techniques used by Paetzold. DeCaprio's questions during that cross-examination were limited to demonstrating the inconclusive nature of the results of the test for gunshot residue. This line of questioning was not available to DeCaprio during the cross-examination of Paetzold at trial because Paetzold did not testify at trial about the test results.

[32] The defendant also claims that the trial court's ruling violated his rights to counsel and due process guaranteed by article first, § 8, of the Connecticut constitution. Because he has failed to provide an independent analysis of his claim under the state constitution, we limit our review of this issue to the defendant's claim under the United States constitution. See, e.g., *State* v. *Breton*, supra, 235 Conn. 257 n.47; *State* v. *Carter*, 228 Conn. 412, 417 n.6, 636 A.2d 821 (1994); *State* v. *Walton*, 227 Conn. 32, 62 n.24, 630 A.2d 990 (1993).

used to cause delay. *State* v. *Gonzalez*, 205 Conn. 673, 683, 535 A.2d 345 (1987); *State* v. *Drakeford*, 202 Conn. 75, 83, 519 A.2d 1194 (1987). " 'In order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances.' " *State* v. *Drakeford*, supra, 83–84. "It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel. . . . Moreover, absent a factual record revealing an abuse of that discretion, the court's failure to allow new counsel is not reversible error." (Citation omitted.) Id., 83. The record discloses that the trial court did not abuse its discretion.

On May 10, 1991, during jury voir dire, the defendant asked the court to remove his counsel and to appoint new counsel because of a breakdown in communication. Specifically, the trial court considered the defendant's claim that "conflicts of interest" existed between him and his attorneys, resulting in part from his attorneys' decision to select a juror over his objection, and from their failure to cooperate with him during voir dire. The trial court found, on the basis of its own observations, that there existed "a great deal of cooperation" between the defendant and his attorneys, and concluded that the defendant had not "satisfied the Court that there is such a breakdown of communications that they are not doing an efficient job of communicating." The trial court thereafter denied the defendant's request.

Our review of the record supports the trial court's factual determination that no substantial reason existed to justify replacement of the defendant's counsel on the eve of trial. We conclude that the trial court did not abuse its discretion when it denied the defendant's request for new counsel.

3

We turn next to the defendant's claim that the trial court conducted an inadequate canvass prior to permit-

ting him to waive his constitutional right to counsel. In conjunction with the defendant's request for new counsel on May 10, 1991, during jury voir dire, the defendant also informed the court that he wished to represent himself. He said that he preferred that the court appoint new trial counsel because of "conflicts of interest" between him and his attorneys stemming from his attorneys' failure to cooperate with him and from the fact that Paetzold, a public defender, would testify for the state. See part II A 1 and 2 of this opinion. He stated, however, that, if the court would not appoint new counsel, he was prepared to represent himself.

In connection with his request, the defendant informed the court that "I do understand that by me representing myself I do place myself in a grave disadvantage because me being pro se counsel I'm not well-seasoned as the State's Attorneys or any other attorneys in law 'cause I'm not a student of law." After informing the court that he would need access to a law library so that he could perform legal research, he again explained to the court that he understood the effect of his decision. "The attorneys—or the State's Attorneys would have a leg up definitely or an advantage to that point, which they already—they already have an advantage because they're professionals. And I'm not fortunate enough to have the—at my access the leisure of a law library or the adequate time to present a case—as this case to the Court. But I will try to do my best. I'm aware of what I'm facing. And I just feel as though I would rather proceed on my own at this time due to these conflicts of interest."

The court then questioned the defendant concerning his request for new counsel. After doing so, it determined that neither an actual conflict of interest nor a substantial breakdown of communication existed, and denied the defendant's request. See part II A 1 and 2 of this opinion. The court also advised the defendant

that he had the right to represent himself if he wished, but "there are problems in anyone representing themselves. And you certainly have read enough and appear to be intelligent enough to recognize that." When the defendant stated his intention to represent himself, the court stated: "Despite the fact that the Court has indicate[d] only a fool represents himself. Even lawyers have lawyers." Subsequently, in response to the state's request, the court continued its inquiries of the defendant. The court again explained to the defendant that his attorneys possessed greater expertise and learning, and asked him if he understood that. The defendant responded affirmatively, adding, "[a]nd I understand that I place myself in a tremendous disadvantage, you know."

The court then found that the defendant was articulate and intelligent, and that he was not under the influence of alcohol or drugs and allowed him to proceed pro se. The court also appointed the defendant's public defenders as standby counsel. Thereafter, the voir dire examination of venireperson Laura Caronna commenced.

The court briefly examined Caronna before interrupting the examination in order to attend to a security matter and for a brief recess. When the court reconvened, the state requested that the court conduct a further canvass of the defendant in conformity with Practice Book § 961 and State v. Gethers, 197 Conn. 369, 381, 497 A.2d 408 (1985). The court then conducted another canvass of the defendant and again granted his request to represent himself.

The defendant now claims that the court's initial canvass was insufficient to establish a valid waiver of his constitutional right to counsel. The defendant contends that because the court did not obtain an adequate waiver prior to allowing him to represent himself during

part of the court's preliminary voir dire examination of Caronna, his sixth amendment right to counsel was violated.[33] We are not persuaded.

The federal constitution guarantees a criminal defendant the right to forgo the assistance of counsel and to choose self-representation instead. *State* v. *Day*, 233 Conn. 813, 820, 661 A.2d 539 (1995). "When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel." (Citation omitted; internal quotation marks omitted.) Id., 821.

"The right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. *McKaskle* v. *Wiggins*, [465 U.S. 168, 176–77, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984)] . . . . It is also consistent with the ideal of due process as an expression of fundamental fairness. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. *Faretta* v. *California*, [422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)].

"We harbor no illusions that a defendant's decision to waive counsel and proceed pro se generally will lead to anything other than disastrous consequences. See id., 838–39 (Burger, C. J., dissenting). Nonetheless, the values informing our constitutional structure teach that although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is

---

[33] The defendant also alleges a violation of his state constitutional right to counsel guaranteed by article first, § 8. Because the defendant has failed to provide an independent analysis of this claim under the state constitution, we decline to review it. See footnote 32.

the lifeblood of the law. *Illinois* v. *Allen,* 387 U.S. 337 [350–51, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)] (Brennan, J., concurring). *Faretta* v. *California,* supra, 422 U.S. 834." (Citations omitted; internal quotation marks omitted.) *State* v. *Day,* supra, 233 Conn. 821.

"While a defendant has an absolute right to self-representation, that right is not self-executing. A trial court in this state must satisfy itself that several criteria have been met before a criminal defendant properly may be allowed to waive counsel and proceed pro se." Id., 822. Practice Book § 961[34] requires the trial court to conduct a thorough inquiry in order to ascertain that the following four conditions are satisfied: (1) the defendant has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel if he is so entitled; (2) the defendant possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself; (3) the defendant comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and (4) the defendant has been made aware of the dangers and disadvantages of self-representation.

"At the same time, we have recognized that this test cannot be construed to require anything more for an

[34] Practice Book § 961 provides: "[Right to Counsel]—Waiver

"A defendant shall be permitted to waive his right to counsel and shall be permitted to represent himself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self representation."

effective waiver of counsel than is constitutionally mandated, because such a waiver triggers the constitutional right of an accused to represent himself. . . . The multifactor analysis of § 961, therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion." (Citations omitted; internal quotation marks omitted.) *State* v. *Day*, supra, 233 Conn. 822.

In this case, the defendant does not argue that his waiver was not knowing, voluntary and intelligent. Rather, he argues only that the trial court's canvass was inadequate to ascertain that the waiver was valid. The defendant, however, does not possess a constitutional right to a specifically formulated canvass. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing. *State* v. *Gethers*, 193 Conn. 526, 539–40, 480 A.2d 435 (1984). In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § 961 if the record is sufficient to establish that the waiver is voluntary and knowing. Cf. *In re Manuel R.*, 207 Conn. 725, 743, 543 A.2d 719 (1988) ("[w]ithout a compliance with Practice Book § 961, and in the absence of other evidence sufficient to establish the respondent's knowing and voluntary waiver of his statutory right to counsel," trial court improperly committed juvenile without benefit of counsel).

Even if we were to assume that the defendant makes an implicit claim that his initial waiver was not knowing and voluntary, our review of the record supports the trial court's determination to the contrary. The record shows that the trial court engaged in an extended collo-

quy with the defendant and, moreover, had acquired sufficient knowledge over the course of the proceedings to support its determination that the defendant's waiver of counsel was voluntary and knowing. Furthermore, the defendant was obviously aware of his right to appointed counsel; public defenders were actively representing him when he requested to represent himself and he was encouraged by the court to continue to allow his appointed counsel to represent him. Moreover, the trial court repeatedly commented on the defendant's intelligence and articulate manner, and specifically found that the defendant was capable of understanding the consequences of his decision to represent himself. The defendant also demonstrated that he understood the nature of the proceedings, including the possible punishment he faced, when he stated during earlier proceedings, "[y]ou know, I'm the one that has to pay the ultimate penalty for this case and, if anything, for me to be sitting—sitting in the electric chair, I think I ought to sit there on my own stupidity than someone else's." Furthermore, "a trial court may appropriately presume that defense counsel has explained the nature of the offense in sufficient detail." *State* v. *Gethers*, supra, 193 Conn. 537; *State* v. *Wolff*, 237 Conn. 633, 658, 678 A.2d 1369 (1996). Finally, the trial court explicitly warned the defendant of the dangers of self-representation by describing to him the advantage that the state's attorneys would have because of their training and experience, and by explaining to him that even lawyers usually do not represent themselves in criminal proceedings. The defendant acknowledged the dangers of self-representation three times, stating that he would be at a "grave" and "tremendous" disadvantage. Under these circumstances, we conclude that the court's inquiry, combined with the knowledge it obtained during the course of the trial, was adequate to assure the court that the defendant's waiver of his right to counsel was voluntary and knowing.

In addition, the defendant does not dispute that the second canvass, conducted prior to the court's completion of the preliminary voir dire of Caronna, conformed to the requirements of Practice Book § 961 and was sufficient to effectuate his waiver of the right to counsel. Both canvasses occurred on May 10, 1991, with little more than the court's mid-morning recess separating the two events. During the period between the two canvasses, when the defendant claims he was representing himself without a valid waiver of counsel, there occurred only one event that required the defendant's attention: the trial court's preliminary voir dire of Caronna. Only the trial court questioned Caronna, and it did so only briefly before it was interrupted by other business.[35] Neither the state nor the defendant became involved with the questioning of the potential juror at this time, or later when the questioning resumed after the second canvass of the defendant and the defendant's reassertion of his waiver. On its own initiative and without the involvement of either party, the trial court dismissed Caronna for cause.

Thus, the defendant's pro se status during the short interval between canvasses did not result in any action or inaction on his part that was harmful to his interests, and the trial court no doubt would have dismissed Caronna even if the defendant's counsel had been representing him during the preliminary voir dire. Indeed, the defendant raises no claim of impropriety regarding Caronna's dismissal.

We conclude that the defendant validly waived his right to counsel during the initial canvass, and that no conceivable harm resulted from his brief period of self-representation prior to a more searching canvass and the reassertion of his waiver of counsel. Accordingly, this claim must fail.

---

[35] This part of the trial court's questioning consists of only two and one-half transcript pages.

## B

### Voir Dire Claims

The defendant next challenges several actions taken by the trial court during the jury selection process. Specifically, the defendant claims that the trial court improperly: (1) excused for cause venirepersons who had expressed opposition to the death penalty; (2) allowed the use of a venire panel selected on a nonrandom, racial basis; (3) violated his right to a jury drawn from a fair cross section of the community; and (4) failed to conduct an adequate inquiry when informed that some venirepersons may have seen him while he was physically restrained. We are not persuaded.

1

The defendant first challenges the jury selection process by claiming that the trial court improperly excused for cause those venirepersons who expressed opposition to the death penalty. The defendant argues that the trial court violated his right to an impartial jury, guaranteed by the sixth amendment to the United States constitution and by article first, § 8, of the Connecticut constitution, when it excused for cause two venirepersons who had expressed serious concerns about their abilities to participate in a process that could lead to the imposition of the death penalty. We reject this claim.

The following facts are relevant to this claim. On August 28, 1990, the defendant filed a motion in limine, based upon the sixth, eighth and fourteenth amendments to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution, requesting the trial court to prohibit the state from challenging for cause prospective jurors who opposed capital punishment. The defendant argued that this information was irrelevant because § 53a-46a provides that the jury does

not assess punishment and that, during the penalty phase, the function of the jury is solely to return a special verdict concerning aggravating and mitigating factors.

On February 14, 1991, the defendant filed a revised motion in limine in which he sought an order from the trial court prohibiting questions during jury voir dire concerning the venireperson's "attitudes and beliefs for or against the imposition of the death penalty." The motion also sought to prohibit questions suggesting, directly or indirectly, that the defendant could be sentenced to death if convicted. The defendant based his motion upon article first, § 8, of the state constitution and the eighth and fourteenth amendments to the federal constitution. In support of the motion, the defendant challenged the constitutionality of the death penalty statutes on several grounds and argued, alternatively, that the exclusion "of persons unalterably opposed to the death penalty from the jury which will decide his guilt or innocence will deprive the defendant of his right to a fair and impartial jury" guaranteed by article first, §§ 8 and 19, of the state constitution.

The trial court denied both motions. The court concluded that the decisions of the United States Supreme Court in *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), and *Wainwright* v. *Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), permitted the exclusion of prospective jurors whose opposition to the death penalty would substantially impair the performance of their duties as jurors.

During the jury selection process, the trial court excused for cause venireperson Mary L. Sheary because of her opposition to the death penalty. The defendant's counsel objected to the court's ruling, arguing that neither *Witherspoon* nor *Witt* has been adopted as a matter of state constitutional law, and that Sheary was not

properly excludable under the more exacting *Witherspoon* standard. In addition, the defendant's counsel argued that Sheary should be permitted to serve on the jury during the guilt phase of the trial because she had indicated that she could determine guilt impartially despite her opposition to capital punishment. The trial court responded that under either *Witherspoon* or *Witt*, a juror must be able to follow and apply the relevant law, and that the court had excused Sheary because she would not be able to do so during the penalty phase.

During jury selection, the trial court also excused for cause venireperson Rose M. Elliott because she opposed the death penalty. The defendant objected to the ruling, claiming that Elliott was not properly excludable under the *Witherspoon* standard, that she was not properly excludable under article first, §§ 8 and 9, of the state constitution, and that she should have been permitted to sit on the guilt phase of the trial despite her opposition to the death penalty.

In addition to these two individuals, the trial court excused for cause nine other venirepersons who expressed opposition to the death penalty. The trial court also excused for cause two venirepersons who stated their beliefs that the death penalty should be imposed automatically upon the conviction of certain crimes. The trial court did not excuse for cause three jurors who expressed concerns about the death penalty but who stated that they could follow the court's instructions and participate impartially during the penalty phase.

The defendant now claims that the trial court improperly excused Sheary and Elliott for cause because of their opposition to the death penalty. Specifically, the defendant argues that this court should adopt, as a matter of state constitutional law, the federal constitutional standard for discharging prospective capital

jurors that was established in *Witherspoon* v. *Illinois*, supra, 391 U.S. 522 n.21, but which was abandoned and replaced by a more flexible standard in *Wainwright* v. *Witt*, supra, 469 U.S. 420. The defendant further argues that the trial court improperly excused for cause Elliott because she did not satisfy the *Witherspoon* requirements. Alternatively, the defendant argues that, even if the *Witt* standard applies, the trial court's actions nevertheless violated his constitutional rights because Elliott was not eligible for dismissal under that standard. Additionally, the defendant contends that Sheary should not have been excused for cause from participating in the jury's determination of the defendant's guilt or innocence, despite her inability to participate in the penalty phase of the trial. We reject each of the defendant's claims.

*Witherspoon* was decided before the United States Supreme Court's decisions in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and *Gregg* v. *Georgia*, supra, 428 U.S. 153. In *Witherspoon*, an Illinois statute permitted the state to excuse for cause " 'any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same.' " *Witherspoon* v. *Illinois*, supra, 391 U.S. 512. At the trial of the petitioner in *Witherspoon*, the state had used the statute to excuse for cause forty-seven venirepersons, nearly one half of the entire venire panel, who had expressed concerns about the death penalty. Id., 513–14. The United States Supreme Court noted that "the jury is given broad discretion to decide whether or not [to impose the death penalty] in a given case, and a juror's general views about capital punishment play an inevitable role in any such decision." Id., 519. The court concluded that the jury that had been selected was "uncommonly willing to condemn a man to die." Id., 521. Accordingly, the court held that "a sentence of

death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id., 522. In a footnote, the court indicated that a state may exclude for cause individuals "who [make] unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (Emphasis in original.) Id., 522–23 n.21.

In *Wainwright* v. *Witt*, supra, 469 U.S. 412, which was decided after *Furman* and *Gregg*, the court reexamined the question of how a prospective juror's views on the death penalty should affect that individual's eligibility to serve on a capital sentencing jury. The petitioner argued that several prospective jurors had been excluded in violation of the court's decision in *Witherspoon*. The court noted that "[d]espite *Witherspoon's* limited holding, later opinions in this Court and the lower courts have referred to the language in footnote 21, or similar language in *Witherspoon's* footnote 9, as setting the standard for judging the proper exclusion of a juror opposed to capital punishment." Id., 418. The court explained that more recent decisions had eased the rigid requirements of *Witherspoon* by establishing a standard by which a prospective juror could be excused for cause if the individual's views concerning capital punishment would prevent or substantially impair the performance of the duties of a juror in accordance with the court's instructions and the juror's oath. Id., 419–21. The court concluded that this test was preferable for determining juror exclusion because, as a result of the court's decisions in *Furman* and *Gregg*,

juries could no longer possess unlimited sentencing discretion such as was held by the jury in *Witherspoon*. Id., 421. The court reasoned that, since *Furman* and *Gregg*, capital sentencing juries generally inform the court whether the death penalty is appropriate by answering specific questions. Id., 422. "In such circumstances it does not make sense to require simply that a juror not 'automatically' vote against the death penalty . . . the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially." Id.

The defendant argues that his state constitutional right to an impartial jury guaranteed by article first, § 8, requires the adoption of the *Witherspoon* standard for determining juror exclusion in capital cases. Although the defendant recognizes that the more flexible *Witt* standard now governs as a matter of federal constitutional law, he argues that the *Witherspoon* standard is consistent with this court's more expansive interpretation of the rights ensured by our state constitution. The defendant also cites to studies that purport to demonstrate that if all individuals with serious concerns about the death penalty are eliminated from a jury, the jury is more likely to convict.

The defendant further argues that Elliott was not properly excused for cause under either the *Witherspoon* standard or the *Witt* standard. Thus, the defendant argues, even if we do not adopt the *Witherspoon* test as a matter of state constitutional law, the trial court improperly excused Elliott as a matter of current federal constitutional law. Finally, the defendant argues that the trial court violated his state constitu-

tional right to an impartial jury by excusing for cause Sheary despite the fact that her views concerning the death penalty would not have hindered her participation in the guilt phase of the trial.

The state argues in response that the defendant failed to present a meaningful analysis of his claim under the state constitution and that, therefore, this court should decline to review it. See *State* v. *Ross*, supra, 230 Conn. 208; *State* v. *Robinson*, 227 Conn. 711, 721, 631 A.2d 288 (1993). Moreover, the state argues that the defendant did not present evidence at trial, and no factual findings were made, concerning the conviction tendencies of juries that do not contain individuals with reservations about the death penalty. The state also notes that the United States Supreme Court, in *Lockhart* v. *McCree*, 476 U.S. 162, 168–73, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), previously had attacked the credibility of similar studies relied upon by the lower court in that case. Finally, the state argues that the removal for cause of Elliott and Sheary did not violate either the *Witt* or *Witherspoon* standard.

We conclude that, even if the *Witherspoon* standard is applied to the trial court's actions in this case, no constitutional violation resulted from the trial court's decision to excuse for cause these two venirepersons. Therefore, we need not determine whether the defendant has adequately raised the state constitutional claim, or what standard should be applied under the state constitution.

The standard enunciated in dicta in *Witherspoon* v. *Illinois*, supra, 391 U.S. 522, provides that a prospective juror may be excused for cause if the individual would automatically vote against the imposition of capital punishment regardless of the evidence presented, or if the individual's attitude concerning the death penalty would hinder an impartial determination of whether

the defendant is guilty.[36] In the present case, the responses of Elliott indicate that she would not have been able to vote for imposition of the death penalty in the appropriate circumstances. Elliott expressed immediate doubts about her ability to participate if the case could lead to the imposition of the death penalty,[37] and she subsequently stated several times that she could not participate in a decision-making process that could result in a sentence of death.[38]

[36] The United States Supreme Court was only twice presented with the opportunity to apply the *Witherspoon* standard prior to its rejection of that standard in *Witt*. See *Maxwell* v. *Bishop*, 398 U.S. 262, 90 S. Ct. 1578, 26 L. Ed. 2d 221 (1970); *Boulden* v. *Holman*, 394 U.S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969). In those cases, the Supreme Court was not required to evaluate the lower courts' attempts to apply the *Witherspoon* standard. Rather, the Supreme Court merely rejected the exclusion for cause of potential jurors pursuant to questioning similar to that used in *Witherspoon*, in which the trial court had allowed exclusion of any individual with concerns about the death penalty, regardless of the individual's ability to vote for imposition of the death penalty in an appropriate case. Unlike the case at hand, the venirepersons in those two cases were not subjected to detailed questioning concerning the impact of their concerns about the death penalty on their ability to participate in death penalty proceedings. Thus, the two cases do not inform our determination of whether the questioning in the present case resulted in sufficiently clear indications from the venirepersons that they could not vote for the imposition of the death penalty.

[37] When defense counsel asked Elliott what her thoughts were when she was informed that this case could lead to the death penalty, she responded as follows:

"A. I don't know if I can—my thoughts was, wow, I don't know if I can make a decision in someone's life like that. You know, putting someone to death. I can see life in prison, but the death penalty? Holding that in my hand? You know, it's like rough.

"Q. Okay, let me—

"A. It's like killing."

[38] Although Elliott twice stated that she could decide whether aggravating and mitigating factors were present, she repeatedly denied her ability to participate if the death penalty could result from the decisions she was required to make.

"Q. All right, but you just told us that you don't favor the death penalty.

"A. No, I couldn't make that decision about somebody else's life.

"Q. You could not?

"A. No. . . .

"Q. So that you have a personal feeling against the death penalty.

Although Elliott never stated that she would automatically vote against imposing the death penalty, her repeated and unequivocal assertions that she could not participate in the imposition of the death penalty serves as the functional equivalent of such a statement. As the majority of the Supreme Court noted in *Wainwright* v. *Witt*, supra, 469 U.S. 424, "determinations of juror bias cannot be reduced to question-and-answer sessions

---

"A. Yeah, I just don't—I just couldn't do it myself, put somebody, you know—decide on somebody else's life."

After the trial court described the penalty phase process to Elliott, the following colloquy occurred:

"The Court: . . . Now, could you sit fairly and impartially on that kind of proceeding?

"Ms. Elliott: Not when I have to decide on this death penalty thing. I can't hold it in my hands saying that, you know, give him the death penalty.

"The Court: No matter what the aggravating factor would be?

"Ms. Elliott: No, I can't do that. That's like taking somebody else's life.

"The Court: In other words, you could not be a party to any proceedings where if you were acting fairly and impartially the result would impose the death penalty?

"Ms. Elliott: I—see if—if it wasn't—like if it was all up to you to impose the death penalty—

"The Court: I would be the one that would be imposing it.

"Ms. Elliott: Yeah, but partially, you know, you would decide by what the jurors says, right?

"The Court: Right.

"Ms. Elliott: See? In a way, it would be because of what we said.

"The Court: Exactly.

"Ms. Elliott: What we do. No. Uh-uh.

"The Court: So that you could not under any circumstance be in a—such a proceeding which could end up with the imposition of the death penalty?

"Ms. Elliott: No. No. I don't want to hold—that would bother me. I wouldn't be on that jury. No, no. Uh-uh. Because partially it would be us also. No. I can see life in prison, you know, I wouldn't mind that, but giving somebody like the electric chair or something like that, uh-uh."

After an attempt by defense counsel to rehabilitate Elliott, the trial court again asked her about her ability to participate in the penalty phase if she knew that her participation could result in the imposition of the death penalty.

"The Court: . . . Could you hold that there was no aggravating factor and no mitigating factor, knowing that your decision is telling the judge to impose the death penalty?

"Ms. Elliott: No."

which obtain results in the manner of a catechism."
We are convinced that Elliott's responses demonstrate
unambiguously that she could not have voted for impo-
sition of the death penalty regardless of the circum-
stances and the evidence presented to her during the
penalty phase. Thus, she was properly excluded under
the *Witherspoon* standard.

Similarly, Sheary stated that she opposed the death
penalty and repeatedly stated that she could not partici-
pate in a proceeding that could lead to the imposition
of the death penalty.[39] Because Sheary was unequivocal

---

[39] After the trial court described the penalty phase process to Sheary, the
following colloquy occurred:

"The Court: Are you indicating that under the scheme I outlined to you
last week, where you go into a penalty phase you must as a juror, if you
found the defendant guilty of capital felony, that you couldn't consider
mitigating factors and aggravating factors knowing that your decision on
them, if you found an aggravating factor and no mitigating factor, that the
death penalty must be imposed, that you couldn't be a party to that?

"Ms. Sheary: Not at the moment, Your Honor. Not at the moment. . . .

"The Court:—could you be a party by virtue of the nature of the crime,
the aggravating factors and the mitigating factors that you would hear about,
is there any circumstance where you could be a party to finding an aggravat-
ing factor and no mitigating factor resulting in the imposition of the death
penalty? . . .

"Ms. Sheary: I don't feel as though I could take . . . contribute to anybody
being made guilty because I don't feel as though a life should be taken.

* * *

"The Court: So, if you were to be a member of the jury, finding guilt for
capital felony and you had to then go on to the penalty phase, which is
determination as to whether or not the state proved an aggravating factor—

"Ms. Sheary: Yes.

"The Court:—beyond a reasonable doubt and whether or not the defense
proved a mitigating factor by a fair preponderance of the evidence—

"Ms. Sheary: Yes.

"The Court:—and you were to determine that the state did prove an
aggravating factor beyond a reasonable doubt—

"Ms. Sheary: Um-hum.

"The Court:—and that the defense failed to prove a mitigating factor by
a fair preponderance of the evidence,—

"Ms. Sheary: Um-hum.

"The Court:—in other words, the result that you determine was an aggra-
vating factor—

"Ms. Sheary: Um-hum.

"The Court:—and no mitigating factor was proved and you knew that that result would cause the imposition of the death penalty, could you participate in that type of proceeding?

"Ms. Sheary: No, Your Honor.

"The Court: You could not?

"Ms. Sheary: No.

"The Court: And that's under any circumstance? No matter what the circumstance, you could not fairly and impartially act under those proceedings?

"Ms. Sheary: Well, as a—

"The Court: Where you know that the finding would—

"Ms. Sheary: Um.

"The Court:—cause an imposition of the death penalty.

"Ms. Sheary: Is it all right to say more than no? I'd—

"The Court: Pardon?

"Ms. Sheary: Is it all right to say more than no, now, rather than answer—

"The Court: I'd first like to hear your no or yes.

"Ms. Sheary: Well, I did say no already. Okay? No.

"The Court: All right.

"Ms. Sheary: Okay.

"The Court: You may go on.

"Ms. Sheary: Okay. When I was here for your little, I'll call it a course, law course, I learned an awful lot and maybe in—in time, I could think that way. This is what I'm thinking.

"The Court: Well, I'm more concerned with not what you know about the law—

"Ms. Sheary: Um-hum.

"The Court: The only reason I gave you the principles of the law is to find out whether or not you could—

"Ms. Sheary: Yeah.

"The Court:—apply them to the case.

"Ms. Sheary: No, Your Honor.

"The Court: You could not?

"Ms. Sheary: No.

"The Court: Under any circumstances.

"Ms. Sheary: Well,—

"The Court: And that's your answer?

"Ms. Sheary: No.

"The Court: All right. You may go to the corridor briefly."

When defense counsel questioned Sheary concerning the penalty phase of the trial, she responded as follows:

"Q. . . . If you were told by the court, by the judge, that in the second phase of the trial—

"A. Um-hum.

"Q.—you were to listen to evidence of aggravating factors—

in her assertions that she could not participate in a process that could lead to the imposition of the death penalty, we conclude that, like Elliott, Sheary could not have voted for the imposition of the death penalty regardless of the circumstances and facts proved during the trial. Thus, Sheary also was properly excluded for cause under the *Witherspoon* standard.

The defendant also claims that Sheary should have been permitted to serve on the jury during the guilt phase of the trial, despite her disqualification from participating in the penalty phase. This claim is subsumed by the defendant's challenge to the constitutionality of the statutory bifurcated trial procedure for capital cases, which we discuss in part III of this opinion. Because we uphold the constitutionality of the bifurcated trial procedure, which requires the penalty to be decided by the guilt phase jury absent good cause or the agreement of the parties; see footnote 10; we conclude that the trial court did not improperly excuse Sheary because of her inability to participate in the statutorily required penalty phase proceedings.

"A. Yes.

"Q.—listen to evidence of mitigating factors and then vote on—

"A. Um-hum.

"Q.—those factors, whether they existed or not, fairly and impartially, could you do it?

"A. Uh, that's a difficult question.

"Q. Okay.

"A. I—I could figure it out, but also I would be thinking that I was contributing to it.

"Q. All right. And—

"A. To my final decision.

"Q. Do you mean contributing in the sense that your answers—

"A. Guilty or not—

"Q.—would tell the Judge what to do?

"A. Well, that's the way it's going to come out.

"Q. Right. Now, does your opposition to capital punishment mean that you could not vote on the existence of the factors fairly?

"A. Yes, it does.

"Q. That's all. Thanks."

We conclude that both Elliott and Sheary were properly excluded for cause under the standard adopted by the United States Supreme Court in *Witherspoon,* and later rejected as a matter of federal constitutional law in *Witt.* Because the defendant could not prevail under the application of the *Witherspoon* standard, we decline to determine whether to adopt that standard as a matter of state constitutional law. Moreover, the defendant cannot prevail on his federal constitutional claim because our conclusion that Elliott and Sheary were properly excluded under *Witherspoon* leads us inevitably to the conclusion that they also were properly excluded under the more flexible *Witt* standard, which currently serves as the relevant standard for evaluating federal constitutional claims. Therefore, we reject the defendant's claim that his federal and state constitutional rights to an impartial jury were violated by the trial court's exclusion for cause of Elliott and Sheary.

2

The defendant next claims that the trial court improperly permitted the use of a venire panel that was selected on a nonrandom, racial basis. The defendant contends that certain irregularities in the procedures used to select the members of the venire panel render suspect the composition of his jury. As a result of these irregularities, the defendant argues, he was deprived of his federal constitutional right to a jury selected from a fair cross section of the community. We disagree.

In *State* v. *Ellis,* 232 Conn. 691, 657 A.2d 1099 (1995), we considered the identical claim arising from the same factual situation. Both Ellis and the defendant in this case were tried in the same courthouse at the same time, albeit for different crimes arising from different incidents. As a result, the same general pool of venirepersons was available for both trials. In that otherwise unrelated case, Ellis claimed that the venire panel in

the present case was selected in a nonrandom, racial manner, and that this irregular selection process affected the pool of venirepersons available for the selection of his jury. Ellis claimed that, as a result, his federal right to a jury drawn from a fair cross section of the community was violated. Id., 698.

We remanded the *Ellis* matter to the trial court for an evidentiary hearing to determine whether the venire panel in *State* v. *Webb*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 89 371150, was selected in a nonrandom, racial manner and, if so, whether the *Webb* selection process impermissibly tainted the venire panel from which the *Ellis* jury was selected. See *State* v. *Ellis*, 227 Conn. 902, 630 A.2d 73 (1993). We requested the additional fact-finding by a joint order applicable to both *Ellis* and *Webb*. The parties from both cases participated in the evidentiary hearing on remand. On remand, the trial court conducted an evidentiary hearing and received briefs filed by the parties on the factual issues presented. In its memorandum of decision, the trial court made the following factual findings:

"On May 15, 1991, *State* v. *Webb* was on trial. Mr. Webb was charged with capital felony in violation of General Statutes § 53a-54b. On that date jury selection was proceeding before the Honorable Thomas H. Corrigan. Because of the nature of the case and the number of peremptory challenges, this case required a large number of venirepersons.

"Attorneys Fred DeCaprio and Ronald Gold had been appointed to represent Mr. Webb. On May 10, 1991, Mr. Webb began serving as his own attorney. On May 15, Webb was appearing pro se with Attorneys DeCaprio and Gold as his stand-by counsel. DeCaprio and Gold had obtained a copy of a newly released census report which indicated that 10.2 percent of the population of

Hartford county was black. The attorneys, as well as Mr. Webb, were concerned by the underrepresentation of black people on the panel of venirepersons assigned to the trial. The panel which they would be working with that day consisted of thirty-six persons, two of whom were black. [T]his was less than the percentage indicated in the census report.

"Prior to the opening of court on the fifteenth both attorneys met with Mr. Webb. They discussed the underrepresentation and it was decided that the problem should be presented to the judge prior to the start of voir dire. There is a question as to Webb's participation in this decision. At the very least he was aware of what the attorneys intended to do and he did not object. Later in court he did object to the chambers conference without his presence.

"At the request of Mr. Gold, a conference was held in chambers with Judge Corrigan. In attendance were Attorneys DeCaprio and Gold as well as assistant state's attorneys Rosita M. Creamer and Dennis J. O'Conner who were prosecuting the case. At this conference DeCaprio and Gold raised the issue of underrepresentation of black people on the jury and stated that Mr. Webb was considering a challenge to the array.

"Ms. Diane Aviles was then a jury clerk for the Hartford-New Britain judicial district. Her duties included the drawing of names and the assembling of panels for voir dire using the procedure previously stated. At the chambers conference, with the attorneys present, Judge Corrigan called Ms. Aviles and inquired if there were any black jurors left in the assembly room. Ms. Aviles, who from her office could observe jurors in the assembly area, informed the judge that there appeared to be black jurors in attendance, but she could not tell if they were available. These were people who had been rejected or sent back from various juries.

"Judge Corrigan informed the attorneys of Ms. Aviles' observation and it was discussed.

"Attorney Gold stated to the judge that if there were additional black persons they could simply be added to the panel. He reported that this had been done in another case in which he had been involved.

"Judge Corrigan then initiated a second telephone call to Ms. Aviles concerning additional black venirepersons. Ms. Aviles informed Judge Corrigan that she could provide an additional panel, but she could not guarantee that it would include black persons. Judge Corrigan asked Ms. Aviles to do so. The judge then informed counsel of the situation including the fact that the supplemental panel might not include minority persons.

"Judge Corrigan's clerk, Lynne Williams, was then dispatched to the jury assembly room to get the supplemental panel. She observed Ms. Aviles assembling the panel by going to each individual juror rather than the usual procedure of calling the names and having the jurors report to her.

"The supplemental panel consisted of five venirepersons. Two members of the panel, Thomas Dukes and Jean Merrill were black. The supplemental panel was added to the panel which had been brought down for the morning. The voir dire oath was administered and the selection process in the *Webb* case resumed. Jean Merrill was selected for the case, Mr. Dukes was not.

"Although some of the above facts are in dispute, the essential facts are supported by a preponderance of the evidence. What happened was that the jury clerk at the request of the trial judge, in response to a complaint from [the] defendant concerning the racial makeup of the panel assembled a supplemental panel hoping that

it would contain [prospective] black jurors. Except for notifying the jurors individually of their assignment to the case the usual procedure before noted was used by the jury clerk.

"This conclusion was confirmed by Judge Corrigan's statement on the record addressed to Mr. Webb after the panel was administered the oath and removed from the courtroom and is supported and not directly contradicted by Ms. Aviles' testimony in 1991. If Ms. Aviles simply desired to accommodate the judge and provide more black venireperson[s] as suggested by Mr. Gold she could have done so by sending black jurors only. This was not done.

"In answer to the specific question of the remand order it is found that additional venirepersons were selected for the case of *State* v. [*Webb*, supra, Docket] No. CR 89 371150, in the hope that it would make more minority venirepersons available in that case. The selection was not made on a nonrandom racial basis, however." See *State* v. *Ellis*, supra, 232 Conn. 694–98.

The sixth amendment right to a jury trial requires that jury panels be drawn from a source representing a fair cross section of the community in which the defendant is tried. Id., 698; *Taylor* v. *Louisiana*, 419 U.S. 522, 526–31, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). "[A]ny attempt to stack a jury panel by intentionally including or excluding any members of a discernable class runs afoul of both due process and the right to a jury trial." *State* v. *Nims*, 180 Conn. 589, 595–96, 430 A.2d 1306 (1980).

Generally, we limit our review of the factual findings of the trial court to a determination of whether they are clearly erroneous. *State* v. *Ellis*, supra, 232 Conn. 700; see also Practice Book § 4061. The defendant in the present case does not claim, however, that the findings of the trial court are clearly erroneous. Rather,

the defendant urges this court to adopt a "heightened reliability standard" when reviewing constitutional claims raised in a capital case. The United States Supreme Court has indicated that, compared with its review of cases involving other types of penalties, it imposes a higher requirement of reliability on the determination that death is the appropriate penalty. *Mills* v. *Maryland*, 486 U.S. 367, 383–84, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988); *Woodson* v. *North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); see *State* v. *Ross*, supra, 230 Conn. 230 (United States Supreme Court has recognized "the need for heightened reliability in death penalty deliberations"). In no case cited by the defendant, however, has that court applied a heightened standard to the review of a trial court's factual findings like those involved here, which involve the assessment of the credibility of witnesses, as well as factual inferences from the presentation of evidence. *State* v. *Jones*, 234 Conn. 324, 332–33, 662 A.2d 1199 (1995); *Bieluch* v. *Bieluch*, 199 Conn. 550, 555, 509 A.2d 8 (1986). We will, however, subject these facts to the same searching inquiry that we apply in other instances of constitutional fact-finding.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . Nonetheless, because of the constitutional implications of the alleged defect in the jury selection process, we will subject the findings of the trial court to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . . *State* v. *Ross*, [supra, 230 Conn. 259] . . . ." (Citations omit-

ted; internal quotation marks omitted.) *State* v. *Ellis*, supra, 232 Conn. 700–701.

Our independent and scrupulous examination of the record of the proceedings on remand in *Ellis* persuades us that the trial court's findings of fact are well supported by the record. Accord id., 704 ("[t]he defendant has failed to direct our attention to any fact or portion of the record, nor have we discovered any, that demonstrates that the trial court was clearly erroneous in finding that the supplemental panel in *Webb* had been randomly selected"). As a result, we accept the trial court's factual determination that the defendant's venire panel was not selected on a nonrandom, racial basis. Accordingly, we conclude that the defendant's constitutional right to a venire panel drawn from a fair cross section of the community was not violated.

3

The defendant further claims that the trial court improperly deprived him of his right to a jury drawn from a fair cross section of the community because the trial court excused from jury service all members of the venire panel who had prepaid vacation plans that would conflict with the expected dates of trial. We reject this claim.

In order to establish a violation of his federal constitutional right to a jury drawn from a fair cross section of the community, the defendant must demonstrate the following: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); *State* v. *Robinson*, supra, 227 Conn. 717–18.

In this case, the defendant claims that venirepersons who are able to plan and pay in advance for a vacation represent a distinctive group in the community for the purposes of the *Duren* test. The exclusion by the trial court of those venirepersons who had prepaid vacation plans, the defendant argues, reduced the proportion of affluent prospective jurors available for jury selection and, moreover, their exclusion resulted in the systematic exclusion of affluent venirepersons.

The defendant concedes that he did not assert this claim before the trial court and, thus, he may prevail on this claim only if it satisfies the criteria established by this court in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[40] We conclude that the defendant has failed to demonstrate that the alleged constitutional violation exists and deprived him of a fair trial and, therefore, his claim must fail.

In order for us to agree with the defendant's claim of a constitutional violation, we would have to agree with several dubious propositions. Specifically, we would have to agree that those venirepersons who have made prepaid vacation plans are likely to be members of a class of venirepersons who are more affluent than other venirepersons. Although the defendant may be correct to suggest that we may draw the inference that these individuals are likely to possess some amount of

---

[40] In order for a defendant to prevail on an unpreserved claim of constitutional error, the *Golding* test requires the following conditions to be satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 213 Conn. 239–40.

disposable income, the fact that they possess sufficient disposable income to pay for a vacation in advance does not demonstrate that they belong to a different economic class from the other members of the venire panel.

Moreover, even if we could place these venirepersons in an economically distinct class, the defendant did not attempt to establish that the representation of affluent individuals in the venire panels in this case was not fair and reasonable in relation to the number of affluent persons in the community. The defendant has not alleged the proportion of prospective jurors who were excused because of their prepaid vacation plans. See *State* v. *Tillman*, 220 Conn. 487, 498, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992) (holding that defendant failed to meet second part of *Duren* test when he "did not even allege the proportion of jurors who were actually excused for economic hardship"). Neither did the defendant offer evidence establishing the size of the class of affluent individuals in the relevant community or the degree to which that class was represented on the venire panels in his case. See *State* v. *Couture*, 218 Conn. 309, 316–17, 589 A.2d 343 (1991) (fair cross section claim failed for lack of sufficient evidence when defendant did not present evidence of "whether the representation of Jews in Waterbury panels of veniremen was fair and reasonable in relation to the number of Jews residing in the judicial district").

We conclude, therefore, that the defendant has failed to establish a constitutional violation of his right to a jury drawn from a fair cross section of the community. Accordingly, the defendant's claim must fail.

### 4

The defendant further claims that the trial court failed to question adequately venirepersons who might have

seen him wearing shackles. The defendant argues that the trial court's failure to ask more specific questions concerning this issue violated his right to a fair trial.[41] We are not persuaded.

During a court recess while jury voir dire was being conducted, the defendant was taken to a secure holding area adjacent to the courtroom, which is known as the "lockup." Two of the sheriffs accompanying the defendant to the lockup later reported to the court that they saw one or two individuals pass by a door with a glass window through which these individuals might have seen the defendant as he was being placed in the lockup. The individuals were prospective jurors who were completing questionnaires inside another courtroom.

After questioning the sheriffs about the incident, the trial court stated its intention to question the members of the venire panel individually, prior to questioning by the parties. The court stated that it would seek to determine whether the particular venireperson had used the other courtroom to fill out a questionnaire and, if so, whether he or she had walked by the door and looked through the window. If the venireperson responded affirmatively, the trial court stated that it would ask what the venireperson had seen and, if the venireperson had seen the defendant, how that view might affect the venireperson's ability to serve on the jury in the defendant's trial. Additionally, the trial court stated that it would ask whether the venireperson had been involved in or had overheard any discussions concerning the case among the other members of the panel. The trial court stated that it did not wish to question the venire panel collectively because it feared that such

---

[41] Although the defendant's citation to article first, §§ 8 and 9, implies that he alleges a violation of his state constitutional right to a fair trial, we decline to review this claim because he has failed to provide an independent analysis of his claim under the Connecticut constitution. See footnote 32.

group questioning would infect the entire panel. The court reminded the parties, however, that they would have the opportunity during individual voir dire to ask more questions concerning this incident.

The defendant, who was representing himself at that time, objected to the trial court's plan and moved to strike the entire panel. The trial court denied the motion. The trial court later questioned twenty-three venirepersons about the incident. Three of those venirepersons ultimately served as members of the jury.

The defendant now claims that, as a result of the trial court's failure to ask the venirepersons specifically whether they had seen the defendant while completing their questionnaires, he was denied his right to a fair trial. The defendant bases his claim on the fact that the sheriffs indicated that one or two of the prospective jurors looked through the window in the direction of the lockup and, yet, none of the prospective jurors admitted having seen the defendant in the lockup. This possible inconsistency, the defendant argues, created an unacceptable doubt about whether the defendant received a fair trial.

"As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. *Estelle* v. *Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976). . . . Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. . . . A trial

court may employ a reasonable means of restraint upon a defendant if, exercising its broad discretion in such matters, the court finds that restraints are reasonably necessary under the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Tweedy*, 219 Conn. 489, 505–506, 594 A.2d 906 (1991); see also Practice Book § 892; *State* v. *White*, 229 Conn. 125, 145, 640 A.2d 572 (1994); *Sekou* v. *Warden*, 216 Conn. 678, 691–92, 583 A.2d 1277 (1990).

"In order for a criminal defendant to enjoy the maximum benefit of the presumption of innocence, our courts should make every reasonable effort to present the defendant before the jury in a manner that does not suggest, expressly or impliedly, that he or she is a dangerous character whose guilt is a foregone conclusion. . . . The negative connotations of restraints, nevertheless, are without significance unless the fact of the restraints comes to the attention of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Tweedy*, supra, 219 Conn. 508.

The defendant bears the burden of showing that he has suffered prejudice by establishing a factual record demonstrating that the members of the jury knew of the restraints. Id., 507–508; see *State* v. *Williams*, 195 Conn. 1, 10, 485 A.2d 570 (1985). In this case, the defendant does not argue that any of the three jurors accepted from this venire panel actually saw him in shackles or saw the sheriffs place him in the lockup. Rather, he argues that, because it was *possible* that one of the jurors saw him restrained, the trial court bore the responsibility to conduct an interrogation adequate to determine whether this had occurred. We reject this argument.

In this case, the defendant was provided with a full opportunity during voir dire examination to ask each venireperson the very question that he now faults the

trial court for failing to ask. Moreover, the record created by the trial court reveals no evidence that the defendant was wearing shackles at the time of the incident or that any one of the venirepersons actually saw him being placed in the lockup. The sheriffs testified only that one or two venirepersons could have seen the defendant when they walked by the door and looked through the window in the direction of the lockup. The sheriffs did not testify that any venireperson actually saw the defendant, and the trial court's questions did not disclose or suggest that any venireperson had seen the defendant while he was being placed in the lockup. Thus, the record does not support the defendant's claim that his right to a fair trial was prejudiced by the trial court's actions.

## C

### Other Guilt Phase Claims

#### 1

The defendant claims that the trial court gave improper preliminary instructions concerning reasonable doubt, which misled the jury and lowered the state's burden of proof, and thereby deprived the defendant of his federal constitutional rights to a fair trial and to the presumption of innocence, guaranteed by the fifth and sixth amendments to the United States constitution. Specifically, the defendant argues that the trial court committed constitutional error when, during the preliminary instructions, it improperly instructed prospective jurors to ignore "woman's intuition" when determining whether they possess a reasonable doubt. We disagree.

The defendant concedes that this claim was not preserved at trial and, thus, ordinarily should not be reviewed by this court. The defendant seeks to prevail, however, under *State* v. *Golding*, supra, 213 Conn.

239–40; see footnote 40; or, alternatively, under the plain error doctrine. "A defendant may prevail under the third prong of *Golding* on a claim of instructional error only if, considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 183, 665 A.2d 63 (1995); see *State* v. *Walton*, 227 Conn. 32, 65, 630 A.2d 990 (1993). Moreover, this court will reverse a judgment for plain error only in the "truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Wright*, 207 Conn. 276, 288–89, 542 A.2d 299 (1988). We conclude that the defendant cannot prevail under either of these standards.

"Preliminary instructions to prospective jurors in a criminal case are not mandatory. . . . When preliminary instructions are given, they do not supersede those given after evidence and arguments under our practice. . . . Although [j]udicial attempts to clarify the meaning of the phrase reasonable doubt by explanation, elaboration or illustration . . . more often than not tend to confuse or mislead, such illustrations do not necessarily constitute reversible error. . . . [T]he question on appeal is whether the court's statements correctly conveyed the concept of reasonable doubt to the jury. . . . In determining whether preliminary jury instructions require reversal, we must ask whether the jury was fully and properly instructed at the critical time, after all the evidence and after the arguments of counsel." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, supra, 235 Conn. 184.

We previously considered a similar challenge to preliminary instructions that were nearly identical to the instructions given in the present case. See id., 182–85.

As in *Figueroa*, our review of the record here persuades us that "the defendant was not prejudiced by the reference in the trial court's preliminary instructions to a 'woman's intuition' as one of several examples of methods that cannot be used in determining reasonable doubt.[42] The jury was fully and correctly instructed as to the principles of the defendant's presumption of innocence and the state's burden of proof beyond a reasonable doubt at final instructions.[43] Therefore, the defendant was not deprived of his constitutional right to a fair trial, and may not prevail under *State* v. *Golding*, supra, 213 Conn. 239–40, because he has not demonstrated that an error of constitutional dimension clearly exists." *State* v. *Figueroa*, supra, 235 Conn. 184–85. Similarly, in the present case, the preliminary instructions did not affect the fairness and integrity of and public confidence in the judicial proceedings and, therefore, did not constitute plain error. *State* v. *Wright*, supra, 207 Conn. 288–89; see *State* v. *Figueroa*, supra, 185 (preliminary instructions did not affect fairness or integrity of proceedings and, therefore, did not constitute impermissible articulation requirement).[44]

2

The defendant next challenges the failure of the trial judge to disqualify himself because of his demonstrated

---

[42] In the present case, the trial court used "woman's intuition" as one of several examples of improper bases for determining reasonable doubt. Other examples included "gut feelings" and "itchy elbows."

[43] As in *Figueroa*, the trial court's final instructions here did not refer to "woman's intuition," and the defendant has not challenged those instructions on appeal. Proper final instructions generally will cure the effects of improper preliminary instructions, particularly if sufficient time has elapsed between the preliminary and final instructions. See *State* v. *Ross*, supra, 230 Conn. 224 (later instructions given special prominence in minds of jurors); *State* v. *Lewis*, 220 Conn. 602, 614–16, 600 A.2d 1330 (1991). In the present case, the preliminary instructions were given more than two months before the final instructions.

[44] We have previously disapproved, and now reiterate our disapproval of, instructions of this type. See *State* v. *Figueroa*, supra, 235 Conn. 185; *State* v. *Williams*, 231 Conn. 235, 246–47, 645 A.2d 999 (1994).

bias against the defendant. As a result, the defendant claims, he was deprived of a fair trial. This claim is without merit.

The trial judge who presided over the defendant's trial in this case, *Corrigan, J.*, also had presided over a prior trial, in 1984, that resulted in the conviction of the defendant for sexual assault in the first degree, unlawful restraint in the first degree, and robbery in the third degree. See *State* v. *Webb*, 8 Conn. App. 620, 514 A.2d 345 (1986). During the previous sentencing hearing, the trial judge had noted that, despite the strength of the evidence against the defendant, he continued to deny his guilt at the time of sentencing. The judge had exhorted the defendant to admit his crime so that he could begin the process of rehabilitation.[45] He then had sentenced the defendant to a total effective sentence of ten years incarceration, suspended after four years, with five years probation.

Prior to jury selection in this case, the defendant moved that the trial judge disqualify himself pursuant to Canon 3 of the Code of Judicial Conduct.[46] The trial court denied the motion. The defendant renewed the

[45] Specifically, Judge Corrigan made the following statements: "But you one day are going to have to live up to [the crime] and make the admission before you can start recovering yourself. . . .

"So, I don't know what is bothering you but two young ladies have felt the cruelty that lies within you and in order to root that out, you are going to have to make the admission, you are going to have to seek treatment and I suggest that you do it right away."

[46] Canon 3 of the Code of Judicial Conduct provides in relevant part: "A Judge Should Perform the Duties of Judicial Office Impartially and Diligently. . . .

"C. Disqualification.

"(1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

motion for disqualification at the conclusion of the guilt phase and the trial court again denied the motion.

The defendant argues that the trial court improperly denied his motions because the record shows that the judge possessed an actual bias against the defendant or, at least, that there existed a reasonable question concerning his impartiality. First, the defendant asserts that, because the same judge presided over both the prior trial for sexual assault and this trial, there is a reasonable question about the judge's impartiality during this trial. In addition, the defendant contends that the judge's sentencing comments at the prior trial demonstrate that he possessed a bias against the defendant. The defendant also argues that the trial judge demonstrated his bias against the defendant when the judge "coached" one of the state's witnesses. Finally, the defendant also claims that the trial court's instructions to the jury during the penalty phase were "biased and one-sided" and, as a result, deprived the defendant of his right to a fair trial. We reject each of these claims.

"Canon 3C (1) of the Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 746, 444 A.2d 196 (1982); E. Thode, Reporter's Notes to Code of Judicial Conduct (1973) p. 60 (standard is whether a reasonable [person] knowing all the circumstances would conclude that the judge's impartiality might reasonably be questioned)." (Internal quotation marks omitted.) *Tessmann* v. *Tiger Lee Construction Co.*, 228 Conn. 42, 57–58, 634 A.2d 870 (1993). "Even in the absence of actual bias, a judge must disqualify himself

in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. *State* v. *Santangelo*, 205 Conn. 578, 602, 534 A.2d 1175 (1987)." *In re Zoarski*, 227 Conn. 784, 792, 632 A.2d 1114 (1993).

We consider first the defendant's claims related to the judge's involvement in the 1984 trial and sentencing. We reject the defendant's argument that the mere fact that the same trial judge presided over both trials raises a reasonable question about the judge's impartiality. Courts have routinely held that the prior appearance of a party before a trial judge does not reflect upon the judge's impartiality in a subsequent action involving that party. See, e.g., *Schiff* v. *United States*, 919 F.2d 830, 834 (2d Cir. 1990), cert. denied, 501 U.S. 1238, 111 S. Ct. 2871, 115 L. Ed. 2d 1037 (1991); *United States* v. *Devin*, 918 F.2d 280, 294 (1st Cir. 1990); *Perlmutter* v. *Johnson*, 6 Conn. App. 292, 295, 505 A.2d 13, cert. denied, 200 Conn. 801, 509 A.2d 517 (1986), cert. denied, 479 U.S. 1035, 107 S. Ct. 886, 93 L. Ed. 2d 839 (1987). The greater the length of time that has passed since the prior appearance, the less likely it is that the judge possesses any bias against the party. See *Commonwealth* v. *Simpson*, 6 Ma. App. 856, 857, 373 N.E.2d 362 (1978) (two years since prior trial); *Commonwealth* v. *Rolan*, 520 Pa. 1, 6, 549 A.2d 553 (1988) (nine years since prior trial); *State* v. *Savo*, 150 Vt. 610, 611, 556 A.2d 54 (1987) (eight years since prior trial). In the present case, more than six years had passed between the defendant's prior trial for sexual assault and the trial in this case.

Moreover, the United States Supreme Court has recently held that a federal statute concerning the disqualification of judges, the text of which is essentially

identical to Canon 3 of our Code of Judicial Conduct,[47] does not require the disqualification of a judge who has presided at a prior trial of the defendant. *Liteky* v. *United States*, 510 U.S. 540, 547, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). In *Liteky*, the court concluded that opinions formed by the judge as a result of his or her role in the prior trial do not require disqualification unless the judge displays a level of bias that would make a fair trial impossible. Id., 551. We see no reason to apply a different standard here.

The defendant further claims that the judge's sentencing comments during the prior trial demonstrated bias, and he relies particularly upon the judge's comment regarding the defendant's "cruelty."[48] In this case, the jury was required to consider, during the penalty phase, whether the defendant committed the capital felony in an especially cruel manner in order to determine whether one of the alleged statutory aggravants existed. Thus, the defendant argues, the prior statement by the judge concerning the defendant's cruelty demonstrates that the judge possessed an actual bias that could have affected these proceedings. Upon thorough review of the record, we conclude that the judge's actions and comments during the prior sentencing hearing do not reflect any actual bias, nor do they raise a reasonable question concerning his impartiality.

The defendant next contends that the trial judge demonstrated his bias against the defendant when the judge "coached" a state's witness. The record does not sup-

---

[47] Title 28 of the United States Code, § 455 (1994) provides in relevant part: "(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

"(b) He shall also disqualify himself in the following circumstances:

"(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

[48] See footnote 45.

port the defendant's claim. While the jury was not present, the state made an offer of proof concerning the testimony of Billington. After both the state and the defendant[49] questioned Billington, the defendant objected to the admission of her testimony. The trial court ruled, in response to the defendant's objection, that Billington would be limited in her ability to testify about the defendant's reputation for violence. When the witness indicated that she did not understand how she should limit her answers, the trial explained those limitations to her.[50] This action protected the defendant from improper testimony about prior violent acts. The court's instructions to Billington, in response to her indication that she did not understand how to conform her testimony to the limits set by the court, did not place the judge in the role of advocate, as the defendant claims. Rather, the instructions to Billington served to minimize the possibility that the defendant would be harmed by improper testimony in the presence of the jury. Thus, we conclude that these actions by the judge do not reflect any bias against the defendant.

Finally, we consider the defendant's claim that the trial court also demonstrated its bias against him when

---

[49] The defendant was representing himself at this point in the trial.

[50] "The Court: First of all, Miss Creamer [the assistant state's attorney] will ask you whether or not the defendant even admitted to you of any incident of violence. And you can answer yes. And what was it. He indicated to you previously he'd been convicted of rape. And you can indicate the date that he admitted this was some time in May of 1987. And then they can ask do you know of his reputation in the community for violence or nonviolence. And you can indicate yes, you do. And your—and then they say what is it. You merely have to say there are incidents when he has been known to be or thought to be violent. And that's taken from family recitation. But you can't say where you obtained it. Do you follow that? You've already testified that you learned from his family that he had a violent incident and complaint. You likewise indicated that he is being accused of several bumping incidents with women.

"The Witness: So you are saying not to mention that.

"The Court: You are not to mention the specifics. There are only two areas in which you're going to be questioned. First, on his admission as to

it failed to instruct the jury concerning each of the nonstatutory mitigants alleged by the defendant. Although we have previously held that, if requested to do so, the trial court should instruct the penalty phase jury on each claimed nonstatutory mitigant; *State* v. *Breton*, supra, 235 Conn. 252–55;[51] the trial court's failure to provide such instructions in this case does not give rise to a reasonable question concerning the judge's impartiality. The court's instructions do not reflect any bias against the defendant.

Thus, our review of the record reveals no bias against the defendant on the part of the trial judge, nor does it raise a reasonable question concerning the judge's impartiality. The trial court's denial of the defendant's motions for disqualification did not deprive him of a fair trial.

### III
### CHALLENGE TO CONSTITUTIONALITY OF BIFURCATED TRIAL PROCEDURE

The defendant claims that the bifurcated conviction and sentencing procedures for capital felonies established by § 53a-46a violate his constitutional right to an impartial jury guaranteed by article first, §§ 8 and 19, of the state constitution, because the statute requires the same jury to determine both guilt and punishment. We are not persuaded.

Prior to the penalty phase hearing, the defendant moved to question the members of the jury individually to determine whether the evidence presented at trial or the defendant's self-representation during the trial

the conviction of rape and, secondly, as to his being considered sometimes violent in the community."

[51] See also part IV B 1 of this opinion, in which we reject the defendant's claim that he was deprived of a fair trial by the trial court's failure to provide adequate instructions concerning the nonstatutory mitigants alleged by the defendant.

had affected the jurors' ability to serve impartially during the penalty phase. The trial court denied the motion. The defendant also moved to have the penalty phase hearing held before a panel of three judges. The state objected and the trial court also denied that motion. The defendant did not claim at trial that the jury should be dismissed because its familiarity with the guilt phase evidence would prevent it from deciding fairly the penalty phase issues.[52] The defendant also did not claim that the statutory requirement that the guilt phase jury must serve as the sentencing jury violated his constitutional right to an impartial jury.

Thus, we conclude that the defendant failed to preserve his constitutional claim at trial. We therefore consider his claim pursuant to the criteria set forth in *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 40. We conclude that the defendant cannot prevail on this claim because he has failed to demonstrate that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial."[53] Id., 240.

"In our assessment of whether the statute passes constitutional muster, we proceed from the well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable

[52] The defendant did move to discharge the jury on the grounds that the jury's exposure to the defendant during his representation of himself compromised its ability to consider the penalty phase issues fairly and impartially, and also compromised the ability of his counsel to render effective assistance by contesting evidence of aggravating factors and presenting evidence of mitigating factors. As a result, the defendant argued, the trial court possessed good cause to discharge the jury as permitted by § 53a-46a (b). The trial court denied the motion, and the defendant has not challenged that ruling.

[53] The defendant also urges us to review this claim under the plain error doctrine. Because we conclude that the defendant has failed to demonstrate a constitutional violation, the trial court's decision to conduct the trial pursuant to the bifurcated procedure that is mandated by statute cannot be considered error, plain or otherwise.

doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . The burden of proving unconstitutionality is especially heavy when, as at this juncture, a statute is challenged as being unconstitutional on its face." (Citations omitted; internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 236.

Section 53a-46a; see footnote 10; requires the jury that determined guilt to hear the penalty phase evidence unless the defendant moves to have that hearing tried to the court, the state consents, and the court approves the motion. The defendant now argues that this statutory requirement deprived him of an impartial jury for the determination of the penalty phase issues. The defendant contends that a capital jury that has convicted a defendant, often on the basis of gruesome evidence, will not be able to consider impartially the defendant's evidence of mitigating factors. We disagree.

In *Gregg* v. *Georgia*, supra, 428 U.S. 163, 207, the United States Supreme Court upheld against a federal constitutional challenge a capital sentencing statute that required the same fact finder to sit in both phases of a capital felony trial. See *Lockhart* v. *McCree*, supra, 476 U.S. 180. Similarly, numerous courts, both state and federal, have rejected constitutional challenges to the requirement that the same jury sit for both guilt and penalty phases of a bifurcated capital felony trial. See, e.g., *Wingo* v. *Blackburn*, 783 F.2d 1046, 1052 (5th Cir. 1986), cert. denied, 481 U.S. 1042, 107 S. Ct. 1984, 95 L. Ed. 2d 823 (1987); *Lasley* v. *State*, 274 Ark. 352, 356, 625 S.W.2d 466 (1981); *Hellman* v. *State*, 492 So. 2d 1368, 1372 (Fla. Dist. Ct. App. 1986); *Frazier* v. *State*, 257 Ga. 690, 692, 362 S.E.2d 351 (1987), cert. denied, 486 U.S. 1017, 108 S. Ct. 1755, 100 L. Ed. 2d 217 (1988); *Rondon* v. *State*, 534 N.E.2d 719, 724 (Ind.), cert. denied, 493 U.S. 969, 110 S. Ct. 418, 107 L. Ed. 2d 383 (1989); *Foster* v. *State*, 304 Md. 439, 447–66, 499 A.2d 1236 (1985), cert. denied, 478 U.S. 1010, 106 S. Ct. 3310, 92

L. Ed. 2d 723 (1986); *Billiot* v. *State,* 454 So. 2d 445, 455–56 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S. Ct. 1232, 84 L. Ed. 2d 369 (1985); *State* v. *O'Neal,* 718 S.W.2d 498, 502 (Mo. 1986), cert. denied, 480 U.S. 926, 107 S. Ct. 1388, 94 L. Ed. 2d 702 (1987); *State* v. *Hicks,* 43 Ohio St. 3d 72, 80, 538 N.E.2d 1030 (1989), cert. denied, 494 U.S. 1038, 110 S. Ct. 1502, 108 L. Ed. 2d 636 (1990); *Pope* v. *Commonwealth,* 234 Va. 114, 122, 360 S.E.2d 352 (1987), cert. denied, 485 U.S. 1015, 108 S. Ct. 1489, 99 L. Ed. 2d 716 (1988).

In most capital cases, the evidence presented to demonstrate the defendant's guilt also will be relevant to the determination of the existence of aggravating factors. See *Lockhart* v. *McCree,* supra, 476 U.S. 181. Thus, if different juries were required to consider the guilt and penalty issues, much of the same evidence would be likely to be presented to each of the juries.[54] As a result, any possible anger or revulsion experienced by the guilt phase jury would not be limited to the guilt phase jury because the penalty phase jury would be exposed to the same evidence.

Moreover, the defendant may derive a benefit that would not be available to him if separate juries were to determine guilt and penalty. Although the guilt phase jury has voted to convict the defendant, in some cases individual jurors may retain residual doubts concerning the defendant's guilt. See id. In fact, the defendant recognized such a possibility in this case when he claimed as a mitigating factor "lingering doubts" concerning whether he had kidnapped the victim. Such doubts may

---

[54] For example, in this case, the jury was required to determine whether the defendant committed the murder in a manner that was "especially heinous, cruel or depraved." General Statutes § 53a-46a (h) (4); see footnote 10. If the jury had not already reviewed the evidence concerning the manner in which the victim was killed during the guilt phase, the state undoubtedly would have presented that evidence in the penalty phase in order to establish that aggravating factor.

lead the jury to find a mitigating factor for the defendant. No doubt would be present, however, in the minds of jurors impaneled for purposes of a penalty phase hearing only, who were not presented with all of the specific evidence of guilt but were presented only with the fact that the defendant had been found guilty of the murder.

Finally, the defendant can avoid a determination of both guilt and penalty by the same jury if he elects to have the guilt phase of his trial heard by a panel of three judges.[55] If the three judge panel convicts the defendant of a capital felony, the statute requires the court to impanel a jury to determine the penalty phase issues.[56]

Therefore, we conclude that the statutory requirement that the same jury determine both guilt and penalty in capital cases does not deprive the defendant of his state constitutional right to an impartial jury. The defendant has failed to demonstrate that the jury's

[55] General Statutes § 53a-45 (b) provides: "If a person indicted for murder or held to answer for murder after a hearing conducted in accordance with the provisions of section 54-46a waives his right to a jury trial and elects to be tried by a court, the court shall be composed of three judges designated by the chief court administrator or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

[56] Section 53a-46a (b) provides that the penalty phase hearing "shall be conducted . . . before a jury impaneled for the purpose of such hearing if . . . the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45 . . . ."

Section 53a-46a (b) also permits the defendant to choose to have the penalty phase issues decided by the court, with the consent of the court and the state. At oral argument before this court, the defendant claimed that the state's power to withhold its consent also violated the constitutional right to an impartial jury and rendered this statute facially invalid. This claim was not adequately preserved at trial, nor was it raised in the defendant's appellate briefs and, therefore, we decline to review it. State v. Daniels, 180 Conn. 101, 104, 429 A.2d 813 (1980); State v. Lockman, 169 Conn. 116, 121, 362 A.2d 920, cert. denied, 423 U.S. 991, 96 S. Ct. 403, 46 L. Ed. 2d 309 (1975).

determination of guilt creates a bias sufficient to prevent the jury from fairly and impartially determining the penalty phase issues.[57]

## IV

## PENALTY PHASE CLAIMS

The defendant raises several challenges to the penalty phase proceedings. First, the defendant claims that the trial court improperly failed to grant a mistrial because a juror slept during the presentation of evidence. Second, the defendant raises several claims concerning the trial court's jury instructions regarding the "especially heinous, cruel or depraved" statutory aggravating factor, and the constitutionality of that factor. Finally, the defendant claims that the evidence was insufficient to support the jury's finding of the "especially heinous, cruel or depraved" statutory aggravant. Although we agree with the defendant that the trial court improperly instructed the jury concerning the "especially heinous, cruel or depraved" statutory aggravant, we also conclude that any error caused by the improper instructions was harmless. We reject all of the defendant's other challenges to the validity of the penalty phase proceedings.

## A

## Mistrial Issue

The defendant first claims that the trial court improperly failed to grant a mistrial because a juror slept during the penalty phase proceedings. During the penalty phase, the defendant moved for a mistrial because he

---

[57] We note that the trial court possesses the power to discharge the jury in any case in which the court concludes that the jury cannot fairly perform its penalty phase duties. Section 53a-46a (b) provides that the penalty phase hearing may be conducted "before a jury impaneled for the purpose of such hearing . . . if the jury which determined the defendant's guilt has been discharged by the court for good cause . . . ."

claimed that one of the jurors had been observed sleeping during the presentation of evidence. The trial court conducted an evidentiary hearing at which three witnesses testified that on July 16, 1991, they had observed a female juror slumped down in her chair with her eyes closed, apparently asleep. The juror, Jacqueline Medina, testified that she had closed her eyes on that day during the qualification of one of the defendant's expert witnesses. She stated, however, that she had not been sleeping and that she had been attentive to the evidence presented. She also said that she would be able to discuss the evidence during deliberations. The trial court credited Medina's testimony that she had not slept during the trial and denied the defendant's motion for a mistrial.

"A motion for a mistrial is granted only where it is apparent to the court that some occurrence during the trial has deprived a party of the opportunity for a fair trial. *State* v. *Hill*, 201 Conn. 505, 510, 523 A.2d 1252 (1986); *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *State* v. *Hawthorne*, 176 Conn. 367, 372, 407 A.2d 1001 (1978). The trial court's exercise of its broad discretion to determine whether a motion for a mistrial should be granted will be reversed on appeal only if that discretion has been abused. *State* v. *Hancich*, 200 Conn. 615, 624–25, 513 A.2d 638 (1986); *State* v. *Smith*, [200 Conn. 544, 548, 512 A.2d 884 (1986)]; *State* v. *Fleming*, 198 Conn. 255, 264, 502 A.2d 886 [cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342] (1986)." *State* v. *Cruz*, 212 Conn. 351, 364, 562 A.2d 1071 (1989); see *State* v. *Asherman*, 193 Conn. 695, 735–36, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985) (motion for new trial based on juror misconduct granted only if misconduct prejudicial). Moreover, we accept the factual findings of the trial court unless they are clearly

erroneous. Practice Book § 4061; *State* v. *Stepney*, 191 Conn. 233, 239, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

Our review of the record indicates that the trial court made a finding that was not clearly erroneous when it credited the testimony of Medina that she had not been sleeping and had been attentive to the evidence presented. Accordingly, the trial court did not abuse its discretion when it denied the defendant's motion for a mistrial.

## B

### Jury Instruction Issues

#### 1

The defendant next claims that the trial court instructed the jury in an unbalanced manner that violated his federal constitutional rights to a fair trial and to be free from cruel and unusual punishment. During the trial court's penalty phase instructions, it informed the jury that the state alleged the existence of two aggravating factors. The court described separately each alleged aggravant and briefly marshaled some of the evidence relevant to each. The trial court subsequently informed the jury that the defendant alleged several mitigating factors and that a list of those factors would be given to the jury during its deliberations. The court specifically described the defendant's one alleged statutory mitigant and the court also briefly marshaled some of the evidence relevant to that mitigant. The court informed the jury that the defendant's other alleged mitigants were encompassed within the statutory language allowing the jury to find any mitigating factor.[58]

---

[58] General Statutes § 53a-46a (g) provides in relevant part: "The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. . . ." The statute further provides that the mitigating factors to be

The court instructed the jury to "consider all the factors which the defendant listed and any other factors which might arise from the evidence and ask yourself is there a circumstance or factor which you can draw from the evidence of the defendant's character, background, and history or the nature or circumstances of the crime which provides a basis for a penalty less than death. You must approach this decision considering with fairness and mercy the standards which should apply in this case or the community. Your consideration must be applied without passion or prejudice." The court then encouraged the jury to consider specific evidence relevant to the defendant's alleged mitigants, including certain expert medical testimony, the defendant's school records and the testimony of school personnel, the testimony of the defendant's sister, nephew and mother, and the testimony of Billington concerning the defendant's relationship with his child. The trial court cautioned the jury, however, that its consideration of the alleged mitigants was not limited to that evidence.

The defendant's counsel objected to the trial court's failure "to read the list of mitigating factors and then instruct the Jury on them, marshall evidence on them, in the same fashion as was done with aggravating factors." The trial court declined to modify the instruction.

The defendant now claims that the trial court's unbalanced treatment of aggravating and mitigating factors led the jury to underestimate the importance of the defendant's alleged mitigating factors. As a result, the defendant argues, the jury failed to give adequate consideration to his claims and deprived him of an individualized consideration of mitigating factors as required by the eighth and fourteenth amendments to the United States constitution. We are not persuaded.

considered "shall include, but are not limited to" the five factors described in the statute.

The defendant relies on the decision of this court in *State* v. *Breton,* supra, 235 Conn. 206, in which we considered a claim that the trial court improperly failed to instruct the jury on each mitigating factor alleged by the defendant.[59] In that case, we acknowledged the federal constitutional requirement that "[t]he capital sentencer . . . must be allowed to consider all relevant mitigating evidence in order to 'make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment.' [*State* v. *Ross,* supra, 230 Conn. 240]; see *Blystone* v. *Pennsylvania,* 494 U.S. 299, 307–308, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990)." *State* v. *Breton,* supra, 254. We then proceeded to describe the manner in which the court's instructions conformed to this requirement. Id.

Despite the trial court's compliance with the federal constitutional standard, however, we concluded that the trial court should have granted the defendant's request for specific instructions concerning the mitigating factors. "We nevertheless are persuaded that the recounting of the claimed nonstatutory mitigating factors by the trial court may assist jurors in their consideration of the mitigating evidence. Accordingly, at the new hearing, the trial court should, *if requested by the defendant,* instruct the jury on each of the statutory *and* nonstatutory mitigating factors claimed by the defendant and, *again, if requested,* submit to the jury an accurate written list of those mitigating factors. Although we share the trial court's concern that a court could, in specifically enumerating the mitigating factors, convey the false impression that the list is exclusive, thereby foreclosing the jury's consideration of

---

[59] In *Breton,* the defendant also challenged the trial court's failure to submit the list of claimed mitigants to the jury. In the present case, the defendant's list of mitigating factors was submitted to the jury prior to its deliberations.

other unenumerated mitigating factors we are confident that a properly crafted cautionary instruction will eliminate the possibility of any such misunderstanding." (Emphasis in original.) Id., 254–55.

The defendant claims that the trial court's failure to conform to the *Breton* rule, which was established more than four years after the trial court instructed the jury in this case, entitles him to a new penalty phase hearing. We do not agree. Although we have instructed our trial courts to provide jury instructions on each alleged mitigant, we require this not as a matter of federal constitutional law but, rather, as a matter of sound judicial policy. Moreover, we will not require the trial court to comply with a nonconstitutional rule established several years after the court's action. Thus, the defendant may prevail on this claim only if the trial court's instructions failed to satisfy the requirements established by the United States Supreme Court pursuant to the eighth and fourteenth amendments to the federal constitution.

The United States Supreme Court has held that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Penry* v. *Lynaugh*, 492 U.S. 302, 328, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). In *Blystone* v. *Pennsylvania*, supra, 494 U.S. 306, the court considered a claim that a death penalty statute's sentencing instructions unconstitutionally limited the jury's consideration of unenumerated mitigating circumstances. The court rejected this argument, concluding that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence. In petitioner's case the jury was specifically instructed to consider, as mitigating evidence, any 'matter concerning the character or record

of the defendant, or the circumstances of his offense.' . . . This was sufficient to satisfy the dictates of the Eighth Amendment." (Citation omitted.) Id., 307–308.

In the present case, the jury was expressly instructed that, upon its consideration of the evidence, it could find any mitigating factor, even a factor not alleged by the defendant. In fact, the trial court suggested one such factor to the jury.[60] The jury further was instructed that it must consider all the evidence presented, not just the evidence mentioned by the court during its instructions. These instructions comported with the federal constitutional requirement that the jury must be permitted to consider all possible mitigating factors. Moreover, the instructions were not unbalanced in a manner that would have led the jury to believe that it was not required to consider fully and carefully the mitigating evidence. Thus, upon a thorough review of the record, we conclude that the trial court's instructions regarding mitigating factors did not violate the defendant's federal constitutional rights.

2

The defendant also claims that the trial court improperly instructed the jury concerning the "especially heinous, cruel or depraved" statutory aggravant in violation of his federal and state constitutional rights. We agree. We conclude, however, that the error was harmless.

During its final penalty phase instructions, the trial court instructed the jury concerning the meaning of the statutory language of one of the aggravants claimed

---

[60] The trial court explained that, although the defendant was more than eighteen years of age and, thus, could not benefit from that statutory mitigating factor, the jury could consider evidence of the defendant's age and evidence that his mental and emotional development was not commensurate with his chronological age at the time of the murder. The defendant had not included this possible mitigant on his list to be submitted to the jury.

by the state. The statute requires the jury to find the existence of an aggravating factor if it finds that "the defendant committed the offense in an especially heinous, cruel or depraved manner." General Statutes § 53a-46a (h) (4). The trial court instructed the jury that it could consider the three terms alternatively, and could conclude that the defendant acted in a manner that was either "especially heinous," "especially cruel" or "especially depraved." The court informed the jury that "[e]specially means something more than being cruel, heinous or depraved." The court defined "cruel" as "disposed to inflicting pain or suffering. It includes not only physical pain but also mental stress. So the striking of a person which causes physical pain or the helpless anticipation of impending pain can cause conscious suffering. Where it is intended it is cruel. Where a person receives pain from repeated striking or mental distress from the anticipation of impending pain or death it can be especially cruel." The court then marshaled the evidence related to this aggravant. The court further instructed the jury that "[h]einous has its ordinary meaning and that is hatefully or shocking—shockingly evil. It involves the senselessness of the crime and the helplessness of the victim. . . . Depraved likewise has its ordinary meaning, that is debased, corrupt, perversed, relishing in the acts causing the pain, the mental distress and the killing."

The defendant objected to this charge on the grounds that the trial court's definition of "especially cruel" allowed the jury to consider the victim's mental suffering and, thus, was impermissibly broader than the meaning given that term by this court in State v. Breton, 212 Conn. 258, 270, 562 A.2d 1060 (1989). The trial court declined to modify the instruction. The jury returned a special verdict finding the existence of two aggravating factors, including a finding that the defendant had com-

mitted the offense in an especially heinous and cruel manner.[61]

### a

The defendant now argues that the trial court's definition of "especially heinous, cruel or depraved" rendered that language unconstitutionally vague as applied, in violation of the federal constitution's eighth amendment prohibition against cruel and unusual punishment, and in violation of the right to due process of law guaranteed by article first, § 8, of the state constitution. The defendant concedes that this claim was not preserved at trial and that he may prevail only if it satisfies the criteria established by this court in *State* v. *Golding,* supra, 213 Conn. 239–40. See footnote 40.

In *State* v. *Breton,* supra, 212 Conn. 266, we held that a limiting construction was necessary to save the pertinent statutory language from unconstitutional vagueness. Specifically, we concluded that "especially cruel" must be defined as "the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing." Id., 270. The court adopted this definition "as an acceptable core construction of § 53a-46a (h) (4)." Id.

In *State* v. *Ross,* supra, 230 Conn. 260–62, we considered whether the *Breton* construction of "especially cruel" allowed the fact finder to consider psychological anguish as well as physical pain, and whether separate meanings should be assigned to the terms "heinous" and "depraved." We held that the *Breton* construction

---

[61] The special verdict form permitted the jury to indicate separately whether it found (1) that the defendant had committed the offense in a manner that was "especially heinous, cruel or depraved," and (2) the defendant's conduct to be, in separate answers, "especially heinous," "especially cruel," or "especially depraved." The jury marked "yes" for each of these options, except "especially depraved." We interpret this form, therefore, to mean that the jury found the defendant's conduct in committing the capital felony to be especially heinous and especially cruel.

does not exclude mental anguish from "extreme pain or torture." Id., 260. We further held that § 53a-46a (h) (4) encompasses one unitary aggravating factor, and that "the terms 'heinous or depraved' address the defendant's state of mind in intentionally inflicting on his victim extreme pain or torture above and beyond that necessarily accompanying the underlying killing. So construed, § 53a-46a (h) (4) passes constitutional muster under the United States constitution . . . and under our state constitution." (Citation omitted.) Id., 261.

In the present case, the trial court instructed that "[w]here a person receives pain from repeated striking or mental distress from the anticipation of impending pain or death it can be especially cruel." The court defined "heinous" as "hatefully or . . . shockingly evil," and it defined "depraved" as "debased, corrupt, perversed, relishing in the acts causing the pain, the mental distress and the killing." Thus, the court did not appropriately confine its definition of the aggravating factor to the meaning given to those terms in *Breton* and *Ross*, namely, the infliction of mental distress or physical pain that is above and beyond that necessarily accompanying the murder. Not only did the instructions improperly fail to incorporate the judicial gloss placed on the statutory term by this court in those two cases, but, arguably, the instructions rendered the statutory language constitutionally vague as well, because we adopted that judicial gloss in order to avoid improperly vague interpretations of the language. See *State* v. *Ross*, supra, 230 Conn. 260–61; *State* v. *Breton*, supra, 212 Conn. 270–71. Therefore, we conclude that the trial court's instructions on the "especially heinous, cruel or depraved" aggravant were flawed.

b

The defendant also claims that the statutory terms "especially heinous" and "especially depraved" are

facially vague in violation of the due process clause of article first, § 8, of the Connecticut constitution. We resolved this claim in *State* v. *Ross*, supra, 230 Conn. 261, in which we placed a limiting construction on those terms. Accordingly, we reject this claim.

c

The defendant also argues that § 53a-46a (h) (4), when read as a whole, is unconstitutionally vague on its face. This claim is also foreclosed by our decision in *State* v. *Ross*, supra, 230 Conn. 261, in which we held that, when construed as a unitary aggravating factor and limited as required by *Breton*, the statutory language avoids unconstitutional vagueness under both the federal and state constitutions.

d

Although we conclude that the trial court provided flawed instructions to the jury concerning the aggravating factor set forth in § 53a-46a (h) (4), we nevertheless conclude that the defendant cannot prevail in his claim to set aside the penalty phase proceedings. We do so because we are satisfied that the trial court's instructions were harmless beyond a reasonable doubt.

In this case, the sentencing jury returned a special verdict form indicating that it had found two aggravating factors. In addition to finding that the defendant committed the crime in an especially heinous and cruel manner, the jury also found that the defendant committed the murder during the attempted commission or during the immediate flight from the attempted commission of a sexual assault in the first degree, and that he had previously been convicted of a sexual assault in the first degree.[62] In this case, the jury found the defend-

---

[62] Section 53a-46a (h) (1) provides that an aggravating factor exists if the jury finds that "the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commis-

ant to be guilty of criminal attempt to commit sexual assault in the first degree. In addition, the defendant stipulated to the fact that he previously had been convicted of sexual assault in the first degree. Thus, the jury was required to determine only whether the capital felony was committed during the attempted sexual assault or the immediate flight therefrom.

The United States Supreme Court has applied harmless error analysis to uphold the imposition of the death penalty despite the fact that one of the aggravating factors found by the jury was later held to be unconstitutional. In *Zant* v. *Stephens*, 462 U.S. 862, 866–67, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), the court reviewed a death sentence that had been based upon the jury's finding of three aggravating factors. One of those factors had been declared unconstitutional, and the defendant claimed that the trial court's instructions concerning the invalid factor may have affected the jury's deliberations. Id., 868, 885.

The court relied upon the fact that the invalid aggravant did not involve constitutionally protected conduct or constitutionally impermissible factors, such as race, religion or the political affiliation of the defendant. Nor did the invalid aggravant relate to conduct that should militate against the death penalty, such as the defendant's mental illness. "If the aggravating circumstance at issue in this case had been invalid for reasons such as these, due process of law would require that the jury's decision to impose death be set aside." Id., 885.

The court further relied upon the fact that the evidence underlying the invalid aggravating factor was fully admissible at the sentencing phase, even if the state had not alleged the invalid factor. Id., 886. After comparing the instruction given by the trial court with

---

sion or attempted commission of, a felony and he had previously been convicted of the same felony . . . ."

a proper instruction concerning the same evidence, the court concluded that the erroneous instruction concerning the invalid aggravant had an inconsequential impact on the jury's decision. Id., 888–89.

Finally, the court stated that its decision rested in part on the fact that the capital sentencing scheme at issue incorporated "an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality." Id., 890. The United States Supreme Court expressly reserved decision concerning the significance of the invalidation of an aggravating factor under a statute that required the capital sentencer to weigh aggravating factors against mitigating factors. Id. Under the Georgia statute at issue, as under § 53a-46a (f), the finding of more than one aggravating factor bore no greater significance than the finding of a single aggravant. Id., 873–74, 891.

In *Clemons* v. *Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990), the court reviewed a death sentence imposed by the jury after it found two aggravating factors and weighed those factors against the mitigating circumstances. Although one of the two aggravants was subsequently invalidated, the Mississippi Supreme Court upheld the imposition of the death penalty. Id., 743–44. The United States Supreme Court held that the federal constitution permitted the state appellate court to affirm the validity of the sentence either by reweighing the sentencing evidence or by reviewing the sentencing proceeding for harmless error. Id., 745–54; see also *Arizona* v. *Fulminante*, 499 U.S. 279, 306–12, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (applying harmless error analysis to coerced confession in capital case); *Barclay* v. *Florida*, 463 U.S. 939, 957–58, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983) (upholding state case law permitting harmless error analysis in capital cases).

The state argues that we should apply harmless error analysis in this case to uphold the imposition of the death sentence. We agree. The state bears the burden of proving that a constitutional error was harmless beyond a reasonable doubt. *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996). We conclude that the state has met that burden. First, as in *Zant*, the improper instruction in this case did not implicate constitutionally protected conduct or constitutionally impermissible factors, such as race or religion.

Second, the invalidity of the "especially heinous, cruel or depraved" aggravating factor was caused by instructional impropriety only, not per se unconstitutionality. Thus, the evidence supporting that aggravant, concerning the manner in which the crime was committed, was properly presented to the jury.

Third, the two aggravants are logically and factually distinct, and the trial court's instructions properly presented the aggravants as separate matters for the jury's consideration. In this connection, the state properly points to the facts that the trial court expressly instructed the jury that the state was required to prove only one aggravating factor, and that each aggravant must be considered separately "on its own evidence." Moreover, the trial court gave separate instructions concerning each aggravant and marshaled the evidence related to each aggravant separately.

Fourth, harmless error analysis is appropriate in capital cases because our capital sentencing scheme provides for meaningful appellate review sufficient to ensure that an invalid aggravating factor will not result in the arbitrary or capricious imposition of a sentence of death. See General Statutes § 53a-46b.

Fifth, applying harmless error analysis in a capital case conforms with our prior practice and reasoning. See *State* v. *Ross*, supra, 230 Conn. 215–21; *State* v.

*Chapman*, 229 Conn. 529, 543, 643 A.2d 1213 (1994) (if state alleges commission of crime in more than one way and trial court instructs that state need prove only one allegation, verdict will be upheld if sufficient evidence of any allegation).

Finally, we note that overwhelming evidence supported the jury's finding of the aggravating factor set forth in § 53a-46a (h) (1). To find this factor, the jury was required to conclude only that the murder of the victim occurred in the course of an attempted sexual assault or during the flight from that crime. The evidence in this case unequivocally supported the jury's conclusion that the defendant murdered the victim during the commission of or flight from an attempted sexual assault. In the circumstances of this case, we are convinced beyond a reasonable doubt that the trial court's improper instructions concerning the "especially heinous, cruel or depraved" aggravating factor did not affect the jury's deliberations concerning the other alleged aggravant. The defendant, therefore, was not harmed by the trial court's improper instruction.[63]

### 3

The defendant next claims that the evidence was insufficient to support the jury's finding that the defendant committed the offense in an especially heinous and cruel manner. This claim is without merit.

First, we note that, ordinarily, we would decline to resolve this claim because we have concluded, in part

---

[63] This is not to say that improper instructions regarding an aggravating factor may never result in the invalidation of the death sentence if the jury's verdict also includes the finding of a valid aggravating factor. Rather, we conclude that, if the state meets its burden of demonstrating beyond a reasonable doubt that the jury's finding of a valid aggravating factor was not improperly affected by the evidence or instructions concerning the invalid aggravant, the imposition of the death penalty may stand despite the constitutional error. Whether the invalid aggravant affected the jury's deliberations must be determined on a case-by-case basis.

IV B 2 of this opinion, that the trial court improperly instructed the jury concerning the "especially heinous, cruel or depraved" aggravant. In this case, however, we review the claim because we conclude in part VI A 5 of this opinion that the jury's finding concerning this aggravating factor, which we conclude is based upon sufficient evidence, is relevant to our proportionality review of the defendant's death sentence.

After the state's presentation of evidence during the penalty phase, the defendant moved for a judgment of acquittal on the aggravating factors based on "the failure of the State to sustain a prima facie case of proof beyond a reasonable doubt." The trial court denied the motion.

The state must establish the existence of an aggravating factor beyond a reasonable doubt. *State* v. *Ross*, supra, 230 Conn. 258; *State* v. *Daniels*, 207 Conn. 374, 384, 542 A.2d 306 (1988). The defendant claims that, even if the jury had been properly instructed concerning the aggravating factor, the evidence was insufficient to prove beyond a reasonable doubt that he intentionally inflicted extreme physical or psychological pain above and beyond that necessary to accomplish the murder, as required by this court's definition of the aggravant in *Ross* and *Breton*.

Furthermore, as in *Ross*, the defendant urges this court to review this claim with a heightened standard of review because it is made pursuant to the statutory mandate of § 53a-46b (b) (2), which requires this court to "affirm the sentence of death unless it determines that . . . the evidence fails to support the finding of an aggravating factor." We conclude, as we did in *Ross*, that "[t]hat language gives no indication that the legislature intended a fundamental alteration in the standard of review that generally governs a criminal defendant's challenge of the sufficiency of the evidence of his guilt

at trial. See *State* v. *Francis,* 228 Conn. 118, 127, 635 A.2d 762 (1993); *State* v. *Joyner,* supra, 225 Conn. 455. Nonetheless, because of the seriousness of any death penalty determination, we will subject a finding of an aggravating factor to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession; *State* v. *Medina,* 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); or the seizure of a defendant. *State* v. *Greenfield,* 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Northrop,* 213 Conn. 405, 414, 568 A.2d 439 (1990)." *State* v. *Ross,* supra, 230 Conn. 259.

"In a review of the sufficiency of the evidence to support the jury's finding of an aggravating factor under § 53a-46a (h) (4) . . . the focus must be on whether the state has proved, beyond a reasonable doubt, that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain or torture on each of his victims above and beyond that necessarily accompanying the underlying killing. Evidence of the defendant's callousness or indifference to his victims' suffering would substantiate such a finding, but it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims." Id., 262.

"Even with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury." Id., 264.

In the present case, the jury reasonably could have found that the victim experienced extreme physical and

psychological pain beyond that necessary to accomplish her death. Prior to her death, she experienced a prolonged abduction during which she was held at gunpoint while the defendant drove, for approximately twelve minutes, to a park nearly four miles away from the point of abduction. The jury reasonably could have inferred that during this kidnapping the victim experienced extreme fear and anxiety concerning her fate. See id., 263.

Once they arrived at the park, the defendant either forcibly removed or forced the victim to remove her shoes, pantyhose and panties, and he attempted to assault her sexually. The jury reasonably could have found that the victim's terror had been exacerbated by the defendant's attempted sexual assault. See id. That conclusion was supported by evidence indicating that the victim physically struggled against the defendant's assault, causing rips to her clothing and a scratch to his face.

After the victim escaped from the defendant, he shot her twice in the back. These wounds caused the victim to suffer excruciating pain and hemorrhaging, caused her to aspirate blood from her mouth, and rendered her unable to walk. The jury reasonably could have concluded that the victim suffered extreme physical pain as a result of these two gunshot wounds.

While repeatedly crying for help, the victim then began crawling away from the defendant, and crawled for a distance of approximately thirty-three yards. From this evidence, the jury reasonably could have concluded that the victim suffered extreme physical pain and mental anguish after she had received these wounds and as she continued to attempt to escape from the defendant.

As the victim crawled away and cried repeatedly for help, the defendant got into the car and drove to where the victim had crawled. The defendant got out of the

car, walked over to the victim and, standing directly in front of her, shot her three more times: in the chest, in the ear and, bending over the prostrate victim, point blank in the face. This last shot finally killed the victim. As much as three minutes may have passed between the time the defendant first wounded the victim and when he shot her for the last time. The jury reasonably could have found, on the basis of these facts, that the defendant was callous or indifferent to his victim's suffering and, moreover, that he intentionally inflicted extreme pain and torture on her in excess of that necessary to cause her death. See id., 262.

Finally, the bullets used by the defendant were specially designed to generate a high velocity and, as a result, had greater destructive capacity than ordinary bullets. At least two of the bullets were designed with hollow points, which caused them to expand upon impact and cause greater damage than ordinary bullets. This evidence further supports a finding by the jury that the defendant intentionally inflicted extreme pain and torture on the victim beyond that necessary to accomplish the murder.[64]

Pursuant to our review of the defendant's claim that the jury's finding of this aggravating factor was based on insufficient evidence, we have conducted an independent and scrupulous examination of the record. On the basis of the evidence presented concerning the manner in which this crime was committed, we conclude that the jury reasonably could have found beyond a reasonable doubt that the defendant committed the

---

[64] We reject the defendant's argument that, as a matter of law, his use of high-powered, highly destructive ammunition indicates his intention to kill the victim as quickly and humanely as possible. The jury was not required to draw that inference in the defendant's favor. Moreover, the defendant's decision to allow his victim to crawl along the ground, wounded, for as much as three minutes prior to killing her, strongly suggests the contrary inference, namely, that he possessed no such humane motive.

crime in an especially heinous and cruel manner, as that statutory standard has been interpreted by this court.

V

## CLAIM FOR HEARING CONCERNING CONSTITUTIONALITY OF EXECUTION BY LETHAL INJECTION

The defendant further claims that this court should remand this case to the trial court in order to allow him to challenge his execution by lethal injection as cruel and unusual punishment under the state constitution. We agree.

At the time of the defendant's conviction and sentencing, General Statutes (Rev. to 1991) § 54-100 required any sentence of death to be carried out by electrocution. Subsequently, the legislature amended § 54-100 to provide that all sentences of death would be carried out by means of lethal injection.[65] The amendment requires the use of lethal injection for any execution taking place on or after October 1, 1995. Thus, although the defendant was sentenced to death by electrocution, the defendant's death sentence now must be executed by means of lethal injection.

The defendant claims that he should be provided the opportunity in the trial court to challenge the state constitutionality of execution by lethal injection, and he requests a remand for that purpose.[66] The state responds

[65] See footnote 11.

[66] The defendant claimed for the first time on appeal at the second oral argument that this case should be remanded for a new penalty hearing so that he might have the opportunity to claim the form of death as a nonstatutory mitigant. The defendant failed to raise this claim in his reply brief, which he filed after the passage of the legislation amending § 54-100, and in which he first raised his constitutional challenge to execution by lethal injection. Because this issue was not timely raised and properly briefed, we decline to review it. See footnote 56.

that the defendant failed to create a factual record concerning the method of execution in order to support such a challenge on appeal. Thus, the state argues, this issue was not adequately preserved and we should decline to review it. The state argues that the defendant should be required to raise this claim, if he so chooses, in a postconviction proceeding.

We agree with the defendant. The defendant moved in the trial court for imposition of a life sentence, and included among his grounds the claim that the "imposition of the death penalty by electrocution . . . constitutes cruel and unusual punishment under the provisions of the Connecticut Constitution." The trial court denied that motion. Although at trial he failed to create a factual record to support his challenge to the constitutionality of electrocution as a means of execution, that failure does not foreclose his present challenge to the constitutionality of execution by lethal injection. The factual issues raised by these two forms of execution are sufficiently distinct that the defendant has not waived his right to challenge one by failing to preserve adequately the other.

Accordingly, we remand this action to the trial court for a hearing limited to the defendant's claim concerning the state constitutionality of lethal injection as a means of execution. We retain jurisdiction of the case solely for the purpose of appellate review following the trial court's determination of this issue.

## VI

## PROPORTIONALITY REVIEW CLAIMS

Under General Statutes § 53a-46b (a),[67] "[a]ny sentence of death imposed in accordance with the provi-

---

[67] General Statutes § 53a-46b provides: "Review of death sentence. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall

sions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules," and following that review we must "either affirm the sentence of death or vacate" the death sentence and remand the case for imposition of a sentence of life imprisonment without the possibility of release pursuant to General Statutes § 53a-35a (1).[68] Pursuant to this review, "[t]he supreme court shall affirm the sentence of death unless it determines that . . . the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b) (3).[69] Under § 53a-46b (b) (3), therefore, we must engage in what has come to be known as proportionality review of the defendant's

---

either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

[68] General Statutes § 53a-35a provides in relevant part: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a . . . ."

[69] Section 53a-46b (b) (1) requires that we vacate the death sentence if it "was the product of passion, prejudice or any other arbitrary factor"; and subsection (b) (2) requires that we vacate the death sentence if "the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a." The defendant does not claim that the sentence was the product of an arbitrary factor. We resolve in part IV B 3 of this opinion his claim that the evidence is insufficient to support the jury's finding of the "especially heinous, cruel or depraved" aggravant.

death sentence.[70] This is the first case in which we have been called upon to do so.[71]

The defendant mounts a multifaceted constitutional challenge to our proportionality review statutory scheme, both on its face and as applied. Specifically, he claims that our proportionality review statutory scheme: (1) violates the eighth amendment to the United States constitution because it injects arbitrariness into death penalty proceedings, and because the sentencing scheme permits the jury to consider mercy as a mitigant; (2) violates the due process clause of article first, § 8, of the Connecticut constitution because it is standardless, facially vague and vague as applied; (3) violates the separation of powers provision of our state constitution; and (4) violates the implied prohibition against cruel and unusual punishment of article first, § 8, and the equal protection provision of article first, § 20, of the Connecticut constitution.

In addition, the defendant claims that, under the statutory scheme, his death sentence is disproportionate to the penalties imposed in other similar cases. Specifically, the defendant claims that his death sentence is disproportionate to: (1) the death sentences imposed on two other defendants convicted of kidnap-murder; (2) the death sentences imposed on two other defend-

[70] We emphasize that it is § 53a-46b (b) (3), rather than subsection (b) (1), that provides for proportionality review. See *State* v. *Cobb*, supra, 234 Conn. 740. Therefore, all references herein to proportionality review under § 53a-46b refer to subsection (b) (3).

[71] In the only other cases that we have considered in which the death penalty had been imposed, we did not reach the issue of proportionality review because in each case we remanded the matter for a new sentencing hearing. See *State* v. *Breton*, supra, 235 Conn. 206; *State* v. *Ross*, supra, 230 Conn. 183.

Although the legislature recently repealed the proportionality review requirement; see Public Acts 1995, No. 95-16, § 3 (b); the requirement applies to the defendant's case, because "such review is still mandatory for all capital felony cases pending at the time that the repealing statute became effective." *State* v. *Cobb*, supra, 234 Conn. 746 n.10.

ants who were not convicted of kidnap-murder; (3) the life sentence imposed on another defendant convicted of kidnap-murder but against whom the state did not seek the death penalty; (4) the life sentences imposed on three other defendants convicted of capital felony, committed in an aggravated manner and without the finding of a mitigant, but on whom the sentencers did not impose the death sentence; (5) the life sentence imposed on another defendant with respect to whom a nonstatutory mitigant was found; (6) the life sentence imposed on a defendant whose mental capacity was found to be significantly impaired; and (7) the life sentence imposed on a defendant who inflicted multiple gunshot wounds on three victims but with respect to whom the trial court concluded that, as a matter of law, the evidence did not support a finding that he had acted in an especially cruel manner.

We reject the defendant's constitutional and statutory claims. We conclude that our statutory proportionality review scheme is constitutional. We also conclude that the death sentence imposed on the defendant is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b) (3).

In order to consider both the defendant's constitutional and statutory claims, it is necessary first to analyze and interpret our statutory scheme, because many of the defendant's arguments proceed from his interpretation of the statute, which is an interpretation that we do not share. We therefore proceed as follows. We first explain the statutory scheme, in light of its jurisprudential background. See part VI A of this opinion. We then consider the defendant's constitutional claims in light of that explanation. See part VI B of this opinion. We next consider whether the defendant's death sentence is "excessive or disproportionate to the penalty

imposed in similar cases," as we interpret that statutory phrase. See part VI C of this opinion.

We undertake this process, moreover, pursuant to two well established propositions. The first, relating to the interpretation of § 53a-46b, is that "[t]he process of statutory interpretation involves a reasoned search for the intention of the legislature. *In re Valerie D.*, 223 Conn. 492, 512, 613 A.2d 748 (1992). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . . *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991) . . . *State* v. *McVeigh*, 224 Conn. 593, 607, 620 A.2d 133 (1993); and to the jurisprudential background of the statute. *Federal Deposit Ins. Corp.* v. *Hillcrest Associates*, 233 Conn. 153, 164, 659 A.2d 138 (1995)." (Internal quotation marks omitted.) *State* v. *Piorkowski*, 236 Conn. 388, 404, 672 A.2d 921 (1996).

The second is the "well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . In choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent. . . . We undertake this search for a constitutionally valid construction when confronted with criminal statutes as well as with civil statutes. (Citations omitted.) *State* v. *Breton*, [supra, 212 Conn. 269]." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 236. Moreover, to the extent that the defendant claims that § 53a-46b is facially unconstitutional, "[t]he burden of proving

unconstitutionality is especially heavy when . . . a statute is challenged as being unconstitutional on its face." Id.

## A

## Proportionality Review Under § 53a-46b

### 1

Proportionality review under § 53a-46b can be properly understood only in light of its jurisprudential background. That background consists of several decisions of the United States Supreme Court expounding that court's death penalty jurisprudence.

In 1972, the Supreme Court invalidated all of the death penalty statutes of the states and the federal government because it determined that those statutes violated the eighth amendment's proscription against cruel and unusual punishment. Justice Stewart stated "that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death *under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed*." (Emphasis added.) *Furman* v. *Georgia*, supra, 408 U.S. 310 (Stewart, J., concurring). Indeed, Justice Stewart characterized the death sentences at issue there as "cruel and unusual in the same way that being struck by lightning is cruel and unusual." Id., 309.

Four years later, in *Gregg* v. *Georgia*, supra, 428 U.S. 153, the court, after rejecting the argument that the death penalty is invalid under the eighth amendment regardless of the circumstances of the offense, the character of the offender and the procedure followed; id., 187; concluded that "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary and capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."

Id., 195. The court in *Gregg* read *Furman* to hold that the death penalty "could not be imposed *under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.*" (Emphasis added.) Id., 188. After repeating Justice Stewart's analogy between the imposition of the death penalty and being struck by lightning, and his condemnation of a system that permits the penalty to be wantonly and freakishly imposed, the court stated: "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited *so as to minimize the risk of wholly arbitrary and capricious action.*" (Emphasis added.) Id., 189.

The court then examined Georgia's death penalty statutory scheme. Among the features of that scheme was the requirement that the Georgia Supreme Court "review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' " Id., 204. The United States Supreme Court construed this requirement as follows: "Since the proportionality requirement on review is *intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.*" (Emphasis added.) Id., 203. That court also stated: "The provision for appellate review in the Georgia capital-sentencing system *serves as a check against the random or arbitrary imposition of*

*the death penalty.* In particular, the proportionality review *substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury.* If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." (Emphasis added.) Id., 206. The concurring opinion echoed this same theme: "[I]f the Georgia Supreme Court properly performs the task assigned to it under the Georgia statutes, *death sentences imposed . . . wantonly or freakishly for any given category of crime will be set aside.*" (Emphasis added.) Id., 224 (White, J., concurring).

Furthermore, in *Gregg* the United States Supreme Court cited with approval the standards adopted by the Georgia Supreme Court in its performance of its sentence review function. "In performing its sentence-review function, the Georgia court has held that 'if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive.' *Coley* v. *State*, [231 Ga. 829, 834, 204 S.E.2d 612 (1974)]. The court on another occasion stated that 'we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally . . . .' *Moore* v. *State*, 233 Ga. 861, 864, 213 S.E.2d 829, 832 (1975) [cert. denied, 428 U.S. 910, 96 S. Ct. 3222, 49 L. Ed. 2d 1218 (1976)]. See also *Jarrell* v. *State*, [234 Ga. 410, 425, 216 S.E.2d 258 (1975), cert. denied, 428 U.S. 910, 96 S. Ct. 3223, 49 L. Ed. 2d 1218 (1976)] (standard is whether 'juries generally throughout the state have imposed the death penalty'); *Smith* v. *State*, 236 Ga. 12, 24, 222 S.E.2d 308, 318 (1976) (found 'a clear pattern' of jury behavior).

"It is apparent that the Supreme Court of Georgia has taken its review responsibilities seriously. In *Coley*, it held that '[t]he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death.' [*Coley* v. *State*, supra, 231 Ga. 835]. It thereupon reduced Coley's sentence from death to life imprisonment. Similarly, although armed robbery is a capital offense under Georgia law, [Ga. Code Ann.] § 26-1902 (1972), the Georgia court concluded that the death sentences imposed in this case for that crime were 'unusual in that they are rarely imposed for [armed robbery]. Thus, under the test provided by statute . . . they must be considered to be excessive or disproportionate to the penalties imposed in similar cases.' [*Gregg* v. *State*, 233 Ga. 117, 127, 210 S.E.2d 659 (1974)]. The court therefore vacated Gregg's death sentences for armed robbery and has followed a similar course in every other armed robbery death penalty case to come before it. See *Floyd* v. *State*, 233 Ga. 280, 285, 210 S.E.2d 810, 814 (1974); *Jarrell* v. *State*, [supra, 234 Ga. 424–25]. See *Dorsey* v. *State*, 236 Ga. 591, 225 S.E.2d 418 (1976).

"The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death. . . .

"The basic concern of *Furman* centered on those defendants who were being condemned to death capri-

ciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines. In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here." *Gregg* v. *Georgia,* supra, 428 U.S. 204–207.

An examination of the Georgia cases that the court cited with approval in *Gregg* reinforces the conclusion that proportionality review was viewed by the United States Supreme Court as protection against the wanton and freakish imposition of the death penalty by an aberrant jury. In *Coley* v. *State,* supra, 231 Ga. 834, the Georgia Supreme Court stated: "The statute also requires comparative sentencing so that if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive." In *Moore* v. *State,* supra, 233 Ga. 861, a case involving a murder committed in the course of an armed robbery, the Georgia Supreme Court described its function under Georgia's statutory scheme for appellate proportionality review. "As we

view the court's duty in light of the *Furman* and *Jackson* [v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] cases and the statutory provisions designed by the Georgia legislature to meet the objections of those cases, this court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally and not wantonly and freakishly imposed, as stated by Justice Stewart in his concurring opinion in the *Furman* and *Jackson* cases . . . ." (Internal quotation marks omitted.) *Moore* v. *State,* supra, 863–64. Applying this standard to the case before it, the Georgia Supreme Court affirmed the death sentence stating: "Notwithstanding the fact that there have been cases in which robbery victims were murdered and the juries imposed life sentences . . . the cited [comparison] cases show that juries faced with similar factual situations have imposed death sentences. . . . Thus, the sentence here was not wantonly and freakishly imposed . . . ." (Citations omitted; internal quotation marks omitted.) Id., 866; see also *Jarrell* v. *State,* supra, 234 Ga. 424 (death sentence for armed robbery reversed because "death sentence has rarely been imposed for the offense of armed robbery").

This history of proportionality review brings several points into relief. First, the jurisprudence of appellate proportionality review, as interpreted and approved in *Gregg* in 1976, was directly tied to the fundamental inquiry regarding post-*Furman* death penalty statutory schemes. That inquiry was whether the particular statute at issue sufficiently protected against the risk of wanton, aberrational or freakish imposition of the death penalty by the appropriate fact finder, because the constitutional flaw in the pre-*Furman* death penalty statu-

tory schemes was that those statutes did not sufficiently guard against the impermissible risk of the death penalty being imposed by the fact finder in a wanton, freakish, aberrant, or wholly arbitrary and capricious manner. See also *Jurek* v. *Texas*, 428 U.S. 262, 276, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976) ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution.").

Second, among the post-*Furman* statutory mechanisms that the court identified as satisfactorily minimizing that risk was appellate proportionality review, as disclosed by the record in *Gregg*. The court viewed appellate review as adding a layer of safeguard, in addition to those statutory standards and requirements aimed at channeling jury discretion such as the articulation of aggravating and mitigating circumstances, against the risk of caprice in the imposition of the death penalty by the sentencing authority.

Third, under *Gregg*, whether a particular death sentence was wantonly or freakishly imposed was to be determined by comparing it with other sentences imposed in similar cases by the sentencing authority in the particular jurisdiction. This comparison would permit the reviewing court to determine whether there were any patterns or trends against which the sentence on review could be measured.

Fourth, the appellate focus on the risk of wantonness, freakishness and aberrance necessarily meant a focus, not on whether the death penalty imposed in a given case was, by application of the statutory standards, *proportional* in some relative sense to other similar

cases, but on whether the death penalty imposed was *disproportionate* to sentences imposed in other similar cases.[72] Similarly, the United States Supreme Court's view of the appellate process of proportionality review did not involve an inquiry into whether it, or any other appellate court, might have imposed the penalty if given that responsibility in any given case. Nor was the focus on whether the particular defendant in the case before an appellate court was more or less morally blameworthy and deserving of the death penalty than any other particular defendant.

Put another way, in the Supreme Court's view the appellate task under proportionality review was not to determine whether the capital case before it in some way was, on a scale of moral blameworthiness, roughly equivalent to all other capital cases and, absent such rough equivalence, to reverse the sentence. Nor was that review considered to require that the capital case before the court must affirmatively be shown, on such a scale, to have been quantitatively different from all other cases in which the death penalty was not imposed and, absent such an affirmative showing, to reverse the sentence.

In the Supreme Court's view, rather, the appellate inquiry under proportionality review was whether the death penalty imposed in a particular case was aberrational, within the particular jurisdiction involved, with respect to similar cases. Under appellate proportionality review as viewed by the Supreme Court in *Gregg*, the search was not necessarily for a similarity of the case on review to other cases within the selected pool of similar cases, but for a gross disparity between the case on review and other cases within the selected pool

---

[72] Our own rule of practice regarding proportionality review reflects this understanding by referring to such review as "the issue of *disproportionality* pursuant to Gen. Stat., § 53a-46b (b) (3)." (Emphasis added.) Practice Book § 4066A (b).

of similar cases. Although the difference may be subtle, it is significant.

Our proportionality review statute was enacted against this jurisprudential background. We turn next to that enactment.

2

On the same day that the United States Supreme Court decided *Gregg*, it also decided *Jurek* v. *Texas*, supra, 428 U.S. 262. The Texas death penalty statutory scheme did not provide for proportionality review, and there was no indication that the Texas Supreme Court nevertheless engaged in such review as a matter of court practice. Compare *Proffitt* v. *Florida*, 428 U.S. 242, 250–51, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976) (Florida Supreme Court engaged in proportionality review in absence of statutory requirement). Without explicitly addressing the requirement of proportionality review, the United States Supreme Court concluded that Texas' capital punishment statute was constitutional. *Jurek* v. *Texas*, supra, 276.

"Nonetheless, until 1984, it was generally believed that any capital punishment statute that did not provide for proportionality review was constitutionally vulnerable. Therefore, in 1980, when our legislature enacted § 53a-46b, which for the first time provided for appellate review, including proportionality review, of all death sentences, the then House of Representatives chairman of the legislature's Judiciary Committee described the proposed bill as 'clarify[ing] our existing death penalty law without any expansion of it or retraction from it . . . . It also mandates that there be an automatic review by the Connecticut Supreme Court in order to affirm any death sentence which may be imposed on anybody. *Most of those standards we feel would put the existing statutes within compliance with the United States Constitutional standards.*' (Emphasis added.)

23 H.R. Proc., Pt. 9, 1980 Sess., p. 2768, remarks of Representative Richard D. Tulisano.

"Thereafter, in 1984, the United States Supreme Court explicitly concluded that '[t]here is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it. Indeed, to so hold would effectively overrule *Jurek* and would substantially depart from the sense of *Gregg* and *Proffitt*. We are not persuaded that the Eighth Amendment requires us to take that course.' *Pulley* v. *Harris*, 465 U.S. 37, 50–51, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984)." *State* v. *Cobb*, 234 Conn. 735, 746, 663 A.2d 948 (1995).

Significantly, the appellate review language of § 53a-46b tracks almost precisely the corresponding language of the Georgia statute that the United States Supreme Court had declared constitutional in *Gregg*. Compare *Gregg* v. *Georgia*, supra, 428 U.S. 198 (Georgia Supreme Court "is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice . . . and whether the sentence is disproportionate compared to those sentences imposed in similar cases. [Ga. Code Ann.] § 27-2537 [c] [Supp. 1975].") and Ga. Code Ann. § 17-10-35 (c) (1) and (3) (1990) (formerly § 27-2537) ("[c] With regard to the sentence, the court shall determine: [1] Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor . . . and [3] Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."), with General Statutes § 53a-46b (b) (1) and (3) ("[b] The supreme court shall affirm the sentence of death unless it determines that: [1] The sentence was the product of passion, prejudice or any other arbitrary factor . . . or [3] the sentence is excessive

or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.").

Thus, § 53a-46b was not enacted in a constitutional or jurisprudential vacuum. To the contrary, it was enacted at a time when it was widely believed that the federal constitution required proportionality review. The legislative history of § 53a-46b clearly indicates that it was intended to comply with the standards thought to be constitutionally mandated by the existing capital punishment jurisprudence. Moreover, our statute was patterned after a specific statute of a sister state that had gained the constitutional stamp of approval from the United States Supreme Court, which had explained why that specific statute met the constitutional concerns that led to the invalidation of previous capital punishment statutes. Furthermore, the United States Supreme Court had specifically approved the general interpretation placed on that statute by the highest court of that sister state as meeting those concerns.

The conclusion is inescapable, therefore, that in enacting § 53a-46b the legislature was aware of and intended to incorporate the jurisprudential background that we have just summarized. We conclude, therefore, that § 53a-46b (b) (3) must be read as substantially incorporating that jurisprudential background, and must be interpreted accordingly.[73] This view of our pro-

[73] Thus, we agree with the statements in the concurring and dissenting opinion of Justice Garibaldi in *State* v. *Marshall*, 130 N.J. 109, 223, 613 A.2d 1059 (1992), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993): "Proportionality review is not a second appellate review nor a broad review of due-process concerns or other constitutional issues. It is a narrow concept directed to whether the defendant received a sentence disproportionate to that imposed on other defendants, considering both the crime and the defendant. It is not a vehicle for determining whether prosecutors abused their discretion. Nor is proportionality review a means of addressing individual instances of racial discrimination or other denials of due process. Of course, this Court will not tolerate such impermissible influences, and any sentence of death that results therefrom will be fatally infected. However, the

portionality statute is consistent with the view of the Court of Appeals of Maryland regarding that state's essentially similar proportionality statute. See *Tichnell v. State*, 297 Md. 432, 465, 468 A.2d 1 (1983), cert. denied, 466 U.S. 993, 104 S. Ct. 2374, 80 L. Ed. 2d 846 (1984) (legislature intended to subscribe to purpose of proportionality review as articulated in *Gregg* and *Proffitt*). With this principle in mind, we turn next to the interpretation of the specific language of our statute.

### 3

We first determine the proper allocation of the burden of persuasion on proportionality review. The defendant correctly asserts that the statute is silent with respect thereto, but he does not offer any resolution of this issue. Specifically, the defendant does not argue that the state has the burden of establishing a negative, namely, that the death sentence in a particular case is *not* excessive or disproportionate. In fact, as the state correctly points out, the defendant presents his analysis of those cases he deems to be similar to his as if he bears the burden.

The state argues that the defendant should bear the burden of establishing that the sentence is excessive or disproportionate. Although there is some linguistic

proper avenue for addressing those issues is . . . not on proportionality review."

Under our statutory scheme, the proper avenue for addressing such issues is § 53a-46b (b) (1), which requires us to reverse any death sentence that "was the product of passion, prejudice or any other arbitrary factor." As noted previously, the defendant does not claim any such factor in this case.

Nonetheless, the dissent of Justices Berdon and Katz accuses the majority of "continu[ing] to evade the issue of whether racism exists with respect to the death penalty." The accusation is false. As this court held in *State v. Cobb*, supra, 234 Conn. 762–63, the defendant, having failed to raise the claim in this case, can nevertheless raise the issue of racial bias by presenting an appropriate record by way of habeas corpus. The issue is not racism; the issue is the proper forum for making a record and presenting such a claim.

and precedential support for the state's position,[74] we are not persuaded that either party has any burden of persuasion on this issue. We conclude, rather, that we must perform proportionality review under the statute irrespective of any allocation of such a burden, examining the appropriate relevant material and arriving at our best judgment, based on that material and the applicable legal principles. Two considerations lead us to this conclusion.

First, the statute unequivocally imposes on this court the task of engaging in proportionality review. It states that "[t]he supreme court shall affirm the sentence of death unless it determines that . . . the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b) (3). Moreover, § 53a-46b (a) mandates that "[a]ny sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules" and we have adopted Practice Book § 4066A[75] in conformity with that mandate. Thus, pro-

---

[74] For example, § 53a-46b (b) (3) provides that the court "*shall affirm the sentence of death unless* it determines that . . . the sentence is excessive or *disproportionate*" to sentences imposed in similar cases. (Emphasis added.) Indeed, the New Jersey Supreme Court, relying partly on the use of the term "disproportionate" in its similar statute, has allocated the burden of persuasion to the defendant. *State* v. *Bey*, 137 N.J. 334, 349, 645 A.2d 685 (1994), cert. denied, 513 U.S. 1164, 115 S. Ct. 1131, 130 L. Ed. 2d 1093 (1995).

[75] Practice Book § 4066A provides: "(a) When a sentence of death has been imposed upon a defendant, following his conviction of a capital felony in violation of Gen. Stat., § 53a-54b and the hearing upon imposition of the death penalty pursuant to Gen. Stat., § 53a-46a, the briefs of the parties shall include a discussion of the issues set forth in Gen. Stat., § 53a-46b (b), to wit, whether (1) the sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (h) of section 53a-46a; and (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

portionality review is part and parcel of the statutorily mandated appellate process for death sentences. Furthermore, our task of proportionality review under the statute is more akin to determining a question of law, in the sense of applying legal standards to undisputed facts, than to making a finding of fact; see *State* v. *Cobb*, supra, 234 Conn. 752 n.16; which is the traditional function to which burdens of persuasion are applicable. We must, and will, perform our statutory duty by examining the appropriate material and by applying the appropriate legal standards.

Second, the state does not contend that, even if the burden of persuasion were to be imposed on the defendant, the defendant would be required to meet a higher standard of proof than "more probable than not."[76]

"(b) For the purpose of reviewing the issue of disproportionality pursuant to Gen. Stat., § 53a-46b (b) (3), the briefs of the parties shall contain appendices setting forth the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed. Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as 'similar cases,' unless the court, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review, shall modify this limitation in a particular case. Any such application shall identify the additional case or cases claimed to be similar and set forth, in addition to the circumstances of the crime and the character and record of the defendant involved, the provisions of the applicable statutes pertaining to the imposition of the death penalty with citations of pertinent decisions interpreting such provisions.

"Any such application shall be filed within thirty days after the delivery date of the transcript ordered by the appellant, or, if no transcript is required or the transcript has been received by the appellant prior to the filing of the appeal, such application shall be filed within thirty days after filing the appeal."

[76] Although the state does not explicitly articulate the particular standard that it contends the defendant must shoulder, its brief implicitly adopts the civil standard. In any event, such a standard is consistent with the only criminal jurisprudence we have regarding a burden of persuasion on the

Although in civil cases we insist on proper jury instructions regarding that traditional burden, the only fact-finding efforts that actually turn on the *allocation* of that burden are those in which the fact finder, after weighing the evidence, finds its mind in perfect equipoise. See *Preston* v. *Keith*, 217 Conn. 12, 20 n.8, 584 A.2d 439 (1991). In such a rare case, the allocation of the burden of persuasion to the party asserting the truth of the proposition at issue means that that party cannot prevail. We are persuaded that we should not make such an important decision by assigning to the defendant the responsibility for whether he will live or die, in effect by default. We cannot conclude that, solely because our minds are in equipoise, the defendant cannot prevail and the death sentence must be affirmed.[77] In other words, the significance of an allocation of a burden of persuasion on the issue of disproportionality is so remote a possibility that it is ephemeral.

Irrespective of any allocation of a burden of persuasion, therefore, we are required to resolve the ultimate issue. We cannot *fail* to decide the question by resort to traditional notions of burdens of persuasion.

4

We next address the general nature of proportionality review under our statute. As the state correctly points

---

defendant, namely, the burden of establishing an affirmative defense. See, e.g., General Statutes § 53a-12 (b); *State* v. *Figueroa*, supra, 235 Conn. 177–78; *State* v. *Zdanis*, 182 Conn. 388, 390, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). Indeed, in the trial court the defendant bears the burden of establishing a mitigant by a preponderance of the evidence. *State* v. *Daniels*, supra, 207 Conn. 384–85.

[77] Although the defendant does not claim that the state has the burden of persuasion, even if we were to consider such a claim we would come to the same conclusion, namely, that neither the defendant nor the state bears the burden of persuasion. We cannot conceive of the possibility that we would decide such a significant issue, involving the most extreme sanction required by the public policy of the state and imposed by the fact finder in the case, by default—by saying that, solely because our minds are in equipoise, the state cannot prevail and must forgo that sanction.

out, the jurisprudence of proportionality review consists of two types: (1) traditional; and (2) comparative. See *Pulley* v. *Harris*, supra, 465 U.S. 42–43. Traditional proportionality review requires the reviewing court to engage in "an abstract evaluation of the appropriateness of a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, [the United States Supreme] Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime. See, e.g., *Solem* v. *Helm*, 463 U.S. 277 [103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983) (life imprisonment disproportionate for habitual offender convicted of minor offenses)]; *Enmund* v. *Florida*, 458 U.S. 782 [102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (death sentence disproportionate for felony murder when defendant did not commit, participate in or intend murder)]; *Coker* v. *Georgia*, 433 U.S. 584 [97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (death sentence for rape inherently disproportionate)]. The death penalty is not in all cases a disproportionate penalty in this sense. *Gregg* v. *Georgia*, [supra, 428 U.S. 187 (Stewart, Powell, and Stevens, Js.)]; id., 226 [White, J., concurring]." *Pulley* v. *Harris*, supra, 42–43. An example of traditional proportionality review is *Coker* v. *Georgia*, supra, 584, in which the court, in 1977, decided categorically that the imposition of the death penalty for a rape conviction is unconstitutionally disproportionate.

By contrast, comparative "proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley* v. *Harris*, supra, 465 U.S.

43. An example of comparative proportionality review is *Coley* v. *State*, supra, 231 Ga. 829, which was decided three years before the United States Supreme Court decided *Coker*. In *Coley*, the Georgia Supreme Court determined on a comparative basis that the imposition of the death penalty for a rape conviction was excessive, within the meaning of Georgia's proportionality review statute, because "[t]he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death." Id., 835.

Traditional proportionality review, therefore, is simply another term for analysis under either the eighth amendment's prohibition against cruel and unusual punishment or under our state constitutional counterpart; see *State* v. *Ross*, supra, 230 Conn. 246, 252; as applied in such cases as *Solem*, *Enmund* and *Coker*, to determine whether the death sentence for certain categories of crime is inherently disproportionate. It would add nothing to § 53a-46b to read it as incorporating traditional proportionality review because, if faced with a claim that the death penalty for a conviction of any of our forms of capital felony under § 53a-54b is inherently disproportionate, under either the federal or state constitution, we would be required to make that determination in any event. Moreover, given the jurisprudential background of § 53a-46b (b) (3), there is nothing to suggest that it was intended to incorporate traditional proportionality review. We conclude, therefore, that § 53a-46b (b) (3) involves comparative, rather than traditional, proportionality review.

The state also correctly points out that in general there are two basic approaches to comparative proportionality review: (1) the frequency method; and (2) the precedent seeking method. See *State* v. *Marshall*, 130 N.J. 109, 151–59, 613 A.2d 1059 (1992), cert. denied, 507

U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993). Both approaches share a common goal: to determine, by means other than solely a subjective judgment of the reviewing court,[78] how the appropriate decision makers within the jurisdiction have in fact decided questions of life or death, so as to effectuate the purpose of that jurisdiction's particular proportionality review statute. See, e.g., id., 153–54 (controlling principle is that " '[a] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction' "). Although the goal of the two approaches may be the same, they are fundamentally different in approach.

In general terms, a reviewing court applying the frequency method uses a complicated method of statistical analysis that purports to quantify, with something like mathematical precision, the various factors leading to the imposition, or nonimposition, of the death penalty, and the frequency with which the death penalty is imposed in certain circumstances. See, e.g., *State* v. *Marshall*, supra, 130 N.J. 151–54. In contrast, a reviewing court applying the precedent seeking method compares the case before it to other cases in which defendants were convicted of the same or similar crimes, by examining the facts of the crimes, the defendants, and the aggravating and mitigating factors

---

[78] We use the phrase "other than *solely* a subjective judgment of the reviewing court" to acknowledge that the process of proportionality review, as we adopt it here, is not, and cannot be, an entirely objective, judgment-free exercise. Some element of judgment enters into the selection of those cases deemed "similar," and an element of judgment necessarily enters into the ultimate comparison of those cases with that of the defendant before us. We acknowledge also that this element of judgment, as in any exercise of judgment by a court, necessarily involves some element of subjectivity. Our task as judges is to strive to minimize that degree of subjectivity, so that the ultimate decision does not depend simply on who the ultimate appellate decision makers happen to be.

involved. See, e.g., *Tichnell* v. *State*, supra, 297 Md. 457–73.

We agree with the state that our statute does not contemplate the frequency method. As our previous discussion indicates, our statute was patterned after the Georgia statute, which was declared constitutional by the United States Supreme Court in *Gregg*. The frequency approach had not even surfaced within published death penalty jurisprudence in 1980, when § 53a-46b (b) (3) was enacted by No. 80-382, § 2, of the 1980 Public Acts, and is inconsistent with the kind of precedent seeking approach that the court described in *Gregg*. It is unlikely, therefore, that our legislature contemplated such a complicated statistical inquiry when it enacted proportionality review.

Moreover, as the defendant suggests, even under his suggested method of proportionality review, "[o]nly fifteen cases fall within the pool of cases eligible for a comparative analysis of the death sentence in [this] case. Applying generally accepted tools of statistical analysis, the pool is simply too small to yield statistically significant data about whether [the defendant's] death sentence was imposed arbitrarily." This fact makes it unlikely, therefore, that our legislature contemplated such a method of proportionality review, because it would be impossible to implement.

Furthermore, New Jersey is the only jurisdiction among the twenty-seven states that engage in proportionality review to employ the frequency approach. See *State* v. *Cobb*, supra, 234 Conn. 754–59 n.18. Our examination of New Jersey cases in which the frequency approach has been employed, however, convinces us that it attempts to quantify the unquantifiable, and is thus unworkable. Indeed, for largely that reason the New Jersey legislature has amended its proportionality review statute so that, in future cases, the frequency

approach will be severely undermined, and perhaps completely eliminated, as a feasible option. See id., 760–61.

We conclude, therefore, that our statute contemplates the precedent seeking method of comparative proportionality review. Accordingly, we proceed to a more particularized interpretation of the statute.

5

Our next task is to define the universe of cases from which can be culled the pool of cases deemed to be "similar cases" for purposes of proportionality review under § 53a-46b (b) (3). In accordance with the statutory mandate of § 53a-46b (a) that we review all sentences of death "pursuant to [our] rules," we adopted Practice Book § 4066A (b), under which we defined the universe as follows: "Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as 'similar cases'. . . ." We allowed for an expansion of this universe in a given case, however, "on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review." Id.

We have twice declined to expand the universe of cases for proportionality review to include cases involving convictions for crimes other than capital felony. *State* v. *Cobb*, supra, 234 Conn. 735; *State* v. *Ross*, 225 Conn. 559, 624 A.2d 886 (1993).[79] We now reaffirm our holdings in those cases.

_____

[79] Prior to our decision in *State* v. *Ross*, supra, 225 Conn. 560–61, however, we had expanded the universe of cases for purposes of that particular case to include Ross' "two murder convictions for which consecutive life sentences were imposed as a result of his entering pleas of nolo contendere after the original charges of capital felony were reduced."

"Under the express provisions of General Statutes §§ 53a-35a and 53a-46a, only conviction of a capital felony subjects a defendant to the possible imposition of a death sentence. Only conviction of a capital felony occasions a hearing into mitigating and aggravating factors to determine whether the death penalty should be imposed. Only conviction of a capital felony will put on the record the circumstances that are relevant to the proportionality review mandated by § 53a-46b (b) (3).

"In view of this unambiguous statutory pattern, the propriety of a death sentence imposed for conviction of a capital felony cannot appropriately be compared with sentences imposed as the result of convictions of less serious crimes. As a matter of law, sentences imposed as the result of such other convictions have not been 'imposed in similar cases,' as § 53a-46b (b) (3) requires." *State* v. *Ross*, supra, 225 Conn. 562–63. Furthermore, to include cases in which there was not a conviction for capital felony would be to contravene our own rule, which, absent a showing "that the resulting pool of eligible cases is inadequate for disproportionality review," limits the appropriate universe of cases to "capital felony cases . . . in which hearings on the imposition of the death penalty have taken place . . . ." Practice Book § 4066A (b).

We next consider whether the universe of cases should include cases in which there was a capital felony conviction, but no penalty phase hearings, either because there was a plea agreement or because the state did not seek the death penalty. To date, at preliminary stages of the appellate process we have, in some individual cases, including this case, expanded the universe to include such cases.[80] We now conclude that, absent

---

[80] On October 15, 1993, we granted the defendant's motion to expand the universe to include *State* v. *Paradise*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49836, in which no penalty phase hearing was held because the defendant waived a probable cause

a showing that the pool of cases eligible for consideration as "similar cases" within the meaning of § 53a-46b (b) (3) is otherwise inadequate; see Practice Book § 4066A (b); the universe of cases should not include cases in which there have been no death penalty hearings following convictions for capital felony.

We reach this conclusion because to include such cases would be fundamentally inconsistent with the notion of proportionality review embodied in § 53a-46b (b) (3). We first note that this court's rule, which we adopted pursuant to the statutory mandate of § 53a-46b (a), defines the outer limits of the universe of cases as those capital felony convictions "in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed

hearing in exchange for the state's agreement not to seek the death penalty. In *State* v. *Ross*, supra, 225 Conn. 561, we granted the defendant's request to expand the universe of cases to include "any case in which a capital felony conviction has been obtained and the conviction was followed not by a hearing on the imposition of the death penalty but by an imposition of a sentence other than death, either by virtue of a plea agreement or by virtue of the fact that the state did not seek the death penalty." In *State* v. *Breton*, Supreme Court Docket No. 13845, we granted the defendant's application to expand the universe to include *State* v. *Amado*, Superior Court, judicial district of Fairfield, Docket No. CR 93-83508, in which no penalty phase hearing was held because the state did not seek the death penalty, and *State* v. *Gonzalez*, 206 Conn. 213, 537 A.2d 460 (1988), in which the trial court's dismissal of the alleged aggravating factor prevented the state from seeking the death penalty. In *State* v. *Johnson*, Supreme Court Docket No. 14801, we granted the defendant's motion to expand the universe in the same manner in which it was expanded in *Ross*, to include capital felony convictions in which no penalty phase hearing was held. In each case, however, we took that action subject to the defendant's supplying in his brief sufficient information to make a relevant comparison. See *State* v. *Cobb*, supra, 234 Conn. 743–44 n.7.

Because we conclude that the universe of cases should not include cases in which there have been no death penalty hearings, we now conclude that *Paradise* should be excluded from consideration in this case. To maintain its inclusion would be fundamentally inconsistent with the purpose and process of proportionality review, as articulated herein. No fact finder evaluated any aggravating or mitigating factors in *Paradise*, because the defendant's life sentence resulted wholly from a plea bargain with the state.

. . . ." Practice Book § 4066A (b). This rule expresses the recognition that proportionality review can be meaningfully and appropriately conducted only within those confines.

Furthermore, in a case in which no penalty phase hearing was held, there was of necessity no searching inquiry by a fact finder—jury or trial court—charged with the responsibility of determining whether there was a statutory aggravating factor established by the state or a mitigating factor established by the defendant. Yet it is the presence or absence of just those factors, as found by a fact finder charged with that awesome responsibility, that is wholly determinative of whether the sentence for a conviction of capital felony shall be death or life without the possibility of release.

The process of proportionality review requires that we canvass a set of "similar cases" to determine whether the death penalty in the case before us was, with respect to that set of cases, wantonly or freakishly imposed by the fact finder. Underlying the process of proportionality review is the legislative intent, signified by "[t]he use of the word 'disproportionate,' rather than 'proportionate' . . . that we should search not for proof that a defendant's death sentence is perfectly symmetrical with other death sentences, but for proof that the sentence is an outlier." *State* v. *Bey*, 137 N.J. 334, 349, 645 A.2d 685 (1994), cert. denied, 513 U.S. 1164, 115 S. Ct. 1131, 130 L. Ed. 2d 1093 (1995).

Thus, proportionality review requires a comparison of the decision to impose a death sentence, made by the fact finder in the case before us on the basis of the presence or absence of aggravating and mitigating factors, with decisions to impose sentences of death or life imprisonment, made by the fact finders in the other relevant cases on the basis of the presence or absence of aggravating and mitigating factors. That pro-

cess requires us to determine whether, as compared to those cases, this case is an outlier. This comparison cannot be appropriately made where there was no such decision by a fact finder. Other cases in which a fact finder has not made such a decision, therefore, cannot be considered to be similar to the case before us. See *Tichnell* v. *State*, supra, 297 Md. 464 ("the legislatively intended inventory of cases from which 'similar cases' are to be culled encompasses only those first degree murder cases in which the State sought the death penalty").

In addition, consideration of cases in which the state, for whatever reasons—whether because of a plea bargain or unilaterally—did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. By including such cases within the universe for consideration as "similar cases," we would, either implicitly or explicitly, be required either to delve into the multifarious reasons for the exercise of prosecutorial discretion or to ignore those reasons completely. We have in another context appropriately declined to follow the former course; see *State* v. *Cobb*, supra, 234 Conn. 750–52; and to do the latter does not suggest itself to us as wise judicial policy.

If we were to consider cases in which the state did not seek the death penalty, we would in effect be using a prior decision of the state not to do so as a basis for invalidating a death penalty in an unrelated case. We agree with the state that such a course would carry an impermissible risk of discouraging the state from exercising its discretion not to seek the death penalty—either unilaterally or by virtue of engaging in plea bargaining with a defendant charged with capital felony—and of encouraging the state to seek that penalty whenever it was "remotely possible to secure it." Thus, although, as we have acknowledged, there are

extreme cases in which the exercise of prosecutorial discretion is subject to judicial oversight,[81] proportionality review was never intended as "a vehicle for determining whether prosecutors abused their discretion." *State* v. *Marshall*, supra, 130 N.J. 223 (Garibaldi, J., concurring and dissenting).

We turn next to the question of whether the universe of cases eligible for consideration as "similar cases" should include (1) cases currently on appeal, or (2) prior cases that have been reversed on appeal. The state argues that both categories of cases should be included in the universe. The defendant does not address the question, but his brief proceeds on the premise that, if his constitutional challenges to § 53a-46b (b) (3) fail, both categories should be included because his proposed list of cases within the universe as well as his arguments regarding disproportionality rely in part on such cases.[82] We conclude that § 53a-46b (b) (3) should

---

[81] See, e.g., *State* v. *Delossantos*, 211 Conn. 258, 287, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989) (" '[a] defendant claiming discriminatory prosecution must show (1) that others similarly situated have generally not been prosecuted and that he has been singled out and (2) that he is the victim of invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protected right' "); *State* v. *Ellis*, 197 Conn. 436, 478, 497 A.2d 974 (1985) ("unless constitutional or other compelling reasons require otherwise, we abstain from setting policy for the performance of the prosecutorial function"), on appeal after remand sub nom. *State* v. *Paradise*, 213 Conn. 388, 567 A.2d 1221 (1990); see also *Bordenkircher* v. *Hayes*, 434 U.S. 357, 362–63, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) (due process protects against prosecutorial vindictiveness or infringement of protected rights).

[82] In his proportionality brief filed in this court on July 25, 1994, the defendant proposes the following list of cases, identified by name and trial court docket number, that he claims are eligible pursuant to Practice Book § 4066A (b): *State* v. *Breton*, Superior Court, judicial district of Waterbury, Docket No. CR 147941; *State* v. *Cobb*, Superior Court, judicial district of Waterbury, Docket No. CR 4-175454; *State* v. *Daniels*, Superior Court, judicial District of New London, Docket No. CR 21-20169; *State* v. *Day*, Superior Court, judicial district of Bridgeport, Docket No. CR 90-21072; *State* v. *Johnson*, Superior Court, judicial district of Windham, Docket No. CR 91-76196; *State* v. *LaPointe*, Superior Court, judicial district of Hartford-New Britain

be read to include in the universe of cases both cases on appeal and, absent exceptional circumstances, cases that have been reversed on appeal.

First, the language of Practice Book § 4066A (b), although not wholly determinative of the issue, suggests a focus on the results of trial, rather than appellate, level death penalty proceedings. "Only those capital felony cases *that have been prosecuted* in this state after October 1, 1973, and in which *hearings on the imposition of the death penalty have taken place,* whether or not *the death penalty has been imposed,* shall be deemed eligible for consideration as 'similar cases' . . . ." (Emphasis added.) Practice Book § 4066A (b). Absent from this formulation is any mention of appellate proceedings.

Second, this reading of our rule is consistent with the fundamental purpose and operation of proportionality review. As we have explained previously, that purpose is to minimize the risk that the death sentence before the court on such review was imposed by an aberrant

at Hartford, Docket No. CR 89-107933; *State* v. *Roseboro,* Superior Court, judicial district of Ansonia-Milford, Docket No. CR 5-81771; *State* v. *Ross,* Superior Court, judicial district of New London, Docket Nos. CR 21-20300, CR 21-20355, CR 21-20356; *State* v. *Steiger,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 53426; *State* v. *Usry,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49317; and *State* v. *Wood,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 48720. From that list, the defendant has excluded *LaPointe* because the transcript of that case was not available when the defendant's brief was filed. In addition to these cases, the defendant has added *State* v. *Paradise,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49836, which we permitted to be added to the universe of cases pursuant to the defendant's motion. See footnote 80.

Six of these cases—*Breton, Cobb, Day, Johnson, LaPointe* and *Ross*—were on appeal to this court when the defendant filed his brief in this case. Furthermore, although we subsequently reversed the death penalty in two of these cases; see *State* v. *Ross,* supra, 230 Conn. 183; *State* v. *Breton,* supra, 235 Conn. 206; the defendant has taken no steps to remove either case from his proposed universe of cases eligible for consideration as "similar cases."

sentencer—was wantonly or freakishly imposed by the sentencing authority—and that determination is to be made by comparing it with sentences imposed in similar cases by juries or judges in the particular jurisdiction. That purpose and the process by which it is implemented support the conclusion that the universe of cases includes cases on appeal and, absent extraordinary circumstances,[83] cases in which the death penalty was reversed on appeal. Despite the fact that the capital

---

[83] For example, the defendant has excluded from his proposed universe of cases the case of *State* v. *McGann*, Superior Court, judicial district of New London, Docket No. CR 10-13678, in which the sentencing three judge panel imposed a life sentence because no aggravant had been proved. This court subsequently reversed the underlying conviction of capital felony for insufficiency of evidence, and remanded with direction to modify the judgment to reflect, instead, a conviction for murder. *State* v. *McGann*, 199 Conn. 163, 179, 506 A.2d 109 (1986). The state, although including *McGann* in its universe, concedes that at some point a reversed conviction might not be appropriately included in the universe of cases "if it is shown that an error so taints the verdict as to render it of no practical value."

We agree with the defendant that the universe of cases does not appropriately include a case in which the underlying conviction of capital felony was subsequently reversed for insufficiency of evidence. Such a conviction must be excluded because, having been based on insufficient evidence, it is too unreliable to serve as a basis for comparison with the case on review. See *State* v. *Varszegi*, 236 Conn. 266, 269–78, 673 A.2d 90 (1996) (conviction based on insufficient evidence not sufficiently reliable to be used for impeachment purposes). Thus, it can give no reliable insight to us regarding patterns or trends of sentencers in similar cases. Furthermore, to decide otherwise would be inconsistent with our earlier conclusion that the universe appropriately includes only cases in which there was a conviction of capital felony. Thus, *McGann* must be excluded from the universe of cases.

We also agree with the state that, with respect to the imposition by a sentencer of the death penalty itself, a subsequent reversal of a case on appeal might involve such a taint on the verdict as to render the case inappropriate for inclusion in the universe. The conclusion is inescapable, moreover, that a reversal that is based on insufficiency of the evidence to support the finding of an aggravant, which finding is the sine qua non of the imposition of the death penalty, will mandate the exclusion of the case from the universe of cases. In other words, if it is authoritatively determined that the sentencing authority could not, as a matter of law, have imposed the death penalty based on the evidence before it, such a case cannot be deemed to be "similar" to the case under proportionality review. That scenario, however, is not present in this case.

felony convictions are currently on appeal, or were subsequently reversed on appeal for reasons other than those that wholly taint the reliability of the verdict, the sentences imposed in such cases provide valuable insight to this court in aid of our task of determining whether a particular death sentence is aberrational. Cases on appeal and subsequently reversed cases in which "juries [or judges] impose[d] the death penalty reflect the conscience of the community on the propriety of the imposition of that penalty." *State* v. *Bey*, supra, 137 N.J. 348. Although, as the state correctly points out, courts have not been unanimous on this question, our conclusion is consistent with the practice of a number of other jurisdictions. See, e.g., *Harper* v. *Commonwealth*, 694 S.W.2d 665, 671 (Ky. 1985), cert. denied, 476 U.S. 1178, 106 S. Ct. 2906, 90 L. Ed. 2d 992 (1986); *State* v. *Welcome*, 458 So. 2d 1235, 1255–58 (La. 1983), cert. denied, 470 U.S. 1088, 105 S. Ct. 1856, 85 L. Ed. 2d 152 (1985); *Tichnell* v. *State*, supra, 297 Md. 469; *State* v. *Bey*, supra, 345–49; *Osborn* v. *State*, 672 P.2d 777, 801–803 (Wyo. 1983), cert. denied, 465 U.S. 1051, 104 S. Ct. 1331, 79 L. Ed. 2d 726 (1984); but see *State* v. *Palmer*, 224 Neb. 282, 330–31, 399 N.W.2d 706 (1986), cert. denied, 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987); *State* v. *Steffen*, 31 Ohio St. 3d 111, 123–24, 509 N.E.2d 383 (1987), cert. denied, 485 U.S. 916, 108 S. Ct. 1089, 99 L. Ed. 2d 250 (1988); *State* v. *Copeland*, 278 S.C. 572, 591–92, 300 S.E.2d 63 (1982), cert. denied, 460 U.S. 1103, 103 S. Ct. 1802, 76 L. Ed. 2d 367 (1983), cert. denied sub nom. *Roberts* v. *South Carolina*, 463 U.S. 1214, 103 S. Ct. 3553, 77 L. Ed. 2d 1399 (1983).

In this connection, we also address a subsidiary question that this case presents: whether the jury's finding that the defendant committed the capital felony in an especially heinous and cruel manner; see footnote 61; which we previously have noted was made pursuant to

flawed jury instructions; see part IV B 2 of this opinion; should nonetheless be considered in the proportionality review of this case. We conclude that the finding should be considered.

We have determined that the finding at issue was supported by sufficient evidence. See part IV B 3 of this opinion. Thus, in this respect, this case is different from a case in which a conviction for capital felony has been reversed for insufficient evidence. Such a reversed conviction must be excluded from the universe of cases because it is too unreliable to yield insight into the patterns or trends of sentencers in similar cases. See footnote 83. The finding at issue here, however, which was made upon sufficient evidence, does not suffer from a similar defect. The finding does give us sufficient additional insight into patterns or trends of sentencers—namely, the jury in this case—to justify its inclusion in our analysis. Moreover, the flaw in the instructions did not wholly taint the fact-finding process so as to render the jury's finding of especially heinous and cruel conduct unreliable. That finding adequately "reflect[s] the conscience of the community on the propriety of the imposition of [the death] penalty" in this case. *State* v. *Bey*, supra, 137 N.J. 348.

Furthermore, to exclude the finding in this case would be inconsistent with our earlier conclusion that prior cases that have been reversed on appeal should, absent exceptional circumstances, be included in the universe of cases. If, as we have decided, such cases, in which the imposition of the death penalty has been reversed; see, e.g., *State* v. *Breton*, supra, 235 Conn. 206; *State* v. *Ross*, supra, 230 Conn. 183; are to be included in the universe, we see no principled reason to exclude the particular finding in this case from the process of proportionality review. Put another way, if we include in the universe the imposition of a death penalty that was reversed because of the improper exclusion of

evidence; see *State* v. *Ross*, supra, 183; or for fundamental ambiguity in the verdict form; see *State* v. *Breton*, supra, 206; there is no reason to exclude from the process of proportionality review the finding of an aggravant in this case that we have reversed because of flawed jury instructions. The relevance of all to the purpose of proportionality review remains the same, and the reasons for inclusion of all remain the same.

Moreover, to include in proportionality review the finding of the aggravant at issue is simply to recognize the reality that, even if we were to exclude the fact that the jury formally made such a finding, we would, of necessity, nonetheless be required to consider the evidence underlying that finding. The "circumstances of the crime"; General Statutes § 53a-46b (b) (3); in this case would necessarily include the manner in which the defendant killed his victim. To rule otherwise would be to blink at reality, and would be inconsistent with the language and purpose of the proportionality review statute.

We turn next, therefore, to the question of how to go about culling from the universe of eligible cases the ultimate pool of cases deemed to be "similar cases" for purposes of proportionality review. Having defined and limited the universe of cases, we must determine which particular cases within that universe are similar to this case for purposes of deciding whether the death sentence being reviewed is an outlier.

The state proposes a two part test, based on the similarity of the particular kinds of capital felony involved and the similarity of the aggravating factors charged. Thus, the state contends that " 'similar crimes' are those having common elements in the offenses and the aggravating factors that are charged. In the instant case, the defendant's capital felony conviction was based on a kidnap-murder. Regarding aggravating fac-

tors, the state alleged, and the jury found, that the capital felony was committed: (1) during the attempted commission of, or immediate flight from, sexual assault in the first degree and the defendant previously had been convicted of sexual assault in the first degree (the [§ 53a-46a (h) (1)] aggravant); and (2) in an especially heinous, cruel and depraved manner (the [§ 53a-46a (h) (4)] aggravant). Consequently, cases that are 'similar' to the defendant's must involve a capital felony based on the abduction and/or sexual assault of a victim who is brutally murdered."[84]

In the state's view, however, the question of whether a case is "similar" for purposes of proportionality review does not involve an inquiry into mitigating factors claimed or established. The state does not urge that mitigating factors be ignored; rather, the state argues that mitigating factors should be considered solely in the ultimate decision.

Unlike the state, the defendant does not offer a structured analysis of how to decide which cases are "similar." His analysis *first* proceeds on the implicit assumption that "similar cases" are those cases in which other defendants have been convicted of the same subsection of capital felony, namely, kidnap-murder under § 53a-54b (5). He *then* argues, however, that his sentence is disproportionate to the sentences in a number of other cases, some of which involved kidnap-murders and others which did not.

---

[84] As a result of this analysis, the state arrives at the following pool of "similar cases": (1) *State* v. *Cobb*, Superior Court, judicial district of Waterbury, Docket No. CR 4-175454 (kidnap-murder and sexual assault-murder); (2) *State* v. *LaPointe*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 89-107933 (sexual assault-murder); (3) *State* v. *Ross*, Superior Court, judicial district of New London, Docket Nos. CR 21-20300, CR 21-20355, CR 21-20356 (two kidnap and sexual assault-murders and two kidnap-murders); and (4) *State* v. *Usry*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49317 (sexual assault-murder).

Although the state's formulation might have the virtue of apparent predictability, we conclude that it is not fully consistent with the language and purpose of § 53a-46b (b) (3). That statute requires that we determine whether "the sentence is excessive or disproportionate to the penalty imposed *in similar cases, considering both the circumstances of the crime and the character and record of the defendant.*" (Emphasis added.) General Statutes § 53a-46b (b) (3). We see no principled reason to differentiate, for purposes of defining the pool of "similar cases," between aggravating and mitigating factors, because both may implicate "the circumstances of the crime," and both may also implicate "the character and record of the defendant." We hold, therefore, that both aggravants and mitigants must be viewed together, analytically, although not as part of the definition of "similar cases." Rather, they must both be considered in the process of actually comparing the case before us on review with the predetermined pool of "similar cases," as we illustrate later in this opinion.

There is no hard and fast rule or definition of "similar cases" that will be satisfactory—in the sense of conforming to legislative intent in establishing proportionality review—in all cases. What the ultimate pool of "similar cases" will consist of in any particular case will have to be developed on a case-by-case basis. This does not mean, however, that we cannot determine the appropriate pool of "similar cases" for this case, and thereby indicate a similar approach for future cases.

In our view, "similar cases" means, in general, cases in which the underlying capital felonies were based on conduct of other defendants that is substantially similar, in its criminal characteristics, to that of the defendant in the case under review. We ask: in the general transaction that underlies the conviction for capital felony in the case under review, in what kind of criminal conduct, in general, did the defendant engage? We then seek to

identify other cases in which the defendants engaged in substantially similar conduct. Thus, with respect to this case, the cases of any other defendants who were convicted of kidnap-murder under § 53a-54b (5), as was this defendant, would be "similar cases" to this case.

We are unpersuaded, however, that "similar cases" was intended to be cabined by the particular subsections of the capital felony statute. Thus, the cases of other defendants who were convicted under another subsection involving a sexual assault or attempted sexual assault comparable to the defendant's conduct in this case would also be "similar cases" to this case. In sum, with respect to this case, the other "similar cases" consist of those capital felony convictions based upon kidnap-murders, sexual assault or attempted sexual assault-murders, or both.[85] Several considerations lead us to this conclusion.

The language of § 53a-46b (b) (3) is relatively open-textured, suggestive of a broad but not unlimited inquiry. The statute's focus on "similar crimes," rather than the same crimes, and on "the circumstances of the crime," rather than the elements of the crime, suggests an inquiry into the essential facts of cases, rather than the precise statutory elements.[86] Furthermore, the

[85] As a result of this definition, we arrive at the following pool of "similar cases": (1) *State* v. *Cobb*, Superior Court, judicial district of Waterbury, Docket No. CR 4-175454 (kidnap-murder and sexual assault-murder); (2) *State* v. *LaPointe*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 89-107933 (sexual assault-murder); (3) *State* v. *Ross*, Superior Court, judicial district of New London, Docket Nos. CR 21-20300, CR 21-20355, CR 21-20356 (two kidnap and sexual assault-murders and two kidnap-murders); and (4) *State* v. *Usry*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49317 (burglary and sexual assault-murder). We note that this is the same pool of cases arrived at by the state pursuant to its proffered definition of "similar cases," although we have arrived at the same destination by a somewhat different route.

[86] As we have previously noted in a different but related context: "The statute contemplates a process of comparing the circumstances of one

purpose of proportionality review focuses on the sentencing practices and histories of sentencing authorities, principally although not exclusively juries, and requires a comparison of sentences imposed in "similar cases." That requirement assumes that the notion of similarity can, with reasonable specificity, be defined. This assumption, in turn, suggests that it is appropriate that the notion of similarity contain some element of what such sentencing authorities would normally consider to be "similar cases." We are persuaded that, in general, sentencers' commonsense notion of similarity would include, not only the particular subsections under which the defendants were convicted, but also a consideration of the substance of the defendants' criminal behavior. Moreover, there is nothing in the jurisprudence of proportionality review, as articulated by the United States Supreme Court in *Gregg* and *Pulley*, that suggests a more circumscribed inquiry, and there is some indication in that jurisprudence that supports our conclusion. See *Pulley* v. *Harris*, supra, 465 U.S. 43 (proportionality review "purports to inquire . . . whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others *convicted of the same crime*" [emphasis added]). Finally, we find precedent for this approach in the method employed by the Maryland Court of Appeals, which has read its proportionality review statute in a way similar to the reading that we have arrived at in this opinion. See *Tichnell* v. *State*, supra, 297 Md. 464–73.

6

To summarize, we conclude as follows regarding § 53a-46b (b) (3). First, neither the state nor the defend-

particular crime and the character and record of one particular defendant with the particular circumstances of other particular crimes committed by other particular defendants. The phrases 'similar cases,' 'circumstances of the crime,' and 'character and record of the defendant' are strongly sugges-

ant bears a burden of persuasion on the issue of dispro-
portionality. Second, proportionality review consists of
comparative review, and employs the precedent seek-
ing method. Third, the universe of cases from which
we cull the ultimate pool of cases deemed "similar
cases" consists only of capital felony convictions in
which there was a penalty phase hearing. Fourth, the
universe of cases includes cases currently on appeal
and, absent exceptional circumstances wholly
undermining the fundamental reliability of the fact-find-
ing process, cases that have been reversed on appeal.
Fifth, in the absence of such exceptional circumstances,
a reversed finding regarding an aggravating factor in
the case on review will be included in the process of
proportionality review. Sixth, the pool of "similar
cases," for purposes of comparison to the case on
review, consists of those cases in which the underlying
capital felony convictions involved conduct that is sub-
stantially similar, in its criminal characteristics, to that
of the defendant in the case under review.

### B

### The Defendant's Constitutional Claims

Having interpreted § 53a-46b (b) (3), although not yet
having applied it to this case; see part VI C of this
opinion; we now turn to the defendant's specific consti-
tutional challenges to the statute. We are not persuaded
by any of those challenges.

### 1

The defendant first claims that our proportionality
review statute is unconstitutional under the eighth
amendment to the United States constitution because
it "injects unconstitutional arbitrariness into principled
administration of the death penalty." He argues that:

---

tive of a process of particularized comparison." *State* v. *Cobb*, supra, 234
Conn. 748.

(1) neither the statute nor our rule of practice "offer[s] meaningful guidance on what factors are to be compared when conducting a review or even on how such a review is to be conducted"; (2) there are too few capital felony cases to yield statistically significant data; (3) this court "is therefore left with little but its intuition to determine which 'circumstances' of a crime or what aspects of a defendant's 'character' are relevant"; (4) we therefore are left to the impossible task of "comparing unique cases"; and (5) consequently, "[b]ecause proportionality review cannot in Connecticut be conducted in a non-arbitrary manner, proportionality review is proscribed by *Furman* and its successors." We disagree.

First, as we have indicated previously, our statute is patterned after the Georgia statute that the United States Supreme Court found to be constitutional in *Gregg*. It would be anomalous for us to conclude that essentially the same statute that the court approved in *Gregg* because it cured the constitutional defects identified in *Furman* is itself somehow unconstitutional under *Furman*.

Second, the interpretation of the statute that we have placed on the statute, which is drawn directly from *Gregg*, effectively responds to the defendant's remaining arguments. We have elaborated on the meaning of the statutory terms; we have eschewed any attempt at statistical analysis under the statute; we have made clear that the process of proportionality review does not involve the impossible task of comparing unique individual cases; and we do not rely on our intuition in engaging in the process. Although certainly difficult, the process of proportionality review is neither arbitrary nor unprincipled.

## 2

The defendant next claims that the statute violates his right to due process of law under article first, § 8, of

the Connecticut constitution; see footnote 14; because it is both facially vague and vague as applied to this case. As a general precursor to his vagueness claims, the defendant, relying on *International Harvester Co. of America* v. *Kentucky*, 234 U.S. 216, 34 S. Ct. 853, 58 L. Ed. 1284 (1914), and *State* v. *Zazzaro*, 128 Conn. 160, 20 A.2d 737 (1941), recognizes that generally the federal constitutional due process vagueness principle is aimed at "providing citizens with notice of proscribed conduct." Nonetheless, the defendant asserts that "Connecticut's due process requirement should not be confined to such a narrow purpose." Thus, the defendant maintains that, under article first, § 8, the due process proscription against impermissibly vague statutes applies to § 53a-46b (b) (3) because it requires "him to rely on a procedure offering no guidance on what he must do to prevail." In this connection, the defendant argues that, because neither the statute nor the rule of practice allocates the burden of persuasion, or provides a standard of review or rules of procedure, this court has "unbridled discretion to uphold or vacate a death sentence based almost entirely on the standards of its own choosing on such constitutionally vital issues as the burden of proof and the standard of proof."

In support of his claim that the statute is facially vague under the state constitution, the defendant argues that, because until now this court has not interpreted the statute, "no judicial gloss saves [the] statute from unconstitutional vagueness." He also argues that, because the statute "offers no guidance on how the court is to recognize a sentence that is either disproportionate or excessive," it impermissibly delegates these basic matters to us for resolution on an ad hoc and subjective basis, and he "is deprived of the benefit of an articulable standard offering guidance on what he must do to protect . . . his life." The defendant argues further that the "limited number of cases in Connecti-

cut's proportionality review pool makes it impossible to generate statistically meaningful data to assist in determining whether a death sentence was imposed arbitrarily." Therefore, the defendant urges us to conclude that the statute is facially vague because "the proportionality review fails to offer meaningful guidance [to him or to us] on what factors the court is to consider when it reviews a death sentence," and "gives to the court virtually unlimited discretion in deciding on what basis to uphold a sentence of death."

The defendant's claim that the statute is unconstitutionally vague as applied in this case rests entirely on the assertion that the "limited pool of cases in Connecticut's death penalty pool renders statistically meaningful examination of the outcome in a particular case impossible. As a result, there is no scientific means of determining whether a sentence was imposed arbitrarily in violation of *Furman*."

We reject both of these claims of the defendant. We note, as does the defendant both explicitly and implicitly, that his claims of vagueness under our state due process clause differ markedly in principle from any vagueness analysis employed under the federal due process clause. "The purpose of the vagueness doctrine is twofold. The doctrine requires statutes to provide fair notice of the conduct to which they pertain and to establish minimum guidelines to govern law enforcement." *State* v. *Indrisano*, 228 Conn. 795, 802, 640 A.2d 986 (1994). The first purpose is premised on the need for fair warning so that an individual may " 'steer between lawful and unlawful conduct . . . .' " Id. The second is premised on the need to avoid the impermissible delegation of basic law enforcement policy matters " 'to policemen, judges, and juries for resolution on an ad hoc and subjective basis . . . .' " Id., 803.

The defendant's claims of vagueness, however, do not implicate either the notion of fair notice of what

*conduct* is prohibited or the concept of guarding against the risk of arbitrary enforcement of the law by police officers, judges or juries. Section 53a-46b (b) (3) does not govern, directly or indirectly, any individual's conduct, or how police officers, judges or juries will enforce any laws. Rather, the statute provides an appellate mechanism whereby, after the defendant has been convicted of capital felony on the basis of his conduct and sentenced to death by a jury whose sentencing discretion has been sufficiently channeled to avoid arbitrary and capricious imposition of that penalty, and after his conviction has been affirmed on its merits, this court must compare his death sentence to other sentences imposed in similar capital felony cases so as to provide an additional safeguard against the risk of an aberrational or outlier death sentence having been imposed on him.

That kind of ultimately prophylactic, comparative appellate review does not implicate the concept of "law enforcement by judges" as that phrase is used in vagueness parlance. The defendant offers no authority to support such an interpretation of that strand of the vagueness doctrine, and we know of none. In general terms, the second purpose of the vagueness doctrine is designed to protect against the impermissible risk of arbitrariness in the application of laws by trial level actors who exercise a certain amount of discretion. That risk is not inherent in the appellate process of proportionality review, which is designed to add an additional layer of safeguard to a determination by a jury that was already sufficiently channeled so as to avoid impermissible risk of arbitrariness.[87]

---

[87] We recognize that the penalty provided by a statute may be impermissibly vague. See, e.g., *United States* v. *Batchelder*, 442 U.S. 114, 123, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979); *United States* v. *Ferryman*, 897 F.2d 584, 590–91 (1st Cir.), cert. denied, 498 U.S. 830, 111 S. Ct. 90, 112 L. Ed. 2d 62 (1990); *Smith* v. *United States,* 145 F.2d 643, 644–45 (10th Cir. 1944), cert. denied, 323 U.S. 803, 65 S. Ct. 563, 89 L. Ed. 641 (1945). Those cases, however,

Thus, the defendant's claims, rather than being vagueness claims under traditional vagueness analysis, amount to the contention that, because the statute does not spell out by its terms, without some process of interpretation, all that one must know in order to present an appropriate appellate argument, it is unconstitutionally vague under the state constitution because it has not been interpreted previously and because it involves the defendant's life. The defendant, however, has not presented any independent analysis under the state constitution to support his assertion that our due process clause includes a void for vagueness principle that is considerably broader than and different from the corresponding principle under the federal constitution.[88] See, e.g., *State* v. *Geisler*, supra, 222 Conn. 684–85 (describing factors relevant to independent analysis of state constitutional provisions). On one occasion we have simply declined to review a defendant's void for vagueness claim under the state constitution. See *State* v. *Indrisano*, supra, 228 Conn. 798 n.4. We could, therefore, on the basis of this precedent, decline to review the defendant's vagueness claim. On other occasions, however, we have consistently equated vagueness analysis under our state due process clause with the corresponding federal constitutional analysis. See *State* v. *DeFrancesco*, 235 Conn. 426, 443, 668 A.2d 348 (1995);

simply involve an appropriate extension of the traditional vagueness doctrine as we have described it. They do not support the inappropriate extension of that doctrine to the appellate process of proportionality review.

[88] The defendant's entire analysis to support his assertion of a broader conception of vagueness under the state constitution than under the federal constitution is that, although vagueness involves "providing citizens with *notice of proscribed conduct, Connecticut's due process requirement should not be confined to such a narrow purpose. Article first, § 8, of the state constitution serves as a limitation upon government conduct, requiring, among other things, that a person not be 'deprived of life' without due process of law. In the context of proportionality review, that can only mean that a defendant exercising his statutory right to seek commutation of his death sentence cannot be deprived of due process by requiring him to rely on a procedure offering no guidance on what he must do to prevail."

*State* v. *Linares*, 232 Conn. 345, 376–77, 655 A.2d 737 (1995); *Bishop* v. *Kelly*, 206 Conn. 608, 611, 539 A.2d 108 (1988); *State* v. *White*, 204 Conn. 410, 414 n.1, 528 A.2d 811 (1987); *State* v. *Proto*, 203 Conn. 682, 696, 526 A.2d 1297 (1987); *State* v. *Eason*, 192 Conn. 37, 45 n.9, 470 A.2d 688 (1984), overruled in part, *Paulsen* v. *Manson*, 203 Conn. 484, 525 A.2d 1315 (1987). Applying these precedents, therefore, we reject on its merits the defendant's claim that § 53a-46b (b) (3) is unconstitutionally vague, either on its face or as applied, under the state constitution.[89]

---

[89] We address, nonetheless, irrespective of constitutional principles, the substance of the defendant's contentions because of the interests at stake. We are not persuaded of the merits of any of his contentions.

First, as we have explained previously, any argument based on the lack of the specific allocation of the burden of persuasion is irrelevant. We have concluded that neither party bears such a burden, and that the ultimate determination that we must make is akin to a question of law, which we will make irrespective of any such burden. Second, to the extent that the defendant's argument rests on a perceived absence from the statute of guidance for this court regarding how to determine disproportionality or excessiveness, our prior discussion answers that argument. To the extent that his argument rests on a perceived absence of guidance for him, because of a lack of prior judicial gloss on the statute, we are not persuaded that the defendant has been disadvantaged.

The lack of a prior authoritative judicial gloss on a statute always confronts the first appellate litigant to be governed by a statute. The defendant did in this case what any such litigant does: after presenting his constitutional challenges, he posited what he considered to be the meaning of the statute and the results that he considered to be mandated thereunder. The defendant then encountered the state's interpretation of the statute and the results that it considered to be mandated thereunder, and he had a full and fair opportunity to respond thereto. Indeed, as we note previously, the analysis that we ultimately employed, although it differs somewhat from the state's, leads us to the same pool of "similar cases" as that proffered by the state. Thus, upon learning the state's response to his claims, the defendant had a full and fair opportunity to respond to the pool of cases that we will consider.

Additionally, as we have also indicated before, § 53a-46b (b) (3) was not enacted in a vacuum. It was derived directly from the Georgia statute and from the United States Supreme Court's discussion of that statute in *Gregg*. That jurisprudential background was as available to the defendant, in formulating an interpretation of the statute in this appeal, as it was to this court and to the state. Indeed, we discussed a good deal of that history in *State* v. *Cobb*, supra, 234 Conn. 735, which judicial gloss on the statute was

3

The defendant next maintains that § 53a-46b (b) (3) violates the separation of powers principle embodied in article second[90] and article fifth, § 1,[91] of the state constitution. He argues that our function under the statute is in effect a sentence review function, similar to that of the sentence review division of the Superior Court under General Statutes § 51-194 et seq. The defendant contends that conferring such a function on this court alters the essential appellate nature of this court, which is to determine questions of law, rather than to find facts. See, e.g., *State* v. *Nardini*, 187 Conn. 109, 126, 445 A.2d 304 (1982); *Styles* v. *Tyler*, 64 Conn. 432, 450, 30 A. 165 (1894); compare *State* v. *Cobb*, supra, 234 Conn. 750 n.13. We disagree.

As we have explicitly stated; see part VI A 3 of this opinion; and as is implicit in our entire explication of the proportionality review process under § 53a-46b (b) (3), proportionality review is akin to deciding questions of law, in the sense of applying legal standards to undis-

available to the defendant.

Third, to the extent that the defendant's claims rest on the absence of a sufficient number of cases for statistical significance, any such consideration is irrelevant. Proportionality review under the statute does not involve statistical analysis.

[90] The constitution of Connecticut, article second, as amended by article eighteenth of the amendments, provides: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. The legislative department may delegate regulatory authority to the executive department; except that any administrative regulation of any agency of the executive department may be disapproved by the general assembly or a committee thereof in such manner as shall by law be prescribed."

[91] The constitution of Connecticut, article fifth, § 1, as amended by article twentieth of the amendments, provides: "The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

puted facts as disclosed by the records of other cases. Determining whether a particular death sentence is excessive or disproportionate to the sentences in "similar cases," as we have described that process at length, is much like determining whether a particular set of facts as found by a trial court amounts to probable cause or reasonable suspicion, which is a question of law for this court. *State* v. *Groomes*, 232 Conn. 455, 468, 656 A.2d 646 (1995) (review of trial court's legal conclusion that investigative stop based on reasonable suspicion); *State* v. *Bergin*, 214 Conn. 657, 661–62, 574 A.2d 164 (1990) (trial court's probable cause determination reviewable as question of law). It is also similar to the legal question of whether evidence is sufficient to support a conviction. See, e.g., *State* v. *DeJesus*, 236 Conn. 189, 195–96, 672 A.2d 488 (1996) (review of evidence to determine whether fact finder reasonably could have found defendant guilty beyond reasonable doubt). Thus, proportionality review under the statute involves essentially a legal determination that is within our traditional appellate function.

4

The defendant's next constitutional challenge is that the statute violates our state equal protection clause under article first, § 20,[92] and substantive due process under article first, § 8. See footnote 14. We are not persuaded.

The defendant first argues that the statute "violates the equal protection clause because it fails to assure equal treatment for similarly situated individuals. Defendants pleading for their lives simply do not know

[92] The constitution of Connecticut, article first, § 20, as amended by article twenty-first of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

what they must do to save themselves." Although cast in equal protection terms, we can perceive no difference between this claim and the claim of vagueness that we previously rejected. We perceive no more merit to this claim here than we did there.

Under the rubric of substantive due process, the defendant reasserts here the substance of his social compact theory that we considered and rejected in part I A 2 of this opinion. We reject his argument under this rubric for the same reasons that we rejected it earlier.

### 5

The defendant's final constitutional challenge to proportionality review is that our proportionality review statute is unconstitutional under the cruel and unusual punishment clause of the eighth amendment as explicated in *Furman*, because it permits the sentencing authority to refrain from imposing the death penalty on the grounds of mercy. This claim is more properly presented as a challenge to the sentencing process rather than to the appellate review of that process, because it addresses the process of reaching the sentencing decision by the sentencing authority rather than the review of that decision by an appellate court. We will nonetheless address this claim on its merits as part of our discussion of proportionality review.

This claim is foreclosed by *Gregg*. "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." *Gregg* v. *Georgia*, supra, 428 U.S. 203; see also id., 199 ("*Furman* . . . dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our

cases suggests that the decision to afford an individual defendant mercy violates the Constitution."). As we have stated: "The sentencer makes the required moral and individualized determination, under our statute, because it must consider a nonexclusive list of mitigating factors as well as a catchall category consisting of any other 'mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime.' General Statutes § 53a-46a (b); and see § 53a-46a (f). The catchall category of mitigating factors includes those factors 'which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.' General Statutes § 53a-46a (d). The ability to consider an unrestricted set of mitigating factors satisfies federal constitutional requirements for a moral and individualized decision. *Blystone* v. *Pennsylvania*, supra, 494 U.S. 305." *State* v. *Ross*, supra, 230 Conn. 240.

C

Review of the Defendant's Sentence
Pursuant to § 53a-46b (b) (3)

We turn, finally, to the task of determining whether the defendant's death sentence is, under the principles that we have articulated, "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b) (3). We reiterate that our function in undertaking this task is "to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposi-

tion. This, of course, is the . . . purpose of proportionality review as articulated in *Gregg* and *Proffitt* and as to which we think the General Assembly intended to subscribe in enacting" § 53a-46b (b) (3). *Tichnell* v. *State,* supra, 297 Md. 464–65. We conclude that the death sentence in this case is not excessive or disproportionate and, accordingly, we affirm that sentence.

In addition to this case, the universe of cases that serves as our starting point for this task consists of the following "capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed"; Practice Book § 4066A (b); and that meet the requirements articulated above: *State* v. *Breton,* Superior Court, judicial district of Waterbury, Docket No. CR 147941; *State* v. *Cobb,* Superior Court, judicial district of Waterbury, Docket No. CR 4-175454; *State* v. *Correa,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 91-0406234; *State* v. *Daniels,* Superior Court, judicial district of New London, Docket No. CR 21-20169; *State* v. *Day,* Superior Court, judicial district of Bridgeport, Docket No. CR 90-21072; *State* v. *Johnson,* Superior Court, judicial district of Windham, Docket No. CR 91-76196; *State* v. *LaPointe,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 89-107933; *State* v. *Roseboro,* Superior Court, judicial district of Ansonia-Milford, Docket No. CR 5-81771; *State* v. *Ross,* Superior Court, judicial district of New London, Docket Nos. CR 21-20300, CR 21-20355, CR 21-20356;[93] *State* v. *Steiger,* Superior Court,

---

[93] With respect to *Ross,* in accordance with the limitations that we have previously discussed; see part VI A 5 of this opinion; we include only the capital felony convictions for which the defendant was sentenced to death. Although the defendant was convicted of six counts of capital felony, the convictions involved only four victims, and we therefore treat the six capital felony convictions as four separate cases. See *State* v. *Ross,* supra, 230 Conn. 183. We exclude the two noncapital convictions for murder; *State* v.

judicial district of Hartford-New Britain at Hartford, Docket No. 53426; *State* v. *Usry*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49317; *State* v. *Wood*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 48720.[94] From this universe of cases, we cull the pool of the following seven cases that we deem to be "similar" to this case because they involve kidnap-murders, sexual assault-murders or both: *State* v. *Cobb*, supra; *State* v. *LaPointe*, supra; *State* v. *Ross*, supra, (four cases); and *State* v. *Usry*, supra.

In the present case, the jury found the following two aggravating factors: (1) the defendant committed the offense during the attempted commission of a sexual assault in the first degree, a felony of which he had previously been convicted; and (2) the defendant committed the offense in an especially heinous and cruel manner. These findings were based on evidence demonstrating that the defendant, after kidnapping the victim at gunpoint in a downtown parking garage, drove her for approximately twelve minutes and for nearly four miles to a municipal park golf course. There he forcibly removed, or forced the victim to remove, her shoes and underclothing and, against her struggle to resist, forcibly attempted to assault her sexually. When the victim broke free of him, the defendant shot her twice in the back, causing her excruciating pain and significant hemorrhaging. As the victim, coughing blood and screaming for help, attempted to crawl away from the defendant, he returned to his car and drove to where the victim had crawled, nearly thirty-three yards from

---

*Ross*, Superior Court, judicial district of Windham, Docket Nos. CR 11-49329-8193, CR 11-49330-8194; which resulted from a plea bargain with the state. See *State* v. *Ross*, supra, 225 Conn. 560–61.

[94] We do not include in the universe of cases *State* v. *McGann*, Superior Court, judicial district of New London, Docket No. CR 10-13678, because the conviction of capital felony was reversed for insufficiency of evidence. See footnote 83.

the place of the attempted sexual assault. The defendant exited the car, stood in front of the prostrate and still conscious victim and shot her in the chest, in the ear and, after bending down to her, point blank in the face. The bullets that the defendant used were specially enhanced for power, and two of them were designed to expand on impact and cause greater damage than ordinary bullets. The evidence and the jury's specific findings, therefore, demonstrate a forcible abduction, followed by a car ride of approximately twelve minutes and four miles, followed by a forcible attempted sexual assault of the highest degree, followed by a particularly brutal murder, all of which inflicted excruciating terror and pain on the victim, by a person who had previously been convicted of the highest degree of forcible sexual assault.

The jury rejected the following ten possible mitigating factors: (1) at the time of the offense, the defendant's mental capacity was significantly impaired; (2) at the time of the offense, the defendant's mental capacity was impaired; (3) the defendant had an emotionally deprived early childhood; (4) at an early age, the defendant exhibited signs of mental or emotional disturbance that went untreated because of parental neglect; (5) the defendant surrendered to the police after learning that he was sought as a suspect; (6) at various times, the defendant had maintained positive relationships with others who do not wish him to be executed; (7) there is a lingering doubt, short of a reasonable doubt, regarding the defendant's guilt that is sufficient to warrant a sentence of less than death; (8) fairness, mercy and humanity; (9) the defendant's youthful age and that his emotional and mental development was not commensurate with his chronological age at the time of the offense; and (10) "[a]ny other mitigating factors concerning [the defendant's] character or background, or the nature and circumstances of the case suggested by the evidence."

In the case of *State* v. *Cobb*, supra, the defendant was convicted of two capital felonies: (1) murder in the course of a sexual assault in the first degree in violation of § 53a-54b (7);[95] and (2) murder of a kidnapped person in the course of a kidnapping in violation of § 53a-54b (5); see footnote 2; both involving the same victim and the same transaction. The defendant abducted the female victim from a shopping mall parking lot. He forced the victim to drive her car to an isolated area near a dam, where he sexually assaulted her. He then placed a leather glove in her mouth, bound her hands, feet and mouth with tape, and threw her from the top of the dam onto an ice-covered concrete apron that was approximately twenty feet below. The fall injured, but did not kill, the victim. When the defendant realized that the victim had survived, he went to the bottom of the dam and caused her to die by asphyxiation. The defendant later returned to the scene in order to make sure that the victim was dead. With respect to aggravating factors, a three judge panel found that the murder had been committed in an especially heinous and cruel manner. With respect to mitigating factors, the panel also found that the defendant had not proven: (1) that his mental capacity was significantly impaired; (2) that his ability to conform his conduct to the requirements of law was significantly impaired; and (3) with respect to his list of mitigants,[96] "any factor that can be consid-

---

[95] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (7) murder committed in the course of the commission of sexual assault in the first degree . . . ."

[96] The parties have not supplied to us the list of particular mitigants claimed by Cobb. We have, however, examined his appellate file in this court. That file discloses that the defendant claimed the following mitigants: (1) his mental capacity was significantly impaired at the time of the offense; (2) his ability to conform his conduct to the law was significantly impaired at the time of the offense; (3) he committed the offense under the influence of an emotional disturbance; (4) he suffers from a mental disorder, namely, mixed personality disorder; (5) he is the father of a four year old son; (6) he served his country as a member of the United States Army; (7) he has a history of steady and reliable employment; (8) he graduated from high

ered as mitigating." Accordingly, the panel imposed the death penalty.

In the case of *State* v. *LaPointe*, supra, the defendant was convicted of the capital felony of murder committed in the course of a sexual assault in the first degree in violation of § 53a-54b (7). He sexually assaulted his wife's grandmother in her apartment. When the victim told the defendant that she would tell his wife what he had done, he stabbed her repeatedly in the stomach and back. He then attempted to strangle her, and he set fire to the sofa on which she was lying. Although the victim had been grievously injured by the stabbing and the fire, she died of smoke inhalation. With respect to aggravating factors, the jury found that the defendant had committed the offense in such a way as knowingly to create a grave risk of death to a person other than the victim. The jury found that the state had not proved that the offense had been committed in an especially heinous or depraved manner. The jury reached no verdict concerning whether the crime had been committed in an especially cruel manner.

The defendant claimed the following fifteen mitigating factors: (1) at the time of the offense, his mental capacity was significantly impaired; (2) at the time of the offense, his mental capacity was impaired such that his innate ability to perform and achieve was compromised by his psychological and intellectual deficiencies; (3) in his youth and adolescence, he suffered from a congenital cranial deformity known as Dandy-Walker syndrome, resulting in hydrocephalus and requiring five

school and was a contributing member of his class; (9) he has been adversely affected by problems of racial identity; (10) his family cares about him and will provide him with emotional support during his incarceration; (11) he possesses positive qualities that are recognized by others; (12) he confessed to the crime; (13) he has adjusted well to incarceration and is adaptable to life imprisonment; (14) based upon all the mitigating evidence, life imprisonment without the possibility of release is the appropriate sentence; and (15) mercy.

cranial operations that left him with permanent injury to the frontal lobe and right side of his brain; (4) in his youth and adolescence, he had been bullied and taunted by his peers, which adversely affected his education and his emotional, psychological and social development; (5) despite his significant intellectual and vocational deficiencies, his formal education had been terminated with the acquiescence and encouragement of his school system; (6) despite his deficiencies, he had a history of steady and reliable employment and positive accomplishments, and worked hard to improve his and his family's socioeconomic situation; (7) he was married, was a loving father to his son, and worked regularly to provide for his family; (8) he demonstrated appropriate parental concern for the secular and religious education of his son; (9) he is a person with religious beliefs, who believes in God and participates in the Catholic religion; (10) before his marriage in 1978, he had volunteered his time and services for the benefit of a neighborhood center for the blind; (11) he was a well adjusted and adaptable prisoner who should present few, if any, prison discipline problems; (12) he had no prior criminal history, except for a minor incident when he was twenty-one years old; (13) mercy, and concern for his unique life; (14) any other factor concerning his character, background or history, or the nature or circumstances of the crime; and (15) life imprisonment without the possibility of release is the appropriate sentence in the case. The jury found that the defendant had proven a mitigating factor. The jury was not required to, and did not, specify which mitigating factor or factors it found proven. Accordingly, a sentence of life imprisonment without the possibility of release was imposed.

In the four cases of *State* v. *Ross*, supra, the defendant was convicted of six counts of capital felony,[97] involving

---

[97] Ross was convicted of four counts of murder by a kidnapper of a kidnapped person during the course of the kidnapping in violation of § 53a-

four separate victims. The defendant had a prior conviction in another state for attempting to assault a woman, for which he had served six months incarceration. The defendant confessed to each of the incidents involved in these capital felony prosecutions, and in his confessions stated that he had killed his victims in order to avoid detection.

With respect to his victim, Wendy B., the defendant accosted her as he was driving and she was walking on a rural road. He forcibly took her into adjoining woods, where he forced her to undress and sexually assaulted her. Then, after remembering his previous arrests and the conviction for assaulting women, he decided to kill this victim. He did so by forcing her to lie on her stomach while he sat on her back and manually strangled her to death. This took several minutes to accomplish, during the first two or three minutes of which the victim was conscious, and during which the defendant's hands cramped, requiring him to relax his grip before resuming the strangulation. While he was relaxing his hands, the victim twitched and moved.

With respect to his victim, Robyn S., the defendant accosted her near a state hospital grounds and forcibly took her into adjoining woods, where he forced her to undress and sexually assaulted her. He then strangled her to death in the same manner, also doing so with such difficulty that he was required to relax his grip in order to relieve his cramping hands. This victim was also conscious during the strangulation, and also twitched and moved while the defendant relaxed his hands.

With respect to his victims, April B. and Leslie S., the defendant picked them up while they were hitchhiking

54b (5), and two counts of murder in the course of the commission of sexual assault in the first degree in violation of § 53a-54b (7). See *State* v. *Ross*, supra, 230 Conn. 187–88, 191–92.

on a rural road, and drove them to a secluded dirt road. He then tied Leslie S.' hands and feet with a belt and with cut up portions of April B.'s jeans, which he had forced her to remove. He then forcibly took April B. away from the car, sexually assaulted her and strangled her to death in the same manner as the other victims. The defendant then returned to the car and killed Leslie S. The defendant then took the two bodies and deposited them in a culvert. Thereafter, the defendant visited the site of the culvert while the bodies were decomposing, and took pleasure in reliving the killings.

The jury found that each offense had been committed in an especially heinous, cruel or depraved manner. The defendant claimed the following thirteen mitigating factors: (1) his mental capacity was significantly impaired at the time of each offense; (2) his ability to conform his conduct to the requirements of law was significantly impaired at the time of each offense; (3) his cooperation with the police was the major factor in the solution of the crimes; (4) he had pleaded nolo contendere in the death of two other victims for which he has been sentenced to 120 years of confinement and, therefore, cannot be released during his natural lifetime; (5) he has been a good prisoner and can lead a peaceful and productive life in confinement; (6) he is emotionally disturbed and was so at the time of the offenses; (7) at various times during his life, he has shown care and concern for others; (8) at various times during his life, he has maintained positive relationships with others who do not wish to see him executed; (9) he can provide information to psychiatrists that will assist the development of the ability to detect in others the symptoms of mental and emotional impairment that he has, thus preventing similar crimes in the future; (10) he suffered a deprived childhood, during which he did not receive the emotional nurturing necessary to his development as a healthy adult; (11) he is the product of a pathologi-

cal family unit; (12) mercy; and (13) any other mitigating factors concerning his character, background and history suggested by the evidence. With respect to the eleven factors that were presented to the jury, numbers four and nine having been excluded, the jury did not find that the defendant had proven a mitigating factor. Accordingly, a death sentence was imposed on each conviction of capital felony.

In the case of *State* v. *Usry*, supra, the defendant was convicted of the capital felony of murder in the course of a sexual assault in the first degree in violation of § 53a-54b (7). The defendant, who had just reached the age of eighteen at the time of the crime, climbed into the victim's first floor apartment through a window. He forcibly sexually assaulted the victim, put sugar around her vaginal area, and killed her by repeated blows to the head with a brick. The victim survived for approximately ten to twenty minutes after first being disabled by a blow to the head. One of the blows, namely, to her nose, was extremely painful. She may have remained conscious until the last blow.

The state claimed that the offense had been committed in an especially heinous, cruel or depraved manner. The defendant claimed the following nine mitigating factors: (1) his mental capacity was significantly impaired at the time of the offense; (2) he was emotionally disturbed; (3) he was of youthful age at the time of the offense because it was committed only five weeks after his eighteenth birthday, and § 53a-46a (g) (1) precludes the death penalty for a defendant who was under the age of eighteen at the time of the offense;[98] (4) his mental or emotional development was below his chronological age at the time of the offense; (5) he suffered from an emotionally deprived early childhood; (6) he was the product of a pathological family unit; (7) he did not obtain help for his psychological problems

---

[98] See footnote 10.

because he was the victim of parental neglect; (8) he suffered from a mental disease or defect, namely, paranoid personality disorder, schizoid personality disorder; and (9) any other mitigating factors suggested by the evidence.

The jury found that the defendant had committed the crime in an especially heinous, cruel or depraved manner. With respect to mitigating factors, the jury could not reach a unanimous verdict and, pursuant to the court's instruction, indicated that five jurors found a mitigating factor proven and seven jurors found no mitigating factor proven. The trial court imposed a sentence of life imprisonment without the possibility of release.

Having set out the pertinent facts of each of the eight cases, the present case and the seven similar cases, we must now compare this case with the other seven cases. In five of the seven similar cases, the sentencer imposed the death penalty, and in two of those cases, the death penalty was not imposed.

With respect to the five cases in which the death penalty was imposed, *Cobb* and the four *Ross* cases, the fact finders found that the offenses had been committed in an especially heinous, cruel or depraved manner. In the present case, the jury found not only that the defendant had committed the offense in that manner,[99] but also an additional aggravant, namely, that the defendant had committed the offense during an attempt to commit sexual assault in the first degree and that he had been previously convicted of that same offense. Thus, this defendant was found not only to have engaged in especially heinous and cruel conduct, but to be a forcible, violent, sexual offense recidivist.

---

[99] We reiterate that, although the jury instructions regarding this aggravant were flawed, the jury's finding is sufficiently reliable to be considered as part of proportionality review.

Moreover, with respect to those five cases, the fact finders rejected the defendants' claims regarding numerous mitigants. Most of the claims of mitigation presented by the defendant in the present case were included, either explicitly or in substance, in the claims of mitigation presented in the other five cases.[100] In all six such cases, therefore, this case, *Cobb*, and the four *Ross* cases, the fact finders rejected most of the claims of mitigation presented by this defendant.

In one of the two cases in which the death penalty was not imposed, *LaPointe*, there was no finding of heinous and depraved conduct, there was a hung jury on the finding of especially cruel conduct, and there was a finding of an additional aggravant, namely, that the defendant knowingly created a grave risk of death to a person other than the victim. In the other case, *Usry*, the jury found that the offense was committed in an especially heinous, cruel or depraved manner.

With respect to mitigants, in *LaPointe*, the jury found proven at least one of the defendant's fifteen mitigating factors, and several of those factors had no counterpart in the mitigants claimed by the defendant in the present case. For example, the following mitigants presented by LaPointe had no such counterpart: (1) permanent brain injury resulting from the five cranial operations required by his Dandy-Walker syndrome; (2) a history of steady and reliable employment, accompanied by hard work to improve his family's situation; (3) parental concern for the secular and religious education of his son; (4) religious beliefs, belief in God, and participation in his religion; (5) a history of volunteering time and services for the benefit of a neighborhood center for the blind; (6) a satisfactory adjustment to prison life;

---

[100] Cobb did not claim a mitigating factor based on parental neglect or a deprived early childhood, as did Webb. Neither Cobb nor Ross claimed a mitigating factor based on "lingering doubts" concerning his guilt, or based on his age or emotional and mental development.

and (7) no significant prior criminal history. This last mitigant in *LaPointe*, moreover, stands in stark contrast to the defendant's violent sexual recidivism in the present case.

In *Usry*, the jury was hung, seven to five against a finding of a mitigant. Moreover, as in *LaPointe*, in *Usry* there were claimed mitigants that have no counterpart in the present case. Those were: (1) the defendant's youthful age, only weeks beyond the statutory minimum for the imposition of the death penalty; and (2) that the defendant suffered from paranoid personality disorder, schizoid personality disorder.

On the basis of this analysis, of our scrupulous examination of all of the material presented to us regarding the imposition of the death penalty in the present case, and of our careful review of all of the material presented to us regarding the imposition of the sentences in the other seven similar cases, we conclude that the death sentence in this case is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b) (3). There is nothing freakish, arbitrary, wanton or aberrational about the sentence in this case. There is no pattern or trend evident in similar cases with respect to which this sentence is inconsistent. This case is not an outlier. The various sentencers' evaluations of similar aggravants and claimed mitigants in the other similar cases is reasonably consistent with the jury's evaluation of the aggravants and claimed mitigants in this case. The death sentence in this case is reasonably consistent with the sentences of death imposed in the five similar cases in which that sentence was imposed, considering the aggravants found and the mitigants claimed. The death sentence in this case is reasonably consistent with the sentences of life imprisonment in the two similar cases in which that sentence was

imposed, considering the aggravants found and the mitigants claimed; there is nothing freakish, aberrational or arbitrary in a jury having imposed the death penalty in this case and having declined to do so in the other two cases. The sentence in this case is reasonably consistent with the sentences imposed in the pool of similar cases. The sentence of death in this case, therefore, must be affirmed.

The judgment is affirmed in all respects, except that the case is remanded for the trial court to consider the defendant's claim that death by lethal injection constitutes cruel and unusual punishment under the state constitution. This court retains jurisdiction for the purpose of appellate review of the trial court's determination of that claim.

In this opinion PETERS, C. J., and CALLAHAN and PALMER, Js., concurred.

BERDON, J., with whom KATZ, J., joins, and NORCOTT, J., joins with respect to parts III and IV, dissenting. I continue to believe that the death penalty violates the state constitution's prohibition against cruel and unusual punishment, and I would remand this case to the trial court with direction to vacate the penalty of death and to impose a sentence of life imprisonment without the possibility of release.

Although I have previously written at length with respect to the unconstitutionality of the death penalty in two previous dissents, which I incorporate by reference in this dissent; *State* v. *Breton*, 235 Conn. 206, 260, 663 A.2d 1026 (1995); *State* v. *Ross*, 230 Conn. 183, 286, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (*Ross II*);[1] I wish

---

[1] *State* v. *Ross*, 225 Conn. 559, 624 A.2d 886 (1993) (*Ross I*), discusses the universe of cases included in a proportionality review pursuant to General Statutes § 53a-46b (b) (3), which was repealed by No. 95-16, § 3, of the 1995

to elaborate on two of the cruel and unusual aspects of this ultimate penalty. First, however, a few preliminary matters need to be addressed.

I

Today is the first time that each of the justices of the Supreme Court of Connecticut has had an opportunity to speak on the issue of whether the death penalty violates our state constitution.[2] The majority of this court, consisting of Chief Justice Peters and Justices Callahan, Borden and Palmer, now concludes that death at the hands of the state is not cruel and unusual punishment, while three justices—Justices Norcott, Katz and myself—would hold that the penalty is unconstitutional under the state constitution.[3] The majority's decision today prevents Connecticut from joining those humane and enlightened states and nations that continue to ban the penalty of death. The only remaining issue in this case is by which means Mr. Webb will be put to death.[4]

Whether a penalty constitutes cruel and unusual punishment depends in large part upon contemporary standards of decency. Unlike other constitutional precedents, this standard of review evolves and therefore the question must be evaluated in each case.[5] I am

---

Public Acts, effective April 12, 1995. The proportionality review requirement that I discuss in part III of this dissent, however, is still mandatory for all capital felony cases pending at the time that act became effective. See *State* v. *Cobb*, 234 Conn. 735, 746 n.10, 663 A.2d 948 (1995).

[2] A number of justices were disqualified from hearing *Ross II* and *Breton*.

[3] This case was initially argued before a five justice panel consisting of Justices Callahan, Borden, Berdon, Norcott and Katz. After oral argument, we ordered rebriefing concerning the state constitutional issue of cruel and unusual punishment and reargument before the en banc panel.

[4] The majority has remanded the case to the trial court "for a hearing limited to the defendant's claim concerning the state constitutionality of lethal injection as a means of execution."

[5] "Perhaps the most important principle in analyzing cruel and unusual punishment questions is one that is reiterated again and again in the prior opinions of the Court: i.e., the cruel and unusual language must draw its meaning from the evolving standards of decency that mark the progress of

confident that eventually both the judicial system and the citizens of this state will reflect back on this day with the same disbelief and sense of outrage that we currently hold in regard to those punishments that were inflicted during the eighteenth[6] and nineteenth[7] centuries in this state. The realization that the penalty of death fails to comport with contemporary standards of decency does not, however, depend upon the passage of time measured by centuries. During his tenure on the United States Supreme Court, Justice Blackmun came to the realization that the death penalty is imposed in an arbitrary, capricious and racist manner, and is therefore unconstitutional: "From this day forward, I no longer shall tinker with the machinery of death." *Callins* v. *Collins*, 510 U.S. 1141, 1145, 114 S. Ct. 1127,

a maturing society. Thus, a penalty that was permissible at one time in our Nation's history is not necessarily permissible today.

"The fact, therefore, that the Court, or individual Justices, may have in the past expressed an opinion that the death penalty is constitutional is not now binding on us." (Internal quotation marks omitted.) *Furman* v. *Georgia*, 408 U.S. 238, 329, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring.)

[6] "For example, contemporary standards of decency would certainly forbid the punishment imposed by a judge of the Connecticut Superior Court in 1773 for burglary: '[T]hat [the defendant] go from hence to the Goal from whence he Came and from thence to the place of Execution and then and there be branded on his forehead with the Capital Litter B on a hot Iron and have one of his Ears Nailed to a post and Cut off and also Whipt on his Naked body fifteen Stripes.' 4 American Legal Records, The Superior Court Diary of William Samuel Johnson 1772–1773 (J. Farrell ed., 1942) pp. 91–92." *Ross II*, supra, 230 Conn. 293.

[7] Nineteenth century punishment included confinement at the Old New-Gate Prison which was "improvised . . . out of certain copper mines at Simsbury. L. Friedman, Crime and Punishment in American History (1993) p. 78. New-Gate was, by all accounts, a horrendous dungeon, a dark cave of horrid gloom. The dripping water trickling like tears from its sides; the unearthly echoes, all conspired to strike an observer aghast with amazement and horror. The prisoners were heavily ironed and secured by fetters; they ate pickled pork for dinner, while working at forges; a piece for each [was] thrown on the floor and left to be washed and boiled in the water used for cooling the iron wrought at the forges. . . . Id." (Internal quotation marks omitted.) *Ross II*, supra, 230 Conn. 294.

127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting). Similarly, after retiring from the bench, Justice Powell revised his thoughts and came to believe that capital punishment should be abolished.[8] Unfortunately, Justice Powell's insight came too late to save Warren McCleskey, for in *McCleskey* v. *Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), five of the nine justices, including Justice Powell, held that the death penalty was constitutional.

Furthermore, I must add that, as judges, we cannot eschew our individual responsibility for the death penalty that the court approves today simply because it is a legislative directive. We have a duty, as the final arbiters of the state constitution, to determine whether the punishment of death meets contemporary and moral standards of decency. If a penalty exceeds those bounds, as I believe the death penalty does, we have a constitutional obligation to declare it unconstitutional, just as we would if the legislature provided for punishment by the rack, the screw or the wheel.

## II

I concluded in *Ross II*, after an examination of several factors,[9] that the death penalty fails to comport with

[8] According to his biographer, four years after his retirement from the United States Supreme Court, Justice Powell stated: "I have come to think that capital punishment should be abolished." J. Jeffries, "A Change of Mind that Came too Late," N.Y. Times, June 23, 1994, p. A23, col. 1; *Ross II*, supra, 230 Conn. 316 (*Berdon, J.*, dissenting).

[9] The factors I considered in *Ross II* to determine whether the death penalty constitutes cruel and unusual punishment under civilized standards are: "(1) whether the punishment is degrading to the dignity of the human being; (2) whether the punishment is acceptable to the public; (3) whether the punishment has, in the past, been administered in an arbitrary and capricious manner; (4) whether the punishment has been imposed in a discriminatory fashion; (5) whether the punishment serves any legitimate purpose; and (6) whether the punishment is so final and complete that error cannot be corrected. Although each of these factors may be considered separately as a standard for determining whether a punishment is cruel and unusual, they are interrelated and should be considered collectively in

contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment. Two of those factors are (1) the death penalty, as imposed, may discriminate against African-Americans; and (2) the penalty is imposed in an arbitrary and capricious manner.

Current statistics suggest that the race of the victim and that of the defendant may affect whether a defendant is sentenced to death. As I explained in *Ross II*, "defendants who are convicted of murdering whites are much more likely to be sentenced to death than those convicted of murdering African-Americans."[10] *Ross II*, supra, 230 Conn. 310 (*Berdon, J.*, dissenting). I also noted that "African-American defendants are more likely to receive the death penalty than white defendants, especially where the victim is white, and poor defendants are more likely to receive the death penalty than defendants generally." Id., 311. These conclusions were based on national statistics gathered by the United States General Accounting Office and other national studies.[11] Since *Ross II*, alarming statistics have been presented to this court that indicate that the death penalty in Connecticut may also be imposed in a racially biased manner. *State* v. *Cobb*, 234 Conn. 735, 768, 663 A.2d 948 (1995).[12] Of course, even if the penalty is imposed in such a manner, there are exceptions. Afflu-

determining whether contemporary standards of human decency and morality prohibit the state from imposing this 'dreadful punishment.'" *Ross II*, supra, 230 Conn. 297–98 (*Berdon, J.*, dissenting).

[10] As of 1995, in Connecticut, 100 percent of the victims of the defendants sentenced to death were white, while, since 1976, 40 percent of the homicide victims in Connecticut have been African-American. *State* v. *Cobb*, 234 Conn. 735, 767, 663 A.2d 948 (1995) (*Berdon, J.*, dissenting).

[11] See generally, S. Bright, "Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty," 35 Santa Clara L. Rev. 433 (1995).

[12] "[T]he defendant cites disturbing preliminary data, the accuracy of which the state does not challenge. First, the data indicates that of all the

ence, which allows a defendant to finance a "dream team" of defense counsel, may counter the effects of race, for it has been said that you simply cannot hang a multimillionaire in America.

In addition to the concern regarding discrimination, the imposition of the death penalty is arbitrary and capricious. As summarized by Justice Thurgood Marshall, "[t]here can be no doubt that the conclusion

defendants who have been charged with capital felony, African-American defendants have been convicted twice as often—and, therefore, have been subjected to the death penalty twice as often—as defendants who are not African-American. In other words, if a defendant who is not African-American is charged with capital felony, there is a 200 percent greater chance that the jury will return a verdict of not guilty on that charge, and therefore not subject him to the death penalty, than if the defendant is African-American.

"Second, the data indicates that the death penalty is more likely to be imposed if the victim of the crime was white or otherwise not African-American. The defendant points to several specific instances:

"(1) Those defendants who murder African-Americans are substantially less likely to be charged with capital felony and, consequently, substantially less likely to be subject to the death penalty, than those defendants who murder persons who are not African-Americans.

"(2) None of the defendants now on death row was sentenced to death for the murder of an African-American, although 40 percent of those persons murdered in this state since 1976 have been African-American.

"(3) Of the twenty-eight cases in which a person was convicted of capital felony, only four, or 14 percent, have involved a victim who was African-American. As indicated previously, however, 40 percent of murder victims since 1976 have been African-American.

"(4) Of the eighteen cases that have proceeded to the 'death penalty phase' hearing, only one, or 5.5 percent, involved a victim who was African-American.

"(5) If the victim was an African-American, those defendants who are accused of kidnapping and murder—two of the specific crimes of which the defendant in this case was convicted—will not be charged with capital felony, and therefore will not be subject to the death penalty.

"(6) Similarly, if the victim was an African-American, those defendants who are accused of sexual assault and murder—also two of the specific crimes of which the defendant in this case was convicted—will very rarely be charged with capital felony, and therefore will very rarely be subject to the death penalty." *State* v. *Cobb*, supra, 234 Conn. 766–68 (*Berdon, J.*, dissenting).

drawn in *McGautha*[13] was properly repudiated in *Furman*,[14] where the [United States Supreme] Court made clear that the arbitrary imposition of the death penalty is forbidden by the Eighth and Fourteenth Amendments. But I believe that the Court in *McGautha* was substantially correct in concluding that the task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system. For this reason, I remain hopeful that even if the Court is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether." *Godfrey* v. *Georgia*, 446 U.S. 420, 442, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980) (Marshall, J., concurring). More recently, Justice Blackmun echoed Justice Marshall's concerns: "It seems that the decision whether a human being should live or die is so inherently subjective—rife with all of life's understandings, experiences, prejudices, and passions—that [the death penalty] inevitably defies the rationality and consistency required by the Constitution." *Callins* v. *Collins*, supra, 510 U.S. 1153 (Blackmun, J., dissenting).[15]

[13] *McGautha* v. *California*, 402 U.S. 183, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971) (defendant's constitutional rights were not infringed by allowing jury to impose death penalty without any governing standards).

[14] *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (standardless death penalty statutes are unconstitutional).

[15] Likewise, I agree with Justice Norcott when he states in his dissent: "I am persuaded that our statutory scheme for its imposition [of the death penalty] cannot withstand constitutional scrutiny because that scheme, by its very nature, admits of an unacceptable opportunity for arbitrariness and the influence of racial discrimination to operate in the determination of who shall die at the hands of the state. A scheme for the imposition of this ultimate punishment that is so infected does not, in my view, comport with contemporary standards of decency."

Connecticut has not been immune from the capricious imposition of the death penalty. Indeed, as I have previously indicated, the prosecutions of Michael Ross, who is currently awaiting a new penalty hearing, "[demonstrate] the inherent arbitrariness of our death penalty. After the defendant had confessed to the murders of six young women in Connecticut, he was charged with capital felony in the judicial district of Windham for two of the murders. The state's attorney in that case, with full knowledge of all of the murders that had been committed by the defendant, allowed him to plead nolo contendere to two counts of first degree murder and to be sentenced to two consecutive terms of life imprisonment (120 years). When the defendant was subsequently prosecuted in the judicial district of New London for the other four murders, a different state's attorney decided to proceed to trial on the capital felony charges and seek the death penalty. As a result, the defendant was convicted and sentenced to death.[16] [Although his death sentence was subsequently set aside on other grounds,] [t]his life-and-death difference between the sentences received by the defendant for identical crimes proves that an unacceptable level of arbitrariness exists due to prosecutorial discretion . . . ." *Ross II*, supra, 230 Conn. 306 (*Berdon, J.*, dissenting). Just recently, the capriciousness of prosecutorial discretion was again demonstrated before this court. The state's attorney who is now prosecuting Ross, while arguing a collateral matter before this court, stated that *he* may decide not to seek the death penalty again: "[The case] could go back. It could be that somehow I've reviewed the file and decided that *I don't want to proceed with a death penalty hearing* on behalf of the state. That, in fact, we will recommend no further hearing, thus recommend life imprisonment." (Empha-

---

[16] In *Ross II*, supra, 230 Conn. 286, this court set aside the imposition of the death penalty and ordered a new penalty hearing.

sis added.)[17] The life or death decision of an aberrant prosecutor is no less capricious than that of a jury.

Racial bias and arbitrariness cannot be tolerated, especially in a process that could result in the termination of an individual's life. Accordingly, it is patently evident that the death penalty fails to satisfy contemporary standards of decency and therefore must be stricken as unconstitutional under the state constitution.

## III

Even if I were to believe that the death penalty did not offend the state constitution, I would, at the very least, order that the universe of cases for statutory proportionality review be expanded. General Statutes § 53a-46b (b), which provides for proportionality review, simply requires that "[t]he supreme court shall affirm the sentence of death unless it determines that . . . (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant."

In defining and applying § 53a-46b (b), statutory proportionality review must first be distinguished from the proportionality review commanded under the eighth amendment of the United States constitution. This distinction was made clear by the United States Supreme Court in *Pulley* v. *Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). The *Pulley* court defined eighth amendment and statutory proportionality review as follows: "Traditionally, [under the eighth amendment] 'proportionality' has been used with reference to an abstract evaluation of the appropriateness of a sentence

[17] In *State* v. *Ross*, 237 Conn. 332, 335–36, 677 A.2d 433 (1996) (*Ross III*), both the defendant and the state petitioned this court to answer certain reserved questions pertaining to the death penalty hearing that this court had ordered. We unanimously declined to do so. Id., 338.

for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime. . . . The proportionality review sought by . . . and provided for in numerous state statutes [referring specifically to Georgia's] is of a different sort. This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional [constitutional] sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." Id., 42–43. As succinctly stated by the New Jersey Supreme Court in *State* v. *Marshall*, 130 N.J. 109, 127, 613 A.2d 1059 (1992): Eighth amendment proportionality review inquires, "does the punishment fit the crime?" See, e.g., *Gregg* v. *State*, 233 Ga. 117, 210 S.E.2d 659 (1974) (death penalty vacated because it is rarely imposed for armed robbery). On the other hand, statutory proportionality review asks whether, in light of how the death penalty has been imposed in the jurisdiction, the "punishment fits the criminal." *State* v. *Marshall*, supra, 129.

The majority narrowly defines the universe of cases eligible for review under § 53a-46b (b) (3) in a manner that is adverse to the rights of defendants and to the achievement of justice. In order for statutory proportionality review to be of any substance, the universe must include all cases involving death eligible homicides. Only in this manner can this court determine whether comparable criminal conduct is receiving comparable penalties. Such a universe would include not only those cases that were prosecuted as capital offenses, but also those cases that are death eligible in

which the prosecutor decided to accept a plea for life imprisonment and those cases in which the prosecutor decided to prosecute the case as a noncapital offense. "Accordingly, one of the purposes served by a universe expanded to include such death-eligible homicides not prosecuted as capital crimes is that the proportionality-review process can then consider *both* jury and prosecutorial decisions about deathworthiness in determining whether a specific death sentence is disproportionate." (Emphasis in original.) Id., 135; see also *Tichnell* v. *State*, 297 Md. 432, 466, 468 A.2d 1 (1983) (proportionality review may take into account noncapital murder cases); *State* v. *Moore*, 210 Neb. 457, 476, 316 N.W.2d 33, cert. denied, 456 U.S. 984, 102 S. Ct. 2260, 72 L. Ed. 2d 864 (1982) (proportionality review includes all other first degree murder convictions); *State* v. *Williams*, 205 Neb. 56, 75, 287 N.W.2d 18 (1979), cert. denied, 449 U.S. 891, 101 S. Ct. 255, 66 L. Ed. 2d 120 (1980) (same); *Commonwealth* v. *Pursell*, 508 Pa. 212, 240–41, 495 A.2d 183 (1985) (proportionality review includes all other first degree murder cases in which evidence could support an aggravating circumstance); *State* v. *Rupe*, 108 Wash. 2d 734, 767, 743 P.2d 210 (1987), cert. denied, 486 U.S. 1061, 108 S. Ct. 2834, 100 L. Ed. 2d 934 (1988) (for purposes of proportionality review, similar cases include cases in which defendants were convicted of first degree murder regardless of whether death penalty was sought); *State* v. *Harris*, 106 Wash. 2d 784, 798–99, 725 P.2d 975 (1986), cert. denied, 480 U.S. 940, 107 S. Ct. 1592, 94 L. Ed. 2d 781 (1987) (proportionality review of death sentence for contract murder included contract murder cases in which death penalty was not sought by prosecutor). Indeed, this standard was partially adopted by this court in *Ross I*, which the court now chooses to reject: "[W]e unanimously agree, in the circumstances of this case, to amend our existing definition of the class of similar cases to add any case in which

a capital felony conviction has been obtained and the conviction was followed not by a hearing on the imposition of the death penalty but by the imposition of a sentence other than death, either by virtue of a plea agreement or by virtue of the fact that the state did not seek the death penalty." *Ross I*, supra, 225 Conn. 561. For these reasons, the court should order an expansion of the universe of cases and rebriefing on the issue of statutory proportionality review.

## IV

I am greatly concerned that the majority of this court continues to evade the issue of whether racism exists with respect to the death penalty. Although this issue is not raised by the defendant, an African-American convicted of killing a white female, under his proportionality challenge, as I have previously stated, the concern of possible systemic racism is a factor that must be considered when deciding whether the death penalty constitutes cruel and unusual punishment, an issue which the defendant does raise.

In *State* v. *Cobb*, supra, 234 Conn. 766–68, I discussed in dissent those alarming statistics relating to Connecticut, to which I have previously referred,[18] which the state did not challenge. Those statistics suggest "that of all the defendants who have been charged with a capital felony, African-American defendants have been convicted twice as often—and, therefore, have been subjected to the death penalty twice as often—as defendants who are not African-American"; id., 766; and "that the death penalty is more likely to be imposed if the victim of the crime was white or otherwise not African-American."[19] Id., 767. I, along with the other

---

[18] See footnote 11.

[19] Paraphrasing and extrapolating from Justice Brennan's dissent in *McCleskey* v. *Kemp*, supra, 481 U.S. 344: At some point during the trial, Daniel Webb and his family surely asked his lawyer whether the jury was

dissenting justices in *Cobb*, implored the prevailing justices to allow the defendant an opportunity to develop the evidentiary underpinnings with respect to the claims that the death penalty is racially biased.[20] If race, either of the defendant or the victim, plays any role in subjecting an individual to this penalty, as the statistics suggest, then the imposition of the death penalty must be stricken as cruel and unusual. At the very least, such a punishment must fail statutory proportionality review.

As long as the question of race remains an issue, there will be a perception that the death penalty is racially imposed, which will pervade the entire judicial system.[21] Furthermore, if it is demonstrated that Afri-

likely to sentence him to death. On the basis of national and local statistics, the lawyer would have had to candidly answer in the affirmative, for the defendant's crime involved the fatal racial combination: an indigent African-American defendant and a white victim.

[20] In *State* v. *Cobb*, supra, 234 Conn. 764–65, the defendant moved "for this court to enlarge the class of cases that we should consider in determining whether his sentence of death was proportionate to the penalty that has been imposed on other defendants in 'similar cases.' By doing so, he argues, he will be able to demonstrate that, in Connecticut, the race of the defendant and the race of the victim impermissibly influence the decision of whether a criminal defendant is sentenced to death. I would grant the defendant's motion." (*Berdon, J.*, dissenting.) Because one justice was disqualified, the panel consisted of six justices, who were equally divided. Consequently, the defendant's motion was denied because a majority of the sitting justices did not vote in favor of granting it. Id., 769–70 n.11.

[21] In 1992, the judicial branch appointed a task force on minority fairness. I take judicial notice of its summarized findings as follows:

"Reality

"This Minority Fairness Task Force report confirms that racial/ethnic bias and discrimination exist in the Connecticut judicial system, in spite of strides taken by the Judicial Branch. Every Task Force subcommittee heard concerns about how the system works to the disadvantage of minorities—whether they be defendants, litigants, family members, or victims. This is not surprising. The courts exist as an integral component of society and inevitably reflect the biases and discriminatory actions of that society. While the Judicial Branch has already responded proactively in a number of ways to some of these concerns, there is more to be done.

"Perception

"Profound differences exist in the way minorities and non-minorities perceive the workings and attitudes of Connecticut's judicial system. In some

can-Americans and other minorities are being subjected to the death penalty because of either their race or the race of the victim, I am confident that the majority today would reconsider their position regarding the constitutionality of the penalty. Therefore, in addition to ordering an expansion of the universe of cases to be considered under proportionality review, the court should stay all proceedings in which there has been a conviction of a capital felony and in which the state seeks to impose the penalty of death, to allow for an evidentiary hearing, in order to give defendants[22] an opportunity collectively to pursue the issue. This court not only has the authority to order such action, but, under § 53a-46b,[23] it has an obligation to do so given the legislature's mandate: "In addition to its authority

---

instances, these perceptions mask the realities of the system's functioning; in others, the perceptions are so endemic that they become, in effect, the reality. While recent Connecticut research studies show that minorities in many instances are being treated more fairly by the criminal justice system than is perceived by defendants and the community at large, these perceptions of unfairness shape the reality of the issues the Judicial Branch must deal with, confront and address." State of Connecticut, Judicial Branch, Task Force on Minority Fairness: Executive Report (April, 1996) p. 11.

[22] In addition to *Cobb*, there is at least one motion pending before this court in which the defendant seeks an opportunity to address this issue: *State* v. *Reynolds*, Supreme Court Docket No. 15258.

[23] General Statutes § 53a-46b provides: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.[24] . . . The supreme court shall affirm the sentence of death unless it determines that . . . [t]he sentence was the product of passion, prejudice or any other arbitrary factor . . . . The sentence review shall be in addition to direct appeal . . . ." The necessary findings required to satisfy § 53a-46b can only be obtained by an evidentiary hearing. Therefore, we should refer this issue to the trial court or to a special master in order to make the necessary factual findings so as to enable us to fulfill our legislative mandate.[25]

---

[21] General Statutes § 53a-35a provides in relevant part: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows . . . (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a."

[25] The majority suggests that the issue of the possible impact of race upon the imposition of the death penalty can be raised by the defendant by way of a writ of habeas corpus. Reliance on the writ is inappropriate for several reasons.

First, the legislature has mandated, regardless of whether a defendant takes an appeal, that this court must review each death sentence to determine whether it "was the product of passion, prejudice or any other arbitrary factor"; General Statutes § 53a-46b (b) (1); and whether "the sentence is excessive or disproportionate to the penalty imposed in similar cases . . . ." General Statutes § 53a-46b (b) (3). The prevailing justices in *Cobb* conceded that the possible relationship between race and the imposition of the death penalty is properly raised under § 53a-46b (b) (1). *State* v. *Cobb*, supra, 234 Conn. 741, 760–62. By enacting § 53a-46b, the legislature clearly intended for *this* court to determine whether the imposition of the death sentence is the product of "prejudice," just as this court is the forum that must determine, under the same statute, whether the penalty of death is "excessive or disproportionate," the latter of which the majority does not question.

Second, a defendant should know at the earliest moment whether he or she will be subject to the death penalty. "[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty . . . [as to when the punishment will be inflicted]." *In re Medley,* 134 U.S. 160, 172, 10 S. Ct. 384, 33 L. Ed. 835

Finally, it bears restating an observation made by the three dissenting justices in *State* v. *Cobb*, supra, 234 Conn. 783 (*Berdon, J.*, dissenting): "Death is irrevocable. It is the ultimate penalty that society can impose and, once imposed, cannot be reversed. This court has an undeniable legal and moral obligation to ascertain whether, as the defendant's data suggests, race is at the core of the imposition of the death penalty in Connecticut. We cannot ignore the specter of racism, but must confront it and eradicate it from the administration of justice."

Accordingly, I dissent.

NORCOTT, J., dissenting. Although I agree with Justice Berdon that Connecticut's death penalty scheme violates the state constitution's prohibition against cruel and unusual punishment, I reach that conclusion by somewhat different reasoning.[1] I do not believe that the penalty of death for certain crimes is necessarily forbidden by the state constitution, but I am persuaded that our statutory scheme for its imposition cannot

---

(1890). Furthermore, because this court should be concerned with the public perception of justice, the issue that systemic racism may exist must be addressed as soon as possible.

Finally, habeas corpus review by a trial court is not a substitute for the review we are required to conduct under § 53a-46b. If the sole avenue left to the defendant to raise this issue is the writ of habeas corpus, this court may never have an opportunity to address this pressing concern. This court has recently restricted the writ of habeas corpus and held that individuals do not have a right to appeal from denial of the writ. *Carpenter* v. *Meachum*, 229 Conn. 193, 202, 640 A.2d 591 (1994). If certification to appeal is denied by the trial court, an individual may only have the merits of his or her writ reviewed if he or she convinces an appellate court that "the habeas court's denial of certification was an abuse of that court's discretion." *Simms* v. *Warden*, 229 Conn. 178, 187, 640 A.2d 601 (1994). Furthermore, even if this court does have the occasion to reach this issue, the standard for relief under habeas may be more onerous. See *Summerville* v. *Warden*, 229 Conn. 397, 419, 641 A.2d 1356 (1994).

[1] I also agree with parts III and IV of Justice Berdon's dissent concerning proportionality review.

withstand constitutional scrutiny because that scheme, by its very nature, admits of an unacceptable opportunity for arbitrariness and the influence of racial discrimination to operate in the determination of who shall die at the hands of the state. A scheme for the imposition of this ultimate punishment that is so infected does not, in my view, comport with contemporary standards of decency. Accordingly, I would vacate the death penalty in this case.

As an initial matter, I have always believed that the death penalty has no place in a civilized society where, ironically, the state, on the one hand, cherishes and reveres the value of life, and then pursuant to the guise of justice, on the other hand, takes it away by virtue of the death penalty. In my view, when the state engages in the exercise of ending life under the justification of punishment, it is treading on ground that is reserved for a different, higher authority.

Of course "[t]he question is not whether any one of us would vote to enact a death penalty if our role were that of a legislator. It is, rather, whether the defendant is correct in his contention that the death penalty [statute] . . . is fundamentally offensive to evolving standards of human decency." *State* v. *Ross*, 230 Conn. 183, 251, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). My conclusion that the death penalty scheme is unconstitutional rests on an operational, rather than a philosophical, ground. I start from the premise that "[t]here is a heightened need for fairness in the administration of death . . . [because] death truly is different from all other punishments a society inflicts upon its citizens." *Callins* v. *Collins*, 510 U.S. 1141, 1149, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994). "Because of the qualitative difference of the death penalty, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (Internal quotation marks omitted.) Id.

Recognizing that the death penalty is unique both in its finality and in the quality of the punishment it inflicts, the United States Supreme Court has invalidated death penalty statutes that lacked either sufficient objective guidance for the sentencer; see *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); or sufficient discretion for the sentencer to afford mercy. See *Woodson* v. *North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (invalidating mandatory death penalty statutes). As Justice Blackmun recently stated, any death penalty scheme must, under the federal constitution, achieve both "[r]easonable consistency . . . [requiring] that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice"; *Callins* v. *Collins*, supra, 510 U.S. 1144; and individual fairness, which "means affording the sentencer the power and discretion to grant mercy in a particular case, and providing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death." Id. In *Ross*, we adopted these principles under the due process clauses of the state constitution. *State* v. *Ross*, supra, 230 Conn. 251–52 (principles articulated by United States Supreme Court "require, as a constitutional minimum, that a death penalty statute, on the one hand, must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably and, on the other hand, must permit the sentencing judge or jury to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular offense").

Justice Blackmun further noted that the way in which legislatures have attempted to satisfy these principles is through "procedural rules and verbal formulas"; *Callins* v. *Collins*, supra, 510 U.S. 1144; designed to "pro-

vide judges and juries with sensible and objective guidelines for determining who should live and who should die." Id., 1148. I agree with Justice Blackmun that the need to achieve both fairness to the individual and consistency has resulted in a "paradox," which requires "sentencer discretion that is at once generously expanded and severely restricted." Id., 1151. Moreover, I am persuaded by his conclusion, reached after twenty years of attempting to fashion workable standards for the imposition of the death penalty, that, despite the laudable efforts of many states, including our own, to strike the optimal balance between discretion and direction, this balance has not and perhaps cannot be reached. "[T]he decision whether a human being should live or die is so inherently subjective—rife with all of life's understandings, experiences, prejudices, and passions—that it inevitably defies the rationality and consistency required by the Constitution." Id., 1153.

Further, I am also convinced that "[t]he arbitrariness inherent in the sentencer's discretion to afford mercy is exacerbated by the problem of race." Id. The United States Supreme Court itself has noted that "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate . . . ." *Turner* v. *Murray*, 476 U.S. 28, 35, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986). I believe that racial prejudice is, and will remain in the foreseeable future, the prevalent unresolved and divisive issue in this country. The specter of racial discrimination touches every facet of our lives and the statutory scheme for the imposition of the death penalty does not escape its pervasive evil. Every indication from the available evidence suggests that "race and poverty continue to determine who dies." S. Bright, "Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty," 35 Santa

Clara L. Rev. 433, 434 (1995);[2] *Callins* v. *Collins*, supra, 510 U.S. 1153 ("[e]ven under the most sophisticated death penalty statutes, race continues to play a major role in determining who shall live and who shall die"); see *McCleskey* v. *Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). "No matter how narrowly the pool of death-eligible defendants is drawn according to objective standards, *Furman*'s promise still will go unfulfilled so long as the sentencer is free to exercise unbridled discretion within the smaller group and thereby to discriminate. The power to be lenient also is the power to discriminate." *Callins* v. *Collins*, supra, 1153.

My review of the Connecticut death penalty scheme does not convince me that it is adequate to cure the influence of arbitrariness and race in the overall equation that results in the imposition of death. Given the history of racism and racial discrimination in this country, I am not convinced that there can ever be a scheme in any state that can reach so lofty a perch. I agree with Justice Blackmun that the continual legislative and judicial efforts to bring about a real sense of fairness in the imposition of the death penalty are delusional endeavors. See id., 1155. As long as racial prejudice is a factor in our lives, and it is an undeniable factor in every facet of American life, there can be no place for a capital penalty in our society.

I respectfully dissent.

---

[2] In its mid-1995 annual report, the NAACP Legal Defense and Education Fund, Inc., reported that of the 3028 persons under the sentence of death in this country, more than one half were African-American, Latino, Native American or Asian; in 82 percent of the cases in which executions have been carried out, the victims of the underlying crimes were white. NAACP Legal Defense and Education Fund, Inc., "Death Row U.S.A." (Summer 1995) p. 1.